## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 16-cv-02304

MEGAN MCFADDEN,
LONNIE WHITE, and
ANTONIO "A.J." WHITE,

       Plaintiffs,

v.

MEEKER HOUSING AUTHORITY[1], a Property Management Company,
MELINDA PARKER, an individual,
MICHELLE BUCKLER, an individual,
EDY GEORGE, an individual,
ROBERT BARR, an individual, and,
STACIE KINCHER, an individual,

       Defendants.

_____

## COMPLAINT AND JURY DEMAND
_____

      Plaintiffs Megan McFadden ("Megan"), Lonnie White ("Lonnie") and Antonio

"A.J." White ("A.J.") (collectively referred to as "Plaintiffs"), by and through counsel

Siddhartha H. Rathod, Matthew J. Cron, and Laura B. Wolf of RATHOD ǀ MOHAMEDBHAI

---

[1] The Meeker Housing Authority is listed as the name of the property company that runs the Meeker Family and Elderly Housing facility at 980 Karen Court, Meeker, CO 81641, also referred to as Karen Court.  *See* U.S. DEP'T OF HOUS. AND URBAN DEV., COLORADO AFFORDABLE HOUSING GUIDE 20, *available at* http://portal.hud.gov/hudportal/documents/huddoc?id=COAffordableHsgGuide.pdf.  Despite being a business within Colorado, Meeker Housing Authority is listed as an expired trade name on the Colorado Secretary of State website.  No registered agent is linked to the Meeker Housing Authority, and according to the Colorado Secretary of State website, no current entities are registered with the names Meeker Family and Elderly Housing or Karen Court.  Meanwhile, the Meeker Housing Authority continues to do business with the U.S. Department of Housing and Urban Development, *see id.*, while appearing not to be authorized to do business within the state of Colorado.

LLC, bring the following Complaint and Jury Demand against Meeker Housing Authority ("MHA" or "Defendant MHA"), Melinda Parker ("Ms. Parker" or "Defendant Parker"), Michelle Buckler ("Ms. Buckler" or "Defendant Buckler"), Edy George ("Ms. George" or "Defendant George"), Robert Barr ("Mr. Barr" or "Defendant Barr"), and Stacie Kincher ("Ms. Kincher" or "Defendant Kincher") (collectively referred to as "Defendants") and in support state as follows:

## I.   INTRODUCTION

1.      This is an action under the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601, *et seq.*, as amended, and § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("§ 504").

2.      In 1973, Congress passed § 504 of the Rehabilitation Act, the first statute providing federal civil rights protections for people with disabilities.

3.      Section 504 prohibits discrimination based on handicap in all programs receiving federal financial assistance, including housing complexes.  *See generally* 42 U.S.C. § 794(a); *Hwang v. Kansas State Univ.*, 753 F.3d 1159, 1161 (10th Cir. 2014).

4.      In response to a history of and continuing national discrimination against individuals with disabilities, Congress enacted amendments to the FHA in 1988.  The purpose of the FHA Amendments was to prohibit discrimination in the national housing market for individuals with disabilities.[2]

5.      "The Fair Housing Amendments Act . . . is a clear pronouncement of a national commitment to end the unnecessary exclusion of persons with handicaps from

---

[2] The FHA uses the term "handicap," *see, e.g.*, 42 U.S.C. § 3602(h), which has the same meaning as disability.  Plaintiffs use the term disabled interchangeably with handicapped.

the American mainstream.  It repudiates the use of stereotypes and ignorance, and mandates that persons with handicaps be considered as individuals.  Generalized perceptions about disabilities and unfounded speculation about threats to safety are specifically rejected as grounds to justify exclusion."  H.R. Rep. No. 100-711, at 18 (1988), reprinted in 1988 U.S.C.C.A.N 23173, 2179.

6.     Expanding on the previously enacted FHA, which prohibited discrimination in housing based on race, color, religion, and national origin, the FHA, as amended, responded to a recognized prejudice against those with disabilities and illnesses.[3]

7.     Plaintiffs Lonnie White, A.J. White, and Megan McFadden are the types of individuals Congress sought to protect under § 504 and the FHA amendments.  A.J. and Megan each have a disability and use companion animals, with the recommendation of their health professionals, to assist with disability-related needs. Lonnie, A.J.'s father, lives with and cares for his son, a person who has a disability and uses companion animals to assist with disability-related needs.

8.     A.J. has a history of suffering from severe depression and Attention Deficit/Hyperactivity Disorder ("ADHD").  A.J.'s depression and ADHD substantially limit major life activities such as his ability to care for himself, concentrate, remember, interact with others, and cope with stress.  A.J. relies on his companion cats Genki and Haim to manage his disabilities, per the recommendation of his mental health professional.

9.     Megan suffers from chronic depression and anxiety.  Megan's disabilities substantially limit her ability to care for herself, complete daily tasks, interact with others,

---

[3] The Fair Housing Act as amended, is sometimes referred to as FHAA.  For ease of reference, Plaintiffs refer to it as "FHA."

cope with stress, and sleep. Megan relies on her companion dog Chewy to manage her disability, per the recommendations of her mental health professional and medical doctor.

