**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.  16-cv-02304

MEGAN MCFADDEN,
LONNIE WHITE, and
ANTONIO "A.J." WHITE,

        Plaintiffs,

v.

MEEKER HOUSING AUTHORITY[1], a Property Management Company,
MELINDA PARKER, an individual,
MICHELLE BUCKLER, an individual,
EDY GEORGE, an individual,
ROBERT BARR, an individual, and,
STACIE KINCHER, an individual,

        Defendants.

_____

**PLAINTIFFS' MOTION FOR EMERGENCY TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION**
_____

        Plaintiffs Lonnie White and Antonio "A.J." White, by and through undersigned counsel,

hereby submit this Motion for Emergency Temporary Restraining Order and Preliminary

Injunction pursuant to F.R.C.P. 65 to prevent their immediate eviction in violation of the Fair

---

[1] The Meeker Housing Authority is listed as the name of the property company that runs the Meeker Family and Elderly Housing facility at 980 Karen Court, Meeker, CO 81641, also referred to as Karen Court.  *See* U.S. DEP'T OF HOUS. AND URBAN DEV., COLORADO AFFORDABLE HOUSING GUIDE 20, *available at*  http://portal.hud.gov/hudportal/documents/huddoc?id=COAffordableHsgGuide.pdf.  Despite being a business within Colorado, Meeker Housing Authority is listed as an expired trade name on the Colorado Secretary of State website.  No registered agent is linked to the Meeker Housing Authority, and according to the Colorado Secretary of State website, no current entities are registered with the names Meeker Family and Elderly Housing or Karen Court.  Meanwhile, the Meeker Housing Authority continues to do business with the U.S. Department of Housing and Urban Development, *see id.*, while appearing not to be authorized to do business within the state of Colorado.

Housing Act, 42 U.S.C. § 3604(f) and § 504 of the Rehabilitation Act, as amended, 29 U.S.C. § 794.

## INTRODUCTION

Plaintiff Antonio "A.J." White ("A.J."), an individual with disabilities, lives with his father, Plaintiff Lonnie White ("Lonnie") (collectively "Plaintiffs"). Plaintiffs seek a temporary restraining order and preliminary injunction to allow them to stay in their current apartment with A.J.'s companion cats. Plaintiffs reside in an apartment unit in Meeker Family and Elderly Housing, located at 980 Karen Court, Meeker CO 81641 ("Karen Court"), which Defendants own and manage. Plaintiffs today filed suit asserting violations of the Fair Housing Act ("FHA") and Section 504 of the Rehabilitation Act, ("§504"). Plaintiffs filed suit because of Defendants' failure to provide Plaintiffs a reasonable accommodation for A.J.'s disability by refusing to waive Karen Court's no-pet policy and its pet fee so that A.J.'s companion cats could continue to reside in Plaintiffs' apartment.

Despite the fact that Lonnie has on multiple occasions provided Defendants with written documentation from A.J.'s licensed clinical social worker establishing A.J.'s need for his companion animals, Defendants issued Lonnie three notices of infraction for "having a pet in your apartment at Karen Court." On August 16, 2016, Defendants served Lonnie with an eviction notice, which references both a violation of the "pet policy" and, for the first time, an alleged failure to provide Defendants with income verification, which was not due until November. The eviction notice states that Plaintiffs must vacate their apartment or face immediate eviction proceedings on or before September 15, 2016.

Plaintiffs are still living in their apartment and want to continue to live in their home. To prevent irreparable harm to Plaintiffs and to maintain the status quo during the pendency of their

action, Plaintiffs respectfully move this Court for a temporary restraining order and preliminary injunction – on an expedited basis pursuant to F.R.C.P. 65(b)(3) – prohibiting Defendants and their officers, directors, agents, employees, and successors, and all other persons in active concert or participation with them, from initiating eviction proceedings against Plaintiffs until their Fair Housing Act and § 504 claims have been resolved in this proceeding.[2]

## FACTS[3]

Plaintiffs fully incorporate the allegations brought in their Complaint and Jury Demand [ECF No. 1] by reference into this Motion.  Plaintiffs also summarize the relevant facts here.

Lonnie and A.J. have lived at Karen Court since approximately January 2014.[4] Defendant Staci Kincher is the current property director of Defendant Meeker Housing Authority ("Defendant MHA").  Defendants Melissa Parker, Michelle Buckler, Edy George, and Robert Barr are Board members for Defendant MHA.  In these roles, the individual defendants are responsible for developing and enforcing Defendant MHA's policies.

### A.    Plaintiff A.J. White Needs His Companion Animals to Manage His Disability

Plaintiff A.J. White has a history of suffering from severe depression and Attention Deficit/Hyperactivity Disorder ("ADHD").  *See* **Ex. 1**, *2015.01.22 Eliasen Letter*; **Ex. 2**, *2016.08.17 Eliasen Letter*; **Ex 3**, *AJ Decl.* ¶¶ 5-6.  A.J.'s depression and ADHD substantially

---

[2] In their complaint, Plaintiffs also seek issuance of appropriate equitable relief, including but not limited to a permanent injunction ordering Defendants and their officers, directors, agents, employees, and successors, and all other persons in active concert or participation with them, to take all affirmative steps necessary to remedy the effects of the illegal, discriminatory, and retaliatory conduct described therein and to prevent similar occurrences in the future.  Plaintiffs do not address that request for relief in this emergency motion.