10. Defendants own and manage Meeker Family and Elderly Housing located at 980 Karen Court, Meeker, Colorado 81641 (referred to as "Karen Court"). Karen Court, through Defendant MHA, is financially subsidized by the U.S. Department of Housing and Urban Development ("HUD") through HUD's Project Based Section 8 Subsidy Program. *See generally* U.S. DEP'T HOUS. & URBAN DEV., U.S. COLORADO AFFORDABLE HOUSING GUIDE, *available at* http://portal.hud.gov/hudportal/documents/huddoc?id=COAffordableHsgGuide.pdf. Through this program, tenants pay a significantly reduced rent based on their income. At all times giving rise to this action, Plaintiffs lived in Karen Court and received subsidized housing based on their low incomes.

11. Prior to June 16, 2016, Plaintiffs were permitted to keep pets in their units upon providing documentation showing that their companion animals assisted them. On June 16, 2016, Defendants revised their pet policy to render it a "no-pet policy" and, in direct contravention of federal civil rights law, began insisting that Plaintiffs pay a $300.00 non-refundable pet fee for each companion animal and provide a letter from a medical doctor, as opposed to a mental health professional, outlining their need for companion animals.

12. Plaintiffs made repeated requests for the reasonable accommodation that the no-pet policy and pet fee be waived, while also providing multiple letters written by mental health professionals explaining that Plaintiffs are disabled and recommending

the continued use of companion animals for their disabilities.  Defendants disregarded these letters and denied Plaintiffs' requests for reasonable accommodations.  In retaliation for having made requests for reasonable accommodation, Defendants began a campaign of citing Plaintiffs for keeping their companion animals in violation of Defendants' new no-pet policy.  Defendants then served Plaintiffs with 30-Day Notices to Vacate, forcing them to look for housing elsewhere that they could not afford.  In so acting, Defendants violated Plaintiffs' federal civil rights under the FHA and § 504.

## II.    JURISDICTION, VENUE, AND PARTIES

13.    Subject matter jurisdiction of this Court is proper pursuant to 28 U.S.C. §§ 1331, 1343, and 42 U.S.C. §§ 3612-13.

14.    Jurisdiction supporting Plaintiffs' claims for actual and punitive damages is conferred by 42 U.S.C. § 3613(c)(1).  Jurisdiction supporting Plaintiffs' claims for attorneys' fees and costs is conferred by 42 U.S.C. § 3613(c)(2).  This action is authorized and instituted pursuant to the FHA, 42 U.S.C. §§ 3601, *et seq.*, as amended, and § 504 of the Rehabilitation Act, 29 U.S.C. § 794.

15.    Venue is proper within this District under 28 U.S.C. § 1391(b).  All of the events alleged herein occurred within the jurisdiction of the United States District Court of Colorado, Defendant MHA's business is in this District, and all of the individual parties were residents of the State of Colorado and citizens of the United States at the time of the events giving rise to this litigation.

16.    Plaintiff Megan McFadden is a citizen of the United States and resident of and domiciled in the State of Colorado.

17.     Plaintiff Lonnie White is a citizen of the United States and resident of and domiciled in the State of Colorado.

18.     Plaintiff A.J. White is a citizen of the United States and a resident of and domiciled in the State of Colorado.

19.     Defendant Meeker Housing Authority[4] owns and manages Meeker Family and Elderly Housing, located at 980 Karen Court, Meeker, CO 81641, which is referred to as Karen Court (hereinafter "Karen Court").[5]  Karen Court is an apartment complex consisting of federally subsidized apartments where Plaintiffs resided at the time of the events giving rise to this action.

20.     Defendant MHA is a "person" as that term is used and defined in the FHA, 42 U.S.C. § 3602(d).

21.     Defendant MHA is a recipient of federal financial assistance from the U.S. Department of Housing and Urban Development ("HUD") and is therefore an entity with capacity to be sued under § 504.

22.     Defendant Melinda Parker was, at all relevant times, a Board Member of Defendant MHA, a citizen of the United States, and a resident of the State of Colorado. In her role as Board Member, Defendant Parker is responsible for adopting and implementing policies for Defendant MHA.

23.     Defendant Michelle Buckler was, at all relevant times, a Board Member of Defendant MHA, a citizen of the United States, and a resident of the State of Colorado.

---

[4] Because Meeker Housing Authority has allows its registration to lapse with the Colorado Secretary of State, it is unknown what type of entity it is and if it has a mailing address separate from that of Karen Court.  *See supra* note 1.

[5] Throughout this complaint, all references to Karen Court are to be considered interchangeable with references to Defendant MHA.

In her role as Board Member, Defendant Buckler is responsible for adopting and implementing policies for Defendant MHA.

24.     Defendant Edy George was, at all relevant times, a Board Member of Defendant MHA, a citizen of the United States, and a resident of the State of Colorado. In her role as Board Member, Defendant George is responsible for adopting and implementing policies for Defendant MHA.

25.     Defendant Robert Barr was, at all relevant times, a Board Member of Defendant MHA, a citizen of the United States, and a resident of the State of Colorado. In his role as Board Member, Defendant Barr is responsible for adopting and implementing policies for Defendant MHA.