[3] All factual statements in this motion as well as in the Complaint will be supported by sworn witness testimony at a preliminary injunction hearing in this matter.

[4] Because Defendant MHA owns Karen Court, Karen Court is referred to interchangeably with Defendant MHA.

3

limit major life activities such as his ability to care for himself, concentrate, remember, interact with others, and cope with stress.  *See id.*

A.J. is twenty years old and lives with his father Lonnie.  Prior to living with his father, A.J. lived with his mother and stepfather in Florida.  **Ex. 3**, ¶ 5.  A.J. was verbally and physically abused by his stepfather.  *See id.*  As a result of the abuse, A.J. became withdrawn and suicidal, struggling socially and at school.  *See id.*  Mental health professionals at Sun Coast Mental Health in Vero Beach, Florida diagnosed A.J. with severe depression and prescribed him medication.  *See id.*  It was the emotional support of his companion cat Genki, however, that provided him the most relief.  *See id.*

At the time Lonnie and A.J. moved into Karen Court, Lonnie informed then-director Karen Garcia, that they would be getting a cat to help A.J with his disability-related needs.  *See* **Ex. 4**, *Lonnie Decl.* ¶¶ 3-4.  Ms. Garcia told Lonnie that he could keep a cat in his apartment if he obtained a letter documenting A.J.'s disability and disability-related need for a companion animal.  *See id.* ¶ 5.  There was no fee associated with keeping companion animals at that time. *See id.* ¶ 6; **Ex. 3**, ¶ 10.

Catherine E. Eliasen, MSW, wrote two letters describing A.J.'s need for his companion animals because of his disability.[5]  The first letter stated:

> Due to his mental illness, AJ has increased difficulty coping with stress, and calming himself when agitated.  It is helpful when dealing with these symptoms for him to have his cats in his home.  The companionship and comfort that emotional support animals provide is soundly supported in research, and thus I am recommending that AJ continue to have his emotional support animals.

---

[5] Because Plaintiffs were unable to immediately relocate Genki from Florida to Colorado, A.J. got a second companion cat named Haim.  Plaintiffs currently live with both companion animals.

**Exhibit 1**.  This letter was provided to Ms. Garcia, who accepted it as documentation of A.J.'s disability and his disability-related need for a companion animal.  *See* **Ex. 4**, ¶¶ 6-7.

Stacie Kincher ("Defendant Kincher") recently replaced Ms. Garcia as Defendant MHA's Property Director, causing MHA's compliance with federal law to suffer.  On June 16, 2016, Defendants revised their pet policy.  *See* **Ex. 4**, ¶ 11; **Ex. 3**, ¶ 14.  According to the new policy, no pets were allowed unless a note from a medical doctor, as opposed to a mental health professional, outlined the need for the pet.  *See* **Ex. 4**, ¶ 12; **Ex. 3**, ¶ 15; **Ex. 5**, *2016.06.16 No-Pet Policy* at 1.  If such a letter were provided, the pet would only be allowed if accompanied by a $300.00 deposit fee per animal.  *See* **Ex. 4**, ¶ 13; **Ex. 3**, ¶ 16; **Ex. 5**, *2016.06.16 No-Pet Policy* at 1-2.  For A.J. and Lonnie, who pay $125 per month in rent due to their low income, the $600.00 deposit fee for Genki and Haim would cost nearly five months of rent.  *See* **Ex. 4**, ¶¶ 15-17; **Ex. 3**, ¶¶ 18-20.  Lonnie and A.J. cannot afford to pay $600.00 to keep Genki and Haim in their apartment.  *See* **Ex. 4**, ¶ 14; **Ex. 3**, ¶ 16.  When Lonnie offered to pay the pet fee in $50 increments, his request was summarily denied.  *See* **Ex. 4**, ¶ 19.

In response to the new no-pet policy, Lonnie immediately went to the first available board meeting on July 20, 2016 to request a reasonable accommodation, specifically that A.J.'s companion cats be permitted to stay in the unit and that the pet fee be waived.  *See* **Ex. 4**, ¶¶ 20-21; **Ex. 3**, ¶¶ 23-24.  Lonnie presented the letter from A.J.'s licensed clinical social worker that Defendants already had on file.  *See* **Ex. 4**, ¶ 22; **Ex. 3**, ¶ 25.  In response to the request, Board Member Parker questioned Lonnie about how he could afford to keep pets when he was living in low-income housing, a wholly inappropriate question meant to humiliate and embarrass Lonnie.  *See* **Ex. 4**, ¶ 23; **Ex. 3**, ¶ 26.  Ultimately, Defendants summarily denied Lonnie's request without explanation.  *See* **Ex. 4**, ¶¶ 24-25; **Ex. 3**, ¶¶ 27-28.

On July 21, 2016, Defendants sent Lonnie a letter formally denying his request while reiterating that the housing authority would have a zero pet policy. **Ex. 6**, *2016.07.21 Kincher-Lonnie Letter*. The letter concludes,

> It was also agreed upon that there will be a $300 non-refundable deposit for each pet that qualifies for being a certified therapeutic pet though [*sic*] the state of Colorado. The only exception to this rule would be a true "service" animal.

*Id.* The next day, Plaintiffs received a notice of infraction for "[h]aving a pet in your apartment at Karen Court." **Ex. 7**, *2016.07.22 Notice of Violations and Infractions*; *See* **Ex. 4**, ¶ 28; **Ex. 3**, ¶ 31.