26.     Defendant Stacie Kincher was, at all relevant times, the Property Director of Defendant MHA, a citizen of the United States, and a resident of the State of Colorado.  In her role as Property Director, Defendant Kincher is responsible for enforcing policies for Defendant MHA.

## II.      FACTUAL ALLEGATIONS

### A. Plaintiffs Lonnie and A.J. White

### A.J. White Suffers from a Disability and His Companion Cats Help Manage His Disability



*A.J. and his companion cats Genki.*

27.      A.J. is twenty years old and lives with his father Lonnie.

28.      A.J. is a person with (1) a "handicap" as that term is defined in the FHA, 42 U.S.C § 3602(h), (2) a "disability" as that term is used in § 504, and (3) a "handicap" as defined in regulation implementing § 504, 24 C.F.R. § 8.3.

29.      Prior to living with his father, A.J. lived with his mother and stepfather in Florida.

30.      A.J. was verbally and physically abused by his stepfather.  During this time, A.J. became withdrawn and suicidal, struggling socially and at school.

31.      Mental health professionals at Sun Coast Mental Health in Vero Beach, Florida diagnosed A.J. with severe depression and prescribed medication.  It was the emotional support of his cat Genki, however, that provided A.J. the most relief.

32.      In January 2014, at the age of seventeen, A.J. moved to Colorado to live with his father Lonnie.

8

33.     In moving to Colorado, A.J. had trouble adjusting without the comfort and relief provided by Genki, who remained in Florida.  He again became withdrawn and suicidal, struggled to focus in school, and found himself having a hard time focusing.

34.     A.J.'s new mental health team at Mind Springs Health in Meeker, Colorado diagnosed A.J. with Attention Deficit/Hyperactivity Disorder ("ADHD") and put him on medication.

35.     A.J.'s ADHD and depression substantially limit major life activities, including his ability to care for himself, work, concentrate, remember, interact with others, and cope with stress.

36.     ADHD and depression are disabilities under the FHA and § 504.

37.     Finding that the medications he was prescribed made him feel worse, and desperate for relief, A.J. asked his dad if Genki could come live with them.

**Lonnie and A.J. White Move into Karen Court and Notify Defendants that They
Intended to Get a Cat for A.J.'s Disability-Related Needs**



*A.J. and his companion cats Genki and Haim.*

38.     In February 2014, Lonnie and A.J. White moved in to a subsidized
apartment at Karen Court.

39.     Rent at Karen Court is based on income, as the landlord receives
subsidies from the federal government through HUD to make up the difference between
the reduced rent and market value.

40.     Based on his low income, Lonnie pays rent in the amount of $125.00 per
month.

41.     Karen Court is governed by the rules and policies promulgated by
Defendants.

42.     Upon moving in, Lonnie informed then-director Karen Garcia that A.J. had
a disability and would require the assistance of a cat.

43.     At the time of Ms. Garcia's and Lonnie's communication regarding the cat,

Defendants had in a place a pet policy that allowed for tenants to keep animals that provided a documented assistance.

44. In February 2014, Defendant MHA's pet policy read, in pertinent part, as follows:

> Absolutely no pets are allowed at Karen Court with the one exception to the rule being: where such animal assists a tenant or family member, and documentation for such assistance has been obtained by third party verification from a reputable source, by the Director.

45. Ms. Garcia informed Lonnie that a cat would be permitted subject to Lonnie's providing a letter from A.J.'s mental health professional explaining that A.J. needed the cat for emotional support.

46. When Lonnie and A.J. first moved into their apartment, a number of other tenants at Karen Court owned and maintained pets on the premises.

47. After determining that it would take some time to get Genki from Florida, and given A.J.'s need for an emotional support animal to assist with A.J.'s disability, Lonnie and A.J. acquired another emotional support cat, Haim.

48. When Genki was able to join Lonnie and A.J. in Colorado, Ms. Garcia reiterated that the cats would be fine as long as they had a letter documenting that the cats provided disability-related assistance.

49. On January 22, 2015, Lonnie and A.J. acquired a letter from Catherine E. Eliasen, a licensed clinical social worker, which stated that A.J. had a disability and that having cats in his home helps him manage the symptoms of his disability.

50. Lonnie and A.J. provided a copy of this letter to Ms. Garcia.

51. Ms. Garcia placed a copy of this letter into Lonnie and A.J.'s file, which is kept by Defendants.

52.     Genki and Haim provide A.J. with a routine and responsibilities, which help him manage his ADHD.  The cats wake A.J. up every morning and it is then his responsibility to feed them and change their litter box.

53.     Staying regimented and scheduled by way of taking care of his cats has helped A.J. manage his ADHD without medication.

54.     In addition to the structure Genki and Haim provide, the soothing, calming affection and mutual reliance between A.J. and the cats help alleviate many of the negative consequences of A.J.'s depression.  The cats give A.J. a reason to get out of bed and confidence in his ability to take care of them.

55.     Lonnie has found that after a particularly stressful or emotional day for A.J., A.J. will only communicate with Lonnie after spending time alone with his companion cats.

56.     Lonnie and A.J. lived at Karen Court with Genki and Haim without complaint or issue for nearly two and a half years.