Just days later, on July 27, 2016, Defendants amended MHA's no-pet policy once again. *See* **Ex. 4**, ¶ 29; **Ex. 3**, ¶ 32. The new amendments were aimed squarely at Lonnie and A.J. and are a clear violation of federal law. The new policy explicitly provides that any resident seeking to keep a companion animal must (1) demonstrate that they have the financial capability to care for the animal; (2) provide a letter from a licensed psychiatrist, not other types of mental health professionals, attesting for the need for a companion animal, and (3) provide additional evidence of a nexus between the companion animal and the debility attested to by the licensed professional. *See* **Ex. 8**, *2016.07.27 No-Pet Policy* at 1; **Ex. 4**, ¶ 30; **Ex. 3**, ¶ 33. The new policy also limits residents to one companion animal per unit, meaning that A.J. would have to part with either Genki or Haim. *See* **Ex. 8**, at 1; **Ex. 4**, ¶ 31; **Ex. 3**, ¶ 34.

Just over a week later, on August 5, 2016, Plaintiffs received another Notice of Violations and Infraction for having a pet in their apartment. *See* **Ex. 9**, *2016.08.05 Notice of Violations and Infractions*; **Ex. 4**, ¶ 32; **Ex. 3**, ¶ 35. On August 16, 2016, Plaintiffs received their last Notice of Violations and Infractions along with a 30-Day Notice to Vacate. *See* **Ex. 10**, *2016.08.16 Notice of Violations and Infractions*; **Ex. 4**, ¶ 33; **Ex. 3**, ¶ 36. The notice indicated

that Lonnie and his son must vacate their apartment on or before September 15, 2016 for having violated Defendants' pet policy.  *See* **Exhibit 10**; **Ex. 4**, ¶ 34; **Ex. 3**, ¶ 37.[6]

A.J. and Lonnie presently face an impending eviction.  Both fear that the effect of the eviction on Lonnie's credit will bring undue hardship to them and that they may not be able to afford another rental unit, leaving them homeless.[7]  *See* **Ex. 4**, ¶¶ 36-39; **Ex. 3**, ¶¶ 39-42.  Additionally, both are concerned that they cannot afford the costs associated with a rental search and moving.  *See* **Ex. 4**, ¶ 39; **Ex. 3**, ¶ 42.  In addition to the physical and financial harm Defendants are causing Plaintiffs, Defendants' actions have caused both Lonnie and A.J. great anxiety, humiliation, and emotional distress.  *See id.*  A.J.'s cats have never caused any damage to the apartment or raised any complaints by outsiders, and Lonnie is paying, and intends to continue paying, rent for his apartment.  *See* **Ex. 4**, ¶¶ 40, 42; **Ex. 3**, ¶¶ 43, 45.

## BACKGROUND & NOTICE

Plaintiffs were served with a 30-Day Notice to Vacate on August 16, 2016.  Plaintiffs filed their Complaint and Jury Demand on September 12, 2016.  Plaintiffs are filing this emergency motion seeking an order enjoining their eviction, notice of which will be served on September 15, 2016.  Also attached to this motion is a Proposed Temporary Restraining Order for the Court's consideration.

Plaintiffs' efforts to provide notice to Defendants are detailed in a document entitled Certificate Pursuant to F.R.C.P. 65(b)(1)(B) and D.C.COLO.LCivR 65.1, which is being filed contemporaneously with this motion.  That certificate and this Motion provide the compelling,

---

[6] The notice also references Plaintiffs' failure to have their income verified.  Meanwhile, Plaintiffs' income verification is not scheduled until November 2016.

[7] Plaintiffs do not have a Section 8 voucher entitling them to move to a new location and continue receiving subsidized housing.  Instead, Defendant MHA is a subsidized housing project under the Section 8 program, meaning that to receive subsidize housing, Plaintiffs would have to continue living at Karen Court.

urgent reasons why additional notice should not be required herein.  Plaintiffs incorporate the

contents of that Certificate as if fully set forth herein.

## LEGAL STANDARD

Defendants' discriminatory and retaliatory conduct gives rise to a number of legal claims:

- Disability housing discrimination under the Fair Housing Act ("FHA") based on the theories of failure to accommodate and discrimination in the terms, conditions, or privileges of rental of dwelling;
- Retaliation in violation of the FHA;
- Interference in violation of the FHA;
- Housing discrimination in violation of § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, *et seq.* ("§ 504"), based on the theory of failure to accommodate; and
- Retaliation in violation of § 504

### A.  Fair Housing Act and Rehabilitation Act Section 504 Legal Standards

Courts utilize the same or substantially similar standards of analysis when

reviewing disability discrimination claims brought under the FHA and § 504.[8]  *See*

*generally Cinnamon Hills Youth Crisis Ctr., Inc. v. Saint George City*, 685 F.3d 917 (10th

Cir. 2012); *see also Roe v. Hous. Auth. of City of Boulder*, 909 F. Supp. 814, 821 (D.

Colo. 1995) ("[B]ased on the explicit intent of Congress and the similar goals of the ADA,

the Rehab[ilitation] Act and the FHAA, I will analyze the FHAA, ADA, and

Rehab[ilitation] Act claims together."); *Jama Investments, L.L.C. v. Inc. Cty. of Los*

*Alamos*, No. CIV 04-1173 JB/ACT, 2006 WL 1228948, at *4 (D.N.M. Feb. 24, 2006)

("The Court agrees with those other Circuits that link the FHAA and the RA because the

House Report strongly suggests that district courts should take into account cases

interpreting the RA when construing the FHAA."); *United States v. California Mobile*

---

[8] The FHA, as amended, is sometimes abbreviated as the FHAA.  For ease of reference, Plaintiffs refer to it as the FHA throughout.