**Defendants Unlawfully Changed their Pet Policy, Demanding a Doctor's Note and $300.00 Non-Refundable Fee for A.J.'s Companion Cats**

57.     On June 16, 2016, Defendants revised their pet policy to a "no-pet" policy.

58.     The June 16, 2016 no-pet policy states, in pertinent part, that companion animals must meet the guidelines set by the Board of Directors of MHA, which includes the new requirement that a tenant provide a letter from a medical doctor concerning the need for a companion animal.

59.     The no-pet policy explicitly states that MHA will not accept letters concerning the need for a companion animal from a psychologist, psychotherapist, or therapist.

60.     A Joint Statement issued by HUD and the Department of Justice ("DOJ") on May 17, 2004 regarding the FHA provides that, "[a] doctor or other medical professional, a peer support group, a non-medical service agency, or a reliable third party who is in a position to know about the individual's disability may also provide verification of a disability."  Joint Statement of the Dep't of Hous. and Urban Dev. and the Dep't of Justice, Reasonable Accommodations under the Fair Housing Act, 13-14 (May 17, 2004), available at http://www.hud.gov/offices/fheo/library/huddojstatement.pdf [hereinafter *Joint Statement on Reasonable Accommodations*].

61.     Defendants' refusal to accept letters from reliable sources other than a medical doctor unlawfully limits Lonnie's and A.J.'s ability to provide documentation of A.J.'s disability-related needs for an assistance animal, in contravention of federal law and agency guidance.

62.     The June 2016 no-pet policy revision also required tenants to pay a non-refundable pet fee of $300.00 for each pet.

63.     Pursuant to the May 17, 2004 Joint Statement issued by HUD and DOJ, "The housing provider may not require the applicant to pay a fee or a security deposit as a condition of allowing the applicant to keep the assistance animal."  *Joint Statement on Reasonable Accommodations* at 9.

64.     Defendants' demand that individuals with disabilities pay a fee as a condition of keeping their companion animals is unlawful and discriminatory.

65.     On July 12, 2016, Lonnie received a notice of violation and infraction for having a pet in his apartment.

66.     Lonnie was told that he had until the end of the month to pay the fee.

67.     At $300.00 per animal, Lonnie was facing a $600.00 fee to keep Genki and Haim.  For Lonnie, who pays $125 per month in rent based on his income, $600.00 is nearly five months of rent.

68.     On July 20, 2016, Lonnie went to the Board of Directors meeting to request a reasonable accommodation for A.J.'s companion cats.

69.     Lonnie explicitly requested that Defendants waive the no-pet policy and pet fees in order for A.J. to keep his two companion cats in the unit.

70.     Lonnie provided Defendants with a copy of the January 2015 letter from A.J.'s licensed clinical social worker indicating that A.J. was disabled and that his two companion cats assist with his disability-related needs.

71.     Lonnie also asked if he could pay the pet fee in a way that was more financially manageable for him, such as by paying an additional $50 with his rent each month, despite the fact that federal law dictates that disabled individuals be permitted to live with their companion animals without charge.

72.     In response to these requests, Defendant Parker questioned how Lonnie could afford to keep pets when he was living in low-income housing.

73.     Pursuant to an April 24, 2013 HUD Notice, housing providers are permitted to ask only for "reliable documentation of a disability and their disability-related need for an assistance animal."  U.S. DEP'T OF HOUS. AND URBAN DEV., SERVICE ANIMALS AND ASSISTANCE ANIMALS FOR PEOPLE WITH DISABILITIES IN HOUSING AND HUD-FUNDED PROGRAMS 3 (April 25, 2013), *available at* https://portal.hud.gov/hudportal/documents/huddoc?id=servanimals_ntcfheo2013-01.pdf [hereinafter *HUD Service and Assistance Animals Report*].

74.     Defendant Parker's question about Lonnie's financial capability is outside the scope of what housing providers are permitted to ask and was intended to harass and embarrass Lonnie in retaliation for his having sought a reasonable accommodation for his son's disability.

75.     On July 21, 2016, the day after the board meeting, Defendant Kincher sent Lonnie a letter denying his request for reasonable accommodation which read, in pertinent part:

> After considerable consideration, the MHA board of directors, [*sic*] made its decision to keep the zero pet policy enforced at Karen Court.  It was also agreed upon that there will be a $300 non-refundable deposit for each pet that qualifies for being a certified therapeutic pet through the state of Colorado.  The only exception to this rule would be a true "service" animal.

76.     While the DOJ amended its regulations for Titles II and III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, *et seq.*, to exclude emotional support animals from the definition of "service animal," the April 24, 2013 HUD Notice explicitly outlines that, "this definition does not limit providers' obligations to make reasonable accommodations for assistance animals under the FHA or § 504." *HUD Service and Assistance Animals Report* at 1.

77.     On July 22, 2016, Defendants sent Lonnie a notice of violation and infraction for having a pet in his apartment.

78.     On July 27, 2016, Defendants again revised the MHA pet policy.

79.     The July 27, 2016 pet policy revision mandates, among other things, that all residents who are eligible to keep a companion animal must:

- Demonstrate that they have the physical and financial capability to care for the companion animal;

15

- Provide a letter from a licensed psychiatrist attesting to the need for a companion animal; and

- Provide evidence of a nexus between the companion animal and the debility attested to by the licensed professional.