*Home Park Mgmt. Co.*, 29 F.3d 1413, 1417 (9th Cir. 1994); *Logan v. Matveevskii*, 57 F. Supp. 3d 234, 253 (S.D.N.Y. 2014).

      1.    <u>Anti-Discrimination Provisions</u>

      Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, *et seq.* ("§ 504" or "RA"), prohibits discrimination against individuals with a disability from programs receiving federal assistance.  29 U.S.C. § 794(a).  Similarly, the Fair Housing Act ("FHA") prohibits housing discrimination on the basis of disability.

      The FHA includes numerous prohibitions against housing discrimination. Relevant to this action are two prohibitions:

- Refusing "to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford tenants equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B)(4).
- Discriminating in the terms, conditions, or privileges of rental of a dwelling because of handicap.  *Id.* § 3604(f)(2)(A).

      The FHA "imposes an affirmative duty upon landlords reasonably to accommodate the needs of handicapped persons."  *California Mobile Home*, 29 F.3d at 1416.

      The definition of the term "handicap" in reference to a person under the FHA is identical to the definition of "disability" in reference to a person under § 504.  *See* 42 U.S.C. § 12102; 42 U.S.C § 3602(h); *see also* 24 C.F.R. § 100.201.[9]  An individual with a handicap/disability is defined as a person having: (A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; (C) or being

---

[9] For ease of reference, Plaintiffs use the term "disability" to refer to both disabilities and handicaps under the respective statutes.

regarded as having such an impairment.  42 U.S.C. § 12102 (§ 504); *see also* 29 U.S.C. § 705(20)(B) (§ 504); 42 U.S.C. § 3602(h) (FHA); *see also* 24 C.F.R. § 100.201 (FHA).

The definition of "Major life activities" includes, but is not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

A plaintiff can establish a violation of the non-discrimination provisions of the FHA and § 504 by demonstrating intentional discrimination, discriminatory impact, or refusal to make reasonable accommodations.  *See Cinnamon Hills*, 685 F.3d at 919, 923; *Roe*, 909 F. Supp. at 820 (citations omitted).

### 2.    Anti-Interference and Anti-Retaliation Provisions

The FHA prohibits unlawfully coercing, intimidating, threatening, or interfering with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, any right granted or protected by the FHA.  42 U.S.C. § 3617.  Section 504 prohibits retaliation against those who assert their right to be free from disability discrimination.  *See Hwang v. Kansas State Univ.*, 753 F.3d 1159, 1165 (10th Cir. 2014).

### 3.    Standing

The FHA and § 504 confer a private right of action on any "aggrieved person" under the Act.  *See* 42 U.S.C. § 3613 ("FHA"); *Pushkin v. Regents of Univ. of Colorado*, 658 F.2d 1372, 1380 (10th Cir. 1981) (§ 504).  The FHA defines "aggrieved person" as "any person who (1) claims to have been injured by a discriminatory housing practice; or (2) believes that such person will be injured by a discriminatory housing practice that is about to occur."  42 U.S.C. § 3602(i).

4.   Relief

The FHA provides that the Court may grant injunctive relief to prevent practices that violate its provisions.  42 U.S.C. § 3613(c)(1) ("[I]f the court finds that a discriminatory housing practice has occurred or is about to occur, the court . . . may grant as relief, as the court deems appropriate, any permanent or temporary injunction, temporary restraining order, or other order (including an order enjoining the defendant from engaging in such practice or ordering such affirmative action as may be appropriate."").  Section 504 provides that the Courts may grant injunctive relief when Defendants have engaged or are engaging in unlawful activities.  29 U.S.C.A. § 794(a); 42 U.S.C.A. § 2000e-5(g).

5.   Applicability

The FHA applies to all buildings that include dwellings occupied as, or designed or intended for, residences.  42 U.S.C. § 3602(b).  Section 504, unlike the FHA, extends only to a "program or activity" receiving federal financial assistance, which it defines as "an entire corporation, partnership, or other private organization, or an entire sole proprietorship (i) if assistance is extended to such corporation, partnership, private organization, or sole proprietorship as a whole . . . ."  29 U.S.C. § 794(a); *id.* § 794(b)(3)(A).  Because Defendants receive federal assistance through HUD subsidies and because Defendants run a building occupied as residences, Defendants are liable under both the FHA and § 504.

**B.  Temporary Restraining Order/Preliminary Injunction Standard**

A party seeking a temporary restraining order or a preliminary injunction must show (1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor;

11

and (4) that the injunction is in the public interest. *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009).[10]

F.R.C.P. 65(b)(1) imposes requirements for the ex parte imposition of a temporary restraining order. It states:

> The court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if:
>
> > (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and
> >
> > (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

## ARGUMENT

### A.    Plaintiffs Can Establish a Strong Likelihood of Success on the Merits of Their FHA and Section 504 Claims

Plaintiffs are likely to succeed on their FHA and § 504 claims, warranting swift injunctive relief.