80.    Defendants' July 27, 2016 pet policy was issued for the purposes of discriminating and retaliating against Lonnie and A.J. for having made their requests for reasonable accommodation.

81.    The July 27, 2016 no-pet policy requirements far exceed the scope of what housing providers are permitted to request pursuant to HUD and DOJ guidance.

82.    In the July 27, 2016 no-pet policy revision, Defendants also set forth rules for residents with companion animals, including:

- One (1) companion animal maximum per household

- Residents shall not permit their companion animal to disturb, interfere, or diminish the peaceful enjoyment of other residents including but not limited to growling, barking, howling, and chirping.

- If companion animals are left unattended for a period of twelve hours or more, the MHA may enter the dwelling unit and remove the companion animal.

- Damages caused by a companion animal will be withheld from a required $300.00 non-refundable security deposit.

83.    Defendants' limitations on companion animals are not reasonable and instead violate federal law.

84.    Defendants' decision to place a limit on companion animals to one per unit

is a form of discrimination and retaliation directed against Lonnie and A.J.

85.     The July 27, 2016 no-pet policy revision also states, "The privilege of maintaining a companion animal in a facility owned/operated by the Meeker Housing Authority shall be subject to the rules set forth above.  This privilege may be revoked at any time, subject to the Meeker Housing Authority Board of Directors . . . ."

86.     A companion animal is not a privilege but a federally protected right.

87.     On August 5, 2016, Defendants sent Lonnie a 10-day notice of violation and infraction for having a pet in his apartment.

88.     On August 12, 2016, Defendant Kincher asked Lonnie for proof of income despite the fact that Lonnie was not scheduled to have his income reassessed until November.

89.     Defendant Kincher's request was motivated by Defendants' desire to harass and intimidate Lonnie in retaliation for his having asserted his federal rights and in discrimination of his son's need for companion animals.

**Defendants Served Plaintiff Lonnie White with Notice of Eviction in Violation of Federal Law**

90.     On August 16, 2016, Defendants sent Lonnie a 30-Day Notice to Vacate.

91.     The August 16, 2016 Notice to Vacate listed the following reason:

> Pet policy violation and you no longer qualify due to the age of your son and he has graduated school.  Also you have not reported your income to the Housing Authority.

92.     The August 16, 2016 Notice to Vacate was the first written notice regarding issues of income that Lonnie received and came just three business days after Defendant Kincher first asked for the information, which was not due until November 2016.

93.     On August 17, 2016, Lonnie acquired a second letter from Catherine Eliasen, M.S.W, A.J.'s licensed clinical social worker.

94.     The August 17, 2016 letter states that A.J. is diagnosed with ADHD, that he has increased difficulty coping with stress and can become depressed, and that it is helpful for A.J. to have his cats in his home to manage these symptoms.

95.     In the August 17, 2016 letter, Ms. Eliasen also indicates that A.J. has been able to manage his disabilities without medication due to the responsibility of caring for his cats and the calming affection they provide.

96.     Ms. Eliasen's letter further posits that having the care of his cats is much less expensive and certainly has less likelihood of negative side effects than medications.

97.     Detailed and extensive information or documentation of impairments is not required from disabled tenants seeking reasonable accommodations.  *See Joint Statement on Reasonable Accommodations* at 13-14.

98.     On August 27, 2016, Lonnie sent Defendant Kincher an email message with A.J.'s disability letters attached, asking that she reconsider his eviction and assuring her that he was getting his income information together.

99.     On August 29, 2016, Defendant Kincher responded to Lonnie by email summarily denying Lonnie's request for reconsideration of eviction.

100.    In the August 29, 2016 email, Defendant Kincher disregarded A.J.'s therapist letter, stating that Defendants require a letter from a medical doctor.

101.    The August 29, 2016 email from Defendant Kincher also indicated that Lonnie had violated his lease by not claiming Supplemental Security Income from A.J.

in his income information.

102.    A.J. does not receive Supplemental Security Income.

103.    Defendant Kincher concludes the August 29, 2016 letter by stating, "[T]his has nothing to do with your pets."

104.    While the August 29, 2016 letter states that "this has nothing to do with your pets," Defendants cited Lonnie numerous times for violating the no-pet policy and listed pet violations as one of the reasons for his receiving a 30-Day Notice to Vacate.

105.    The 30-Day Notice to Vacate indicates that Lonnie and A.J. White will be forced to vacate by September 15, 2016.

106.    Defendants' actions have caused and continue to cause Lonnie and A.J. extreme anxiety, humiliation, and emotional distress.

107.    Due to Defendants' unlawful actions, Lonnie has been forced to apply for and place a deposit on an apartment that he cannot afford.

108.    If evicted, Lonnie may not be able to find another affordable home for he and A.J. to live in.

### B. Plaintiff McFadden

**Plaintiff Megan McFadden Suffers from a Disability and Her Companion Dog Chewy Helps Her to Manage Her Disability**

 

*Megan and Chewy*

109.    Megan is a mother of two children, an eight-year-old daughter and a three-year-old son.

110.    Megan is a person with (1) a "handicap" as that term is defined in the FHA, 42 U.S.C. 3602(h), (2) a "disability" as that term is used in § 504; and (3) a "handicap" as defined in regulation implementing § 504, 24 C.F.R. § 8.3.