    1.    Plaintiffs are Very Likely to Establish that Defendants Discriminated Against Them By Denying Them Reasonable Accommodations in Violation of the FHA and § 504

To prevail on a reasonable accommodation claim, a plaintiff must establish that (1) he is an individual with a disability, (2) the defendant knew or should have known of his disability, (3) that certain reasonable accommodations were necessary to afford him an equal opportunity to use and enjoy his dwelling, and (4) the defendant refused to

---

[10] As discussed in *RoDa Drilling Company*, the Tenth Circuit has established three categories of disfavored preliminary injunctions for which a movant must meet a heightened burden. 552 F.3d at 1208 n.3. Those three categories are: "(1) preliminary injunctions that alter the status quo, (2) mandatory preliminary injunctions, and (3) preliminary injunctions that give the movant all the relief it would be entitled to if it prevailed in a full trial." *Id.* (citation omitted). Because Plaintiffs' request for injunction does not fall into any of these three categories, no such heightened burden is triggered here.

make the accommodation.  *See Kerr v. Heather Gardens Ass'n*, No. 09-CV-00409-MSKMJW, 2010 WL 3791484, at *5 (D. Colo. Sept. 22, 2010) (citations omitted).   A plaintiff may also prevail by showing that Defendants discriminated against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of that person's disability.  *Roe*, 909 F. Supp. At 820.  There is no genuine dispute over the facts establishing each of these elements here.

a.      *Plaintiff A.J. White is an Individual with a Disability*

As fully explained in the Facts section above, Plaintiff A.J. White is an individual with a disability.  *See* **Exhibits 1-2**; *accord* 42 U.S.C. § 3602(h).

b.      *Defendants Knew of Plaintiff A.J. White's Disability*

Defendants knew or should have known of A.J.'s disability.  A.J.'s father Lonnie provided to Ms. Garcia, former-director of MHA, a copy of Ms. Eliasen's letter in January 2015. Lonnie also brought a copy of the letter to the Board meeting on July 21, 2016, explaining A.J.'s disability.  Finally, Lonnie provided a second letter regarding A.J.'s disability in August 2016. Lonnie also referenced his son's disability in writing when specifically requesting reasonable accommodations.  *See Boulder Meadows v. Saville*, 2 P.3d 131, 137 (Colo. App. 2000) (finding that a housing provider's duty to reasonably accommodate a person with a disability arises, at a minimum, the day that the tenant makes a written request for it) (citing *Jankowski Lee & Assoc. v. Cisneros*, 91 F.3d 891 (7th Cir. 1996)).

c.      *Reasonable Accommodations Were Necessary to Afford Plaintiffs an Equal Opportunity to Use and Enjoy Their Dwelling*

Plaintiffs made multiple, ongoing requests for the reasonable accommodation of allowing A.J.'s companion animals in their unit.  These accommodations were necessary to A.J.'s enjoyment of his dwelling.  As detailed in the complaint, A.J.'s companion cats greatly assist

with A.J.'s ADHD and depression by assisting him to communicate, work, care for himself, and manage his emotional state. "[T]he concept of necessity requires at a minimum the showing that the desired accommodation will affirmatively enhance a disabled plaintiff's quality of life by ameliorating the effects of the disability." *Bronk v. Ineichen*, 54 F.3d 425, 429 (7th Cir. 1995). A.J.'s ability to manage his disabilities so greatly depends on his companion cats that Plaintiffs are being forced to move out of their subsidized housing at Karen Court so that A.J. can continue to live with Genki and Haim. Being forced to move elsewhere will deprive Plaintiffs of the opportunity to use and enjoy their dwelling.

Moreover, the accommodation was also reasonable. The cats have been living in A.J. and Lonnie's apartment for nearly two and half years without incident or complaint. Courts regularly hold that exempting a tenant from a no-pet policy constitutes a reasonable accommodation "because such an accommodation does not unduly burden or fundamentally alter the nature of the apartment complex." *Bryant Woods Inn, Inc. v. Howard Cnty., Md.*, 124 F.3d 597, 604 (4th Cir. 1997) (citation omitted); *see also Bronk*, 54 F.3d at 429 (finding that it is "per se" reasonable under FHA to allow deaf and blind individuals to keep service dogs despite economic and aesthetic concerns of landlord); *Green v. Hous. Auth. of Clackamas Cnty.*, 994 F. Supp. 1253, 1257 (D. Or. 1998) (holding defendant violated the FHA by refusing to modify its no-pets policy to permit service dog in plaintiff's apartment).

The federal government has also made clear that exceptions to no-pet policies must, in many circumstances, be made to permit assistance animals, which includes emotional support animals, to reside with their owners. *See* 24 C.F.R. § 100.204; U.S. DEP'T OF HOUS. AND URBAN DEV., SERVICE ANIMALS AND ASSISTANCE ANIMALS FOR PEOPLE WITH DISABILITIES IN HOUSING AND HUD-FUNDED PROGRAMS (April 25, 2013), *available at*

https://portal.hud.gov/hudportal/documents/huddoc?id=servanimals_ntcfheo2013-01.pdf
(attached hereto as **Exhibit 11**); Joint Statement of the Dep't of Hous. and Urban Dev. and the
Dep't of Justice, Reasonable Accommodations under the Fair Housing Act, 6 (May 17, 2004),
*available at* http://www.hud.gov/offices/fheo/library/huddojstatement.pdf (attached hereto as
**Exhibit 12**); U.S. DEP'T OF HOUS. AND URBAN DEV., OCCUPANCY REQUIREMENTS OF
SUBSIDIZED MULTIFAMILY HOUSING PROGRAMS, HUD, No. 4350.3, exhibit 2-2 (1998),
http://portal.hud.gov/hudportal/documents/huddoc?id=DOC_35662.pdf (attached hereto as
**Exhibit 13**).