111.    Megan has a history of anxiety and depression for which she has been diagnosed and prescribed medication.

112.    Megan's anxiety and depression stem largely from trauma and abuse suffered when she was younger.

113.    Megan's anxiety and depression cause her to suffer severe panic attacks.

114.    Megan also experiences suicidal ideation as a symptom of her anxiety and depression.

115.    Megan's anxiety and depression as well as the resulting panic attacks and suicidal ideation substantially limit her ability to sleep, care for herself, complete daily tasks, work, interact with others, and cope with stress.

116.    In December 2015, Megan moved into a subsidized apartment at Karen Court where, because of her low income, she does not pay rent.

117.    In February 2016, Megan met her dog Chewy while visiting a friend.

118.    Megan's friend was looking for a home for Chewy and offered Megan the opportunity to take care of Chewy.

119.    Megan found that Chewy's companionship and calming presence improved her ability to cope with stress and mitigated her feelings of anxiety and depression.

120.    When Megan is overwhelmed with feelings of fear, anxiety, and depression, petting Chewy helps calm her.

121.    Under the belief that she could not have a pet at Karen Court, Megan had Chewy live with family members offsite.

122.    In or around February 2016, Megan asked then-director Karen Garcia if Chewy could come to her apartment for visits.  Ms. Garcia agreed that such visits would be fine.

123.    Megan arranged for Chewy to visit the apartment three times per week.

124.    These regular visits took place without complaint or incident.

125.    At some point thereafter, Chewy began to live with Megan full-time.

126.    Megan lived at Karen Court with Chewy without complaint or issue.

### Defendants Demanded a Doctor's Note and $300.00 Non-Refundable Fee for Megan to Keep Chewy

127.    Pursuant to the June 16, 2016 no-pet policy, Defendants demanded that Megan pay a $300.00 non-refundable pet deposit and provide a letter from a medical doctor in order to keep having her companion animal visit her apartment.

128.    Ms. McFadden suffered a panic attack when Defendant Kincher informed her that Chewy would no longer be permitted to visit.

129.    On July 12, 2016, Megan acquired a letter from her licensed clinical social worker, Catherine Eliasen, MSW, explaining that Megan has a disability and that it is helpful for her to have Chewy in her home in order to manage her disability.

130.    Upon providing this letter to Defendants, Defendants notified Megan that they would not accept letters in support of permitting a pet on the premises from any source other than a medical doctor.

131.    On July 22, 2016, Megan acquired a letter from Dr. A. Michael Vargas, M.D., documenting that Megan was a patient of his and suffers from chronic depression and anxiety.

132.    Dr. Vargas's letter states that Megan has shown great improvement with the use of her companion dog in her home and recommends that Megan continue to use her companion dog for emotional support to manage her depression and anxiety and to mitigate suicidal ideations.

133.    On the same day, July 22, 2016, Defendants sent Megan two Notices of Violation and Infraction for having a pet in her apartment at Karen Court.

134.    On July 25, 2016, Megan went to Defendant Kincher to request a reasonable accommodation, specifically that the no-pet policy and pet fee be waived for her companion animal.

135.    During this meeting, Megan provided Defendant Kincher with the letters from Dr. Vargas and Ms. Eliasen, MSW.

**Defendants Ignored Megan's Doctors Letters, Denied Her Reasonable Accommodation Request, and Ordered Her to Vacate**

136.    On July 27, 2016, Defendants sent Megan a 30-Day Notice to Vacate, citing in support her violations of the no-pet policy.

137.    July 27, 2016 is the same day that Defendants revised their pet policy for a second time.

138.    On August 5, 2016, Megan sent Defendant Kincher an email message expressing her surprise that she had received a 30-Day Notice to Vacate after having requested a reasonable accommodation complete with a doctor's note.  In this email, Megan again asked Defendant Kincher to grant her a reasonable accommodation.

139.    Defendant Kincher denied Megan's request for a reasonable accommodation and noted that Defendant MHA never received any information regarding a companion animal until two notices were given.

140.    Pursuant to the May 17, 2004 Joint Statement issued by HUD and DOJ, "[T]he Fair Housing Act does not require that a request be made in a particular manner or at a particular time."  *See Joint Statement on Reasonable Accommodations* at 10.

141.    After reiterating her request for a reasonable accommodation and resending Dr. Vargas's and Ms. Eliasen's letters, Defendant Kincher again denied Megan's request for a reasonable accommodation on August 22, 2016, claiming without

support that HUD allows local public housing authorities to set their own pet regulations and charge nominal pet deposits.

142.    On August 24, 2016, Megan sent an email to Defendant Kincher expressing her fear that she would be homeless with children and requested again that she be allowed to stay with her dog or at least be given an extension.

143.    Defendants responded to Megan that an extension would only be conditioned on Chewy's removal from the unit.

144.    Unable to part with Chewy due to her medical needs, and in a constant state of anxiety and fear of harassment, Megan and her children were forced to vacate their home.

145.    As a result of the sudden upheaval and resulting uncertainty caused by Defendants' actions, Megan's eight-year-old daughter was forced to move in with her grandmother so that she could stay enrolled in her school, leaving Megan with limited access to her daughter and leaving her daughter with limited access to both her mother and her brother.