> d. *Defendants Unreasonably Refused to Accommodate Plaintiffs*

Plaintiffs can also establish the fourth element of their claim because Defendants
denied Plaintiffs' reasonable requests for accommodation.  Plaintiffs requested that they maintain
the status quo, keeping A.J.'s companion cats in their unit without additional charges.
Defendants unreasonably denied Plaintiffs' request, citing no reason in support except their
unflagging devotion to an unlawful and arbitrarily instituted policy.  Because of Defendants'
refusal to accommodate, Plaintiffs are now facing an eviction on September 15, 2016.

> e. *In the alternative, Defendants Discriminated Against Plaintiffs by Forcing*
> *Them to Vacate Because of A.J.'s Disability*

As discussed in great length above, Defendants discriminated against Plaintiffs in the
terms, conditions, or privileges of rental of a dwelling because of A.J.'s disability by issuing
Plaintiffs a 30-Day Notice to Vacate due to A.J.'s disability-related need for companion animals.

For the foregoing reasons, Plaintiffs easily establish all elements of their denial of
reasonable accommodation claim and are very likely to succeed on the merits.

2.    <u>Plaintiffs are Very Likely to Establish that Defendants Discriminated Against Them By Conditioning Their Continued Housing on Paying a Pet Fee, in Violation of the FHA and § 504</u>

Defendants also discriminated against Plaintiffs in the terms, conditions, or privileges of rental of a dwelling because of A.J.'s disability by demanding that Plaintiffs pay a $300.00 pet fee per companion animal.  Under the FHA, "[h]ousing providers may not require persons with disabilities to pay extra fees or deposits as a condition of receiving a reasonable accommodation."  **Ex 12** at 4 ("A request for a reasonable accommodation may not be unreasonably denied, or conditioned on payment of a fee or deposit or other terms and conditions applied to applicants or residents with pets . . . .").  Because Defendants attempted to charge Plaintiffs an additional fee as a condition of their being allowed to keep their companion animals, Plaintiffs are strongly likely to succeed on the merits of their discrimination claims.

3.    <u>Plaintiffs are Strongly Likely to Establish that Defendants Unlawfully Interfered with Their Rights and Retaliated Against them in Violation of the FHA and § 504</u>

a.    *Retaliation*

Retaliation claims brought under the FHA are "analyzed under the same standards used for analyzing retaliation claims brought pursuant to Title VII."  *See Oxford House, Inc. v. City of Baton Rouge, La.*, 932 F. Supp. 2d 683, 700 (M.D. La. 2013) (citing *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997)).  As noted above, the analysis under § 504 is identical to the analysis under the FHA.

To establish a prima facie case of retaliation in the Tenth Circuit, a plaintiff must show (1) that he engaged in protected opposition to discrimination, (2) that Defendants took adverse action against him, and (3) that a causal connection existed between the protected activity and the adverse action.  *See, e.g.*, *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1234 (10th Cir. 2000) (outlining the retaliation standard in the Title VII context); *see also Reinhardt v.*

16

*Albuquerque Pub. Sch. Bd. of Educ.*, 595 F.3d 1126, 1131 (10th Cir. 2010) (applying the same standard for claims under § 504).

Plaintiffs easily satisfy these elements.  Plaintiffs engaged in protected activities when they repeatedly requested a reasonable accommodation under the FHA.  Defendants took adverse actions against Plaintiffs by issuing them multiple Notices of Violations and Infractions followed by a 30-Day Notice to Vacate, therein adding for the first time a notice of violation regarding the Plaintiffs' alleged failure to verify their income.  *See Boisclair Corp.*, 351 F.3d 361, 363-64 (8th Cir. 2003) (per curiam) (citations omitted) (determining that threats of eviction, even if never carried out, sufficiently allege adverse action).

Plaintiffs can establish a causal connection between their protected activity and the adverse actions by way of close temporal proximity.  Defendants' Notices of Infraction came just days after Plaintiffs first requested a reasonable accommodation.  The 30-Day Notice to Vacate was then served just days after Plaintiffs asked Defendants to reconsider their denial of Plaintiffs' reasonable accommodation requests.  In total, all of the adverse actions took place less than four weeks after Plaintiffs first requested a reasonable accommodation.  The Tenth Circuit has "held that a one and one-half month period between protected activity and adverse action may, by itself, establish causation."  *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (citation omitted); *see also Meiners v. Univ. of Kan.*, 359 F.3d 1222, 1231 (10th Cir. 2004) ("A six-week period between protected activity and adverse action may be sufficient, standing alone, to show causation.").  Considering that the retaliatory conduct here took place within four weeks of the first request for reasonable accommodation and that multiple forms of retaliation began within days of Plaintiffs' engaging in protected conduct, it is very likely that Plaintiffs will be able to establishing a causal connection at trial.