146.    Defendants' actions have caused Ms. McFadden and her children to suffer significant emotional distress and financial harm, amongst other injuries.

## III.    STATEMENT OF CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Federal Fair Housing Act, as amended, 42 U.S.C. §§ 3601, *et seq.*
### Discrimination
(All Plaintiffs Against All Defendants)

147.    Plaintiffs hereby incorporate all of the paragraphs of this Complaint as if fully set forth herein.

148.    Plaintiffs are "aggrieved person[s]" as defined in 42 U.S.C. § 3602(i) and suffered injuries as a result of Defendants' discriminatory actions and conduct.

149.    Plaintiff A.J. White's depression and ADHD are impairments that substantially limit one or more major life activities.

150.    Plaintiff Megan McFadden's anxiety and depression are impairments that substantially limit one or more major life activities.

151.    Plaintiffs A.J. and Megan are "handicapped" as defined in 42 U.S.C. § 3602(h), and this statutory term as used in this Complaint has the same meaning as "disabled."

152.    Plaintiff Lonnie White lives with and cares for A.J.

153.    Lonnie is the leaseholder for the unit in which A.J. lives.

154.    Plaintiffs requested reasonable accommodations from Defendants in response to Defendants' pet policies when each Plaintiff provided letters from mental health professionals indicating that they had a disability-related need for companion animals to stay in their apartment.

155.    Such a reasonable accommodation – an exemption from the no-pet policy and pet deposit – was necessary to afford Plaintiffs equal opportunity to use and enjoy their dwellings.

156.    The proposed accommodations would not have imposed and did not impose an undue financial or administrative burden on Defendants and did not require a fundamental alteration in the nature of Defendants' programs.  This is evidenced by the fact that until June 16, 2016, Defendants had permitted pets in units without suffering an undue financial or administrative burden.

157.    Waiver of Defendants' no-pet policy and pet deposit would have been a reasonable accommodation.

158.    Defendants, directly or through their agents, discriminated against Plaintiffs on the basis of disability through their conduct and acts, *inter alia*, as follows:

a. By failing to accept reliable and HUD- and DOJ-authorized documentation of Plaintiffs' disabilities and disability-related need for companion animals;

b. By demanding that Plaintiffs pay a fee as a condition of receiving a reasonable accommodation;

c. By demanding the immediate removal of Plaintiffs' companion animals;

d. By issuing Notices of Violation and Infraction to Plaintiffs for their keeping companion animals in their homes; and

e. By issuing Plaintiffs 30-Day Notices to Vacate;

159.    Defendants' unlawful conduct and acts deprived Plaintiffs of the equal opportunity to use and enjoy their dwelling at Karen Court.

160.    As a result of Defendants' discriminatory conduct, Plaintiffs have suffered significant injuries, damages, and losses.

## SECOND CLAIM FOR RELIEF
### 42 U.S.C. § 3617
### Retaliation
(All Plaintiffs Against All Defendants)

161.    Plaintiffs incorporate all of the paragraphs of this Complaint as if fully set forth herein.

162.    Plaintiffs engaged in conduct and speech in opposition to Defendants' discriminatory housing practices by exercising their rights afforded by federal fair housing laws.

163.    Plaintiffs requested reasonable accommodations because they reasonably believed that Defendants' refusal to accommodate their disabilities and disability-related needs was in violation of the FHA.

164.    Defendants, directly or through their agents, retaliated against Plaintiffs because Plaintiffs exercised rights afforded to them under federal fair housing laws.

165.    Defendants subjected Plaintiffs to adverse housing actions when they refused Plaintiffs' repeated requests for reasonable accommodations, demanded the removal of Plaintiffs' service animals, issued Plaintiffs Notices of Infraction, and issued Plaintiffs Notices to Vacate, forcing Plaintiffs to seek housing elsewhere.

166.    Defendants have offered no legitimate reasons for their adverse housing actions, refusing to change or waive their no-pet policy despite its unlawfulness.

167.    Defendants treated Plaintiffs less favorably than similarly situated tenants at Karen Court who did not engage in protected opposition to Defendants' discriminatory housing practices.

168.    Defendants' conduct was engaged in with malice or with reckless indifference to the federally protected rights of Plaintiffs within the meaning of the FHA.

169.   As a result of Defendants' retaliatory actions, Plaintiffs have suffered significant injuries and losses.

### THIRD CLAIM FOR RELIEF
### 42 U.S.C. § 3617
### Interference
(All Plaintiffs Against All Defendants)

170.   Plaintiffs hereby incorporate all of the paragraphs of this Complaint as if fully set forth herein.

171.   Section 3617 of the FHA provides as follows: "It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by [the Fair Housing Act]."

172.   Plaintiffs A.J. and Megan are "handicapped" as defined in 42 U.S.C. § 3602(h), and this statutory term as used in this Complaint has the same meaning as "disabled."

173.   Plaintiff Lonnie lives with an individual who is "handicapped" as defined in 42 U.S.C. § 3602(h).

174.   By requesting reasonable accommodations, Plaintiffs exercised or enjoyed a right protected by the FHA.

175.   At least in part, Defendants' conduct and actions were motivated by intentional discrimination.

176.   Defendants' conduct and actions as described above constitute coercion, intimidation, a threat, or interference on account of Plaintiffs having exercised their rights protected under the FHA.