Moreover, evidence of retaliatory motive is evident in Defendants' decision to issue a second-amended no-pets policy on July 27, 2016 specifically targeting Plaintiffs.  Within a week of Plaintiffs' attending the July 20, 2016 Board meeting and requesting a reasonable accommodation for A.J.'s two companion cats, Defendants changed their pet policy to allow only one therapeutic animal per unit.  Defendants also began requiring that unit owners demonstrate a financial ability to care for the pets just one week after explicitly questioning Lonnie about his ability to afford A.J.'s cats.

      b.    *Interference*

To establish an interference claim under the FHA, the plaintiff must show that (1) he is a member of a protected class under the FHA; (2) he exercised or enjoyed a right protected by the FHA, (3) Defendants' conduct was at least in part intentional discrimination; and (4) Defendants' conduct constituted interference on account of Plaintiff's having exercised a right protected under the FHA.  *Zhu v. Fisher, Cavanaugh, Smith & Lemon, P.A.*, 151 F. Supp. 2d 1254, 1259 (D. Kan. 2001) (citing *People Helpers Found. v. City of Richmond*, 781 F. Supp. 1132 (E.D. Va. 1992); *Cass v. American Props., Inc.*, 1995 WL 132166 (N.D. Ill. 1995).

As discussed at length above, Plaintiffs have demonstrated that they are aggrieved individuals under the FHA and that they engaged in protected conduct by asking for reasonable accommodations to Defendants' no-pet policy.  With the intent to discriminate against Plaintiffs for their disability-related needs under the FHA, Defendants not only denied Plaintiffs' requests, but they interfered with Plaintiffs' right to enjoy and use their dwelling by issuing Plaintiffs numerous Notices of Violations and Infraction and a 30-Day Notice to Vacate, and also by amending the no-pet policy to target Plaintiffs.  As Defendants issued Plaintiffs a 30-Day Notice

to Vacate within four weeks of their first request for accommodation, Plaintiffs are strongly likely to succeed on the merits of their interference claim.

    4. <u>Plaintiffs Are Strongly Likely to Succeed of the Merits of their Claims As Defendants Discriminated Against Others in a Similar Manner</u>

Plaintiffs are strongly likely to prevail on all of their FHA & § 504 claims. A final and substantial factor presaging success on the merits is that Defendants have engaged in the exact same course of action to another tenant with disabilities, Megan McFadden. *See generally* **Ex. 14**, *McFadden Decl.* As the complaint alleges, Defendants also demanded payment for Ms. McFadden's companion animals, denying her a reasonable accommodation and retaliating against her by immediately issuing her multiple Notices of Violations and Infractions and a 30-Day Notice to Vacate because of her disability. Defendants' similar discrimination against Ms. McFadden is further direct evidence of discrimination against Plaintiffs A.J. and Lonnie White. Plaintiffs thus are likely to succeed on the merits of their FHA claims.

**B.**     **Plaintiffs Will Suffer Immediate Irreparable Harm in the Absence of Injunctive Relief**

Plaintiffs easily meet the second factor of "irreparable harm." As described fully in the Facts Section above, Plaintiffs are low-income tenants requiring housing assistance. Although they presently live in subsidized housing, they face an immediate eviction for daring to ask their landlord to comply with long-standing federal law. Considering the Ms. McFadden was forced out of her unit, Plaintiffs gravely fear eviction, homelessness, and the significantly negative effect of an eviction on their housing record.

These facts clearly establish irreparable harm. First, the threat of eviction itself constitutes irreparable harm. *See, e.g.*, *Sinisgallo v. Town of Islip Hous. Auth.*, 865 F. Supp. 2d 307, 328 (E.D.N.Y. 2012). Other courts have held that irreparable harm is presumed from the

violation of the FHA, supporting such a finding here. *See Parris v. Pappas*, No. 3:10-cv-1128, 2010 WL 5157326, at *1 (D. Conn. Dec. 14, 2010) (citing *LaFlamme v. New Horizons, Inc.*, 514 F. Supp. 2d 250 (D. Conn. 2007)).

Similarly, the Tenth Circuit has presumed irreparable harm "[w]hen the evidence shows that the defendants are engaged in, or about to be engaged in, the act or practices prohibited by a statute which provides for injunctive relief to prevent such violations." *Mical Commc'ns, Inc. v Sprint Telemedia, Inc.*, 1 F.3d 1031, 1035-36 (10th Cir. 1993) (collecting cases). The FHA provides for injunctive relief to prevent such violations, 42 U.S.C. § 3613(c)(1), triggering a presumption of irreparable harm here. Additionally, as here, "[a] plaintiff suffers irreparable injury when the court would be unable to grant an effective monetary remedy after a full trial because such damages would be inadequate or difficult to ascertain". *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001) (citation omitted). Because a monetary remedy would not remedy the substantial likelihood that Plaintiffs will end up being homeless if evicted, irreparable harm is sure to be found in this case. Finally, ongoing emotional distress, as the Plaintiffs are experiencing because of Defendants' conduct here, is an irreparable harm. *Shapiro v. Cadman Towers*, 51 F.3d 328, 332-33 (2d Cir. 1995). The Plaintiffs therefore have copious support for a finding of irreparable harm absent an injunction to prevent it.