177.   Defendants' conduct, as described herein, constituted a pattern of harassment, invidiously motivated, due to Plaintiffs' disabilities or disability-related needs.

178.   As a result of Defendants' interference with Plaintiff's federally protected rights under the FHA, Plaintiffs have suffered significant injuries, damages, and losses.

### FOURTH CLAIM FOR RELIEF
### § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794
(All Plaintiffs Against All Defendants)

179.   Plaintiffs hereby incorporate all of the paragraphs of this Complaint as if fully set forth herein.

180.   Plaintiffs A.J. White and Megan McFadden have a "disability" as the term is used in § 504 and a "handicap" as defined in regulations implementing § 504, 24 C.F.R. § 8. 3.

181.   Plaintiff Lonnie White lives with a person with a "disability" as the term is used in § 504 and a "handicap" as defined in regulations implementing § 504, 24 C.F.R. § 8. 3.

182.   Defendants receive federal financial assistance through subsidies provided by HUD.

183.   Defendants failed and continue to fail to make the subsidized apartments of Defendant MHA usable by individuals with disabilities who benefit from and rely on companion animals to manage their disabilities.

184.   Defendants' no-pet policy has a disparate impact on individuals with disabilities who benefit from and rely on companion animals.

185.    Defendants' pet deposit requirement constitutes a form of intentional discrimination against individuals with disabilities that benefit from and rely on companion animals.

186.    Defendants' decision to maintain the no-pet policy and pet deposit against Plaintiffs despite repeated requests for reasonable accommodation is a form of discrimination against Plaintiffs on account of their disabilities or disability-related needs.

187.    In their conduct toward Plaintiffs, as set forth above, Defendants recklessly and intentionally discriminated against Plaintiffs on the basis of disability in violation of § 504.

188.    At a minimum, Defendants acted with deliberate indifference to the strong likelihood that pursuit of their no-pet policy would likely result in a violation of federally protected rights.

189.    As a result of Defendants' discriminatory conduct, Plaintiffs have suffered significant injuries, damages, and losses.

**FIFTH CLAIM FOR RELIEF**
**§ 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794**
**Retaliation**
(All Plaintiffs Against All Defendants)

190.    Plaintiffs hereby incorporate all of the paragraphs of this Complaint as if fully set forth herein.

191.    Plaintiffs engaged in conduct and speech in opposition to Defendants' discriminatory housing practices by exercising their rights afforded by federal civil rights laws.

192.   Plaintiffs requested reasonable accommodations because they reasonably believed that Defendants' refusal to accommodate their disabilities was in violation of federal civil rights laws.

193.   Defendants, directly or through their agents, retaliated against Plaintiffs because they exercised rights afforded to them under federal civil rights laws.

194.   Defendants subjected Plaintiffs to adverse housing actions when they refused Plaintiffs' repeated requests for reasonable accommodations, demanded the removal of Plaintiffs' service animals, issued Plaintiffs Notices of Infraction, and issued Plaintiffs Notices to Vacate, forcing Plaintiffs to seek housing elsewhere.

195.   Defendants have offered no legitimate reasons for their adverse housing actions, refusing to change or waive their no-pet policy despite its unlawfulness.

196.   Defendants treated Plaintiffs less favorably than similarly situated tenants at Karen Court who did not engage in protected opposition to Defendants' discriminatory housing practices.

197.   Defendants' conduct was engaged in with malice or with reckless indifference to the federally protected rights of Plaintiffs within the meaning of § 504 of the Rehabilitation Act.

198.   As a result of Defendants' retaliatory actions, Plaintiffs have suffered significant injuries and losses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, and award them all relief as allowed by law, including, but not limited to the following:

a.  A declaration that Defendants have violated the FHA and § 504 of the Rehabilitation Act.

b.  Issuance of a temporary restraining order and preliminary injunction prohibiting Defendants and their agents from initiating eviction proceedings against Plaintiffs Lonnie and A.J. White.

c.  All appropriate equitable relief including changes to Defendants' policies concerning persons with disabilities and other declaratory and injunctive remedies, as appropriate;

d.  Actual economic damages as established at trial;

e.  Compensatory damages, including, but not limited to, those for past and future pecuniary and non-pecuniary losses, emotional distress, suffering, loss of reputation, humiliation, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses;

f.  Punitive and/or liquidated damages for all claims allowed by law in an amount to be determined at trial;

g.  Pre-judgment and post-judgment interest at the highest lawful rate;

h.  Attorneys' fees and costs; and

i.  Such further relief as justice requires.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE**

DATED this 13th day of September, 2016.

RATHOD | MOHAMEDBHAI LLC

_s/ Siddhartha H. Rathod_
Siddhartha H. Rathod
Matthew J. Cron
Laura B. Wolf
2701 Lawrence Street, Suite 100
Denver, CO 80205
(303) 578-4400 (t)
(303) 578-4401 (f)
sr@rmlawyers.com
mc@rmlawyers.com
lw@rmlawyers.com

ATTORNEYS FOR PLAINTIFFS