## C.   The Balance of the Equities Tips Heavily in Plaintiffs' Favor

Third, the balance of the equities comes down staunchly in Plaintiffs' favor. Plaintiffs are low-income tenants and are facing the loss of their subsidized home solely for asking their landlord to comply with federal law. All of the reasons that Plaintiffs are at risk of irreparable harm, outlined in the preceding section, also factor into the balance of the equities. Plaintiffs have much at stake in this motion for temporary restraining order. Defendants, by contrast, have

little to lose.  Plaintiffs continue to pay rent and over the past two and a half years A.J.'s companion cats have lived in Plaintiffs' unit without incident.  Defendants have suffered no damage and have nothing at stake in allowing Plaintiffs to continue living at Karen Court with A.J.'s companion cats.  Defendants' unwarranted threats to begin eviction proceedings in violation of federal law is not an interest worthy of protection.

In *City Wide Associates v. Penfield*, the Massachusetts Supreme Judicial Court engaged in a balancing of a mentally disabled tenant's interest in keeping her federally subsidized apartment and the cost to the landlord of the damage she inflicted upon her unit.  After doing so, the court found that the cost to the landlord (about $520) was minimal compared to the tenant's interest in keeping her apartment. 564 N.E.2d 1003, 1004-06 (Mass. 1991).  This court should easily reach a similar result here, where there has been absolutely no damage to the apartment at issue, finding that the substantial risks to Plaintiffs far outweigh the non-existent damage to Defendants.

In this prong of the analysis, it is also worth noting that the Tenth Circuit has observed that, where "interests involving real property are at stake, preliminary injunctive relief can be particularly appropriate because of the unique nature of the property interest." *RoDa Drilling Co.*, 552 F.3d at 1210 (collecting cases).  The unique nature of Plaintiffs' interest in their apartment, which is significantly subsidized such that Plaintiffs pay only $125 of its market value, thus also militates in favor of injunctive relief here.  Specifically, if Plaintiffs are evicted, it is likely that they will be unable to find another subsidized unit available immediately and, even if they did, that they could qualify for it with an eviction on their housing record and credit report.

Finally, granting an injunction would preserve the status quo, which favors injunctive relief. *See id.* at 1208 (documenting that "the primary goal of a preliminary injunction is to preserve the pre-trial status quo").

**D.      Public Interest Weighs Heavily in Plaintiffs' Favor**

Finally, the public interest is firmly on the side of Plaintiffs and against Defendants, the perpetrators of unlawful housing discrimination. *See United States v. Edward Rose & Sons*, 246 F. Supp. 2d 744, 755 (E.D. Mich. 2003) ("[W]here there has been a showing of housing discrimination, preliminary injunctive relief serves the public interest by carrying out the stated policy of the United States in 42 U.S.C. § 3601"), *aff'd*, 384 F.3d 258 (6th Cir. 2004); *United States v. Puerto Rico*, 764 F. Supp. 220, 225 (D.P.R. 1991) (granting injunction and emphasizing "the public interest that all citizens have in seeing vigorous enforcement of civil rights legislation like the Fair Housing Act.").

**E.      Plaintiffs Have Met All Other Requirements of F.R.C.P. 65**

As described above, Plaintiffs have set forth specific facts via declarations showing that immediate and irreparable injury, loss, or damage will result before the Defendants can be heard in opposition. Plaintiffs' attorneys, in a document titled Certificate Pursuant to F.R.C.P. 65(b)(1)(B) and D.C.COLO.LCivR 65.1, which is being filed contemporaneously with this motion, describe the efforts made by undersigned counsel to give notice to Defendants of this Motion. As noted above, Plaintiffs fully incorporate the contents of that Certificate as though fully set forth herein. That certificate and this Motion provide the compelling, urgent reasons why notice should not be required here. Plaintiffs have therefore met all of the requirements for issuance of a temporary restraining order.

**CONCLUSION**

For the reasons stated, Plaintiffs Lonnie and A.J. White respectfully request that this

Court issue a temporary restraining order and preliminary injunction prohibiting Defendants and

their officers, directors, agents, employees, and successors, and all other persons in active

concert or participation with them, from initiating eviction proceedings against Plaintiffs and

also order that A.J.'s companion cats may continue to live in Plaintiffs' unit until Plaintiffs' Fair

Housing Act and § 504 claims have been resolved in this proceeding.

Respectfully submitted this 13th day of September, 2016.

RATHOD | MOHAMEDBHAI LLC

*s/ Laura B. Wolf*
Laura B. Wolf
Siddhartha H. Rathod
Matthew J. Cron
2701 Lawrence Street, Suite 100
Denver, CO 80205
(303) 578-4400 (t)
(303) 578-4401 (f)
lw@rmlawyers.com
sr@rmlawyers.com
mc@rmlawyers.com

ATTORNEYS FOR PLAINTIFFS

### CERTIFICATE OF SERVICE

      I HEREBY CERTIFY that on this 13th day of September, 2016, a true and correct copy of the foregoing **PLAINTFFS' MOTION FOR EMERGENCY TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** was filed with the Clerk of Court using the CM/ECF system and was delivered to Defendants via hand-delivery and electronic mail as follows:

Stacie Kincher
875 Water Street
Meeker, CO 81641 or
741 Water Street
Meeker, CO 81641
mha@nctelecom.net

Meeker Housing Authority
c/o Stacie Kincher
875 Water Street
Meeker, CO 81641
mha@nctelecom.net

Edy George
1082 Pinyon Ave.
Meeker, CO 81641

Melinda Parker
173 1st Street, Apt 1
Meeker, CO 81641
mha@nctelecom.net

Michelle Buckler
1160 Main Street
Meeker, CO 81641
Via electronic mail at her private email address


                                  *s/ Laura B. Wolf*
                                  Laura B. Wolf