**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.  16-cv-02304-WJM-GPG

MEGAN MCFADDEN,
LONNIE WHITE, and
ANTONIO "A.J." WHITE,

      Plaintiffs,

v.

TOWN OF MEEKER, COLORADO, a municipality,
MEEKER HOUSING AUTHORITY, a governmental entity,
MELINDA PARKER, an individual,
MICHELLE BUCKLER, an individual,
EDY GEORGE, an individual, and
STACIE KINCHER, an individual,

      Defendants.

_____

**~~FIRST~~ SECOND AMENDED COMPLAINT AND JURY DEMAND**
_____

      Plaintiffs Megan McFadden ("Megan"), Lonnie White ("Lonnie") and Antonio

"A.J." White ("A.J.") (collectively referred to as "Plaintiffs"), by and through counsel

Laura B. Wolf, Siddhartha H. Rathod, Matthew J. Cron, and Qusair Mohamedbhai of

RATHOD ǀ MOHAMEDBHAI LLC, bring the following ~~First~~ Second Amended Complaint and

Jury Demand against the Town of Meeker, Colorado ("Meeker"), the Meeker Housing

Authority ("MHA" or "Defendant MHA"), Melinda Parker ("Defendant Parker"), Michelle

Buckler ( "Defendant Buckler"), Edy George ("Defendant George"), and Stacie Kincher (

"Defendant Kincher") (collectively referred to as "Defendants") and in support state as

follows:

## I.    INTRODUCTION

1.      This is an action under the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601, *et seq*., as amended, and § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("§ 504").

2.      In 1973, Congress passed § 504 of the Rehabilitation Act, the first statute providing federal civil rights protections for people with disabilities.

3.      Section 504 prohibits discrimination based on handicap in all programs receiving federal financial assistance, including housing complexes. *See generally* 42 U.S.C. § 794(a); *Hwang v. Kansas State Univ.*, 753 F.3d 1159, 1161 (10th Cir. 2014).

4.      In response to a history of and continuing national discrimination against individuals with disabilities, Congress enacted amendments to the FHA in 1988.  The purpose of the FHA Amendments was to prohibit discrimination in the national housing market for individuals with disabilities.[1]

5.      "The Fair Housing Amendments Act . . . is a clear pronouncement of a national commitment to end the unnecessary exclusion of persons with handicaps from the American mainstream.  It repudiates the use of stereotypes and ignorance, and mandates that persons with handicaps be considered as individuals.  Generalized perceptions about disabilities and unfounded speculation about threats to safety are specifically rejected as grounds to justify exclusion."  H.R. Rep. No. 100-711, at 18 (1988), reprinted in 1988 U.S.C.C.A.N 23173, 2179.

6.      Expanding on the previously enacted FHA, which prohibited discrimination

---

[1] The FHA uses the term "handicap," *see, e.g.*, 42 U.S.C. § 3602(h), which has the same meaning as disability.  Plaintiffs use the term disabled interchangeably with handicapped.

in housing based on race, color, religion, and national origin, the FHA, as amended, responded to a recognized prejudice against those with disabilities and illnesses.[2]

7.      Plaintiffs Lonnie White, A.J. White, and Megan McFadden are the types of individuals Congress sought to protect under § 504 and the FHA amendments.  A.J. and Megan each have a disability and use companion animals, with the recommendation of their health professionals, to assist with disability-related needs. Lonnie, A.J.'s father, lives with and cares for his son, a person who has a disability and uses companion animals to assist with disability-related needs.

8.      A.J. has a history of suffering from severe depression and Attention Deficit/Hyperactivity Disorder ("ADHD").  A.J.'s depression and ADHD substantially limit major life activities such as his ability to care for himself, concentrate, remember, interact with others, and cope with stress.  A.J. relies on his companion cats Genki and Haim to manage his disabilities, per the recommendation of his mental health professional.

9.      Megan suffers from chronic depression and anxiety.  Megan's disabilities substantially limit her ability to care for herself, complete daily tasks, interact with others, cope with stress, and sleep.  Megan relies on her companion dog Chewy to manage her disability, per the recommendations of her mental health professional and medical doctor.

10.     Defendants own and manage Meeker Family and Elderly Housing located at 980 Karen Court, Meeker, Colorado 81641 (referred to as "Karen Court").  Karen Court, through Defendant MHA, is financially subsidized by the U.S. Department of

---

[2] The Fair Housing Act as amended, is sometimes referred to as FHAA.  For ease of reference, Plaintiffs refer to it as "FHA."

Housing and Urban Development ("HUD") through HUD's Project Based Section 8

Subsidy Program.  *See generally* U.S. DEP'T HOUS. & URBAN DEV., U.S. COLORADO

AFFORDABLE HOUSING GUIDE, *available at*

http://portal.hud.gov/hudportal/documents/huddoc?id=COAffordableHsgGuide.pdf.

Through this program, tenants pay a significantly reduced rent based on their income.

At all times giving rise to this action, Plaintiffs lived in Karen Court and received

subsidized housing based on their low incomes.

11.     Prior to June 16, 2016, Plaintiffs were permitted to keep pets in their units

upon providing documentation showing that their companion animals assisted them.

On June 16, 2016, Defendants revised their pet policy to render it a "no-pet policy" and,

in direct contravention of federal civil rights law, began insisting that Plaintiffs pay a

$300.00 non-refundable pet fee for each companion animal and provide a letter from a

medical doctor, as opposed to a mental health professional, outlining their need for

companion animals.

12.     Plaintiffs made repeated requests for the reasonable accommodation that

the no-pet policy and pet fee be waived, while also providing multiple letters written by

mental health professionals explaining that Plaintiffs are disabled and recommending

the continued use of companion animals for their disabilities.  Defendants disregarded

these letters and denied Plaintiffs' requests for reasonable accommodations.  In

retaliation for having made requests for reasonable accommodation, Defendants began

a campaign of citing Plaintiffs for keeping their companion animals in violation of

Defendants' new no-pet policy.  Defendants then served Plaintiffs with 30-Day Notices

to Vacate, forcing them to look for housing elsewhere that they could not afford.  In so

acting, Defendants violated Plaintiffs' federal civil rights under the FHA and § 504.

## II.   JURISDICTION, VENUE, AND PARTIES

13.   Subject matter jurisdiction of this Court is proper pursuant to 28 U.S.C. §§ 1331, 1343, and 42 U.S.C. §§ 3612-13.

14.   Jurisdiction supporting Plaintiffs' federal claims for actual and punitive damages is conferred by 42 U.S.C. § 3613(c)(1), and 29 U.S.C. § 794a(b).  The Court has supplemental jurisdiction over Plaintiffs' related state law claims under 28 U.S.C. § 1367.  Jurisdiction supporting Plaintiffs' claims for attorneys' fees and costs is conferred by 42 U.S.C. § 3613(c)(2), and 29 U.S.C. § 794a(b).  This action is authorized and instituted pursuant to the FHA, 42 U.S.C. §§ 3601, *et seq.*, as amended, and § 504 of the Rehabilitation Act, 29 U.S.C. § 794, and 42 U.S.C. § 1983.

15.   Venue is proper within this District under 28 U.S.C. § 1391(b).  All of the events alleged herein occurred within the jurisdiction of the United States District Court of Colorado, Defendant MHA's business is in this District, and all of the individual parties were residents of the State of Colorado and citizens of the United States at the time of the events giving rise to this litigation.

16.   Plaintiff Megan McFadden is a citizen of the United States and resident of and domiciled in the State of Colorado.

17.   Plaintiff Lonnie White is a citizen of the United States and resident of and domiciled in the State of Colorado.

18.   Plaintiff A.J. White is a citizen of the United States and a resident of and domiciled in the State of Colorado.

19.   Defendant Town of Meeker ("Meeker") is a Colorado municipality.

20.     Meeker receives funding from the federal government.

21.     Meeker created the Meeker Housing Authority ("MHA") pursuant to C.R.S. § 29-4-201, *et seq*.  When it was originally formed, MHA's office was located within Meeker Town Hall.

22.     Meeker created MHA in order to meet its goal of providing a decent home and suitable living environment for all (existing and new) residents of Meeker regardless of age, sex, race, creed, or socio-economic status.  This goal is inherent in Meeker's short- and long-range objectives.  Meeker recognizes that positive concerted community action toward implementation of its housing goal is required.

23.     Meeker, through its Board of Trustees, appoints each MHA Board member pursuant to C.R.S. § 29-4-205.

24.     Meeker advertises to fill empty seats on the MHA Board, and it considers sitting on the MHA Board to be a service to the community.  Applicants for positions on the MHA Board are directed to contact Meeker's Town Hall in addition to MHA.

25.

19.     Meeker delegates its power to oversee, manage, and run the MHA to these appointed Board members.

20.26. Defendant MHA manages Meeker Family and Elderly Housing, located at 980 Karen Court, Meeker, CO 81641, which is referred to as Karen Court (hereinafter "Karen Court").[3]  Karen Court is an apartment complex consisting of federally subsidized apartments where Plaintiffs resided at the time of the events giving rise to this action.

---

[3] Throughout this complaint, all references to Karen Court are to be considered interchangeable with references to Defendant MHA.

21. 27. Defendant MHA is a "person" as that term is used and defined in the FHA, 42 U.S.C. § 3602(d).  Defendant MHA has continuously been "in the business of . . . renting dwellings" within the meaning of the FHA, 42 U.S.C. § 3603, at all times relevant to the allegations in this Complaint.

22. 28. Defendant MHA is a recipient of federal financial assistance from the U.S. Department of Housing and Urban Development ("HUD") and is therefore an entity with capacity to be sued under § 504.

23. 29. Defendant Melinda Parker was, at all relevant times, a Board Member of Defendant MHA, a citizen of the United States, and a resident of the State of Colorado. In her role as Board Member, Defendant Parker is responsible for adopting and implementing policies for Defendant MHA.

24. 30. Defendant Michelle Buckler was, at all relevant times, a Board Member of Defendant MHA, a citizen of the United States, and a resident of the State of Colorado. In her role as Board Member, Defendant Buckler is responsible for adopting and implementing policies for Defendant MHA.

25. 31. Defendant Edy George was, at all relevant times, a Board Member of Defendant MHA, a citizen of the United States, and a resident of the State of Colorado. In her role as Board Member, Defendant George is responsible for adopting and implementing policies for Defendant MHA.

32.     Defendant Stacie Kincher was, at all relevant times, the Property Director of Defendant MHA, a citizen of the United States, and a resident of the State of Colorado.  In her role as Property Director, Defendant Kincher is responsible for enforcing policies for Defendant MHA.

33.     MHA and its Board members act as agents of Meeker in performing the roles of overseeing, managing, and running Karen Court.  Through this relationship with Meeker, MHA has an obligation to provide decent, safe, and sanitary housing pursuant to Meeker's goals and objectives.

34.     Meeker presently holds, at a minimum, an advisory role over the operations of MHA and its appointed Board members.  In this role, Meeker asserts either direct or indirect control over the operations of MHA and the actions of MHA's Board members.

## II.   FACTUAL ALLEGATIONS

### A. Plaintiffs Lonnie and A.J. White

### A.J. White Suffers from a Disability and His Companion Cats Help Manage His Disability



*A.J. and his companion cats Genki.*

27.36. A.J. is twenty years old and lives with his father Lonnie.

28.37. A.J. is a person with (1) a "handicap" as that term is defined in the FHA, 42 U.S.C § 3602(h), (2) a "disability" as that term is used in § 504, and (3) a "handicap" as defined in regulation implementing § 504, 24 C.F.R. § 8.3.

29.38. Prior to living with his father, A.J. lived with his mother and stepfather in Florida.

30.39. A.J. was verbally and physically abused by his stepfather.  During this time, A.J. became withdrawn and suicidal, struggling socially and at school.

31.40. Mental health professionals at Sun Coast Mental Health in Vero Beach, Florida diagnosed A.J. with severe depression and prescribed medication.  It was the emotional support of his cat Genki, however, that provided A.J. the most relief.

32.41. In January 2014, at the age of seventeen, A.J. moved to Colorado to live with his father Lonnie.

33.42. In moving to Colorado, A.J. had trouble adjusting without the comfort and relief provided by Genki, who remained in Florida.  He again became withdrawn and suicidal, struggled to focus in school, and found himself having a hard time focusing.

34.43. A.J.'s new mental health team at Mind Springs Health in Meeker, Colorado diagnosed A.J. with Attention Deficit/Hyperactivity Disorder ("ADHD") and put him on medication.

35.44. A.J.'s ADHD and depression substantially limit major life activities, including his ability to care for himself, work, concentrate, remember, interact with others, and cope with stress.

36.45. ADHD and depression are disabilities under the FHA and § 504.

37.46. Finding that the medications he was prescribed made him feel worse, and desperate for relief, A.J. asked his dad if Genki could come live with them.

**Lonnie and A.J. White Move into Karen Court and Notify Defendants that They
Intended to Get a Cat for A.J.'s Disability-Related Needs**



*A.J. and his companion cats Genki and Haim.*

~~38.~~ 47. In February 2014, Lonnie and A.J. White moved in to a subsidized

apartment at Karen Court.

~~39.~~ 48. Rent at Karen Court is based on income, as the landlord receives

subsidies from the federal government through HUD to make up the difference between

the reduced rent and market value.

~~40.~~ 49. Based on his low income, Lonnie pays rent in the amount of $125.00 per

month.

~~41.~~ 50. Karen Court is governed by the rules and policies promulgated by

Defendants.

~~42.~~ 51. Upon moving in, Lonnie informed then-director Karen Garcia that A.J. had

a disability and would require the assistance of a cat.

~~43.~~ 52. At the time of Ms. Garcia's and Lonnie's communication regarding the cat,

Defendants had in a place a pet policy that allowed for tenants to keep animals that provided a documented assistance.

44. 53. In February 2014, Defendant MHA's pet policy read, in pertinent part, as follows:

> Absolutely no pets are allowed at Karen Court with the one exception to the rule being: where such animal assists a tenant or family member, and documentation for such assistance has been obtained by third party verification from a reputable source, by the Director.

45. 54. Ms. Garcia informed Lonnie that a cat would be permitted subject to Lonnie's providing a letter from A.J.'s mental health professional explaining that A.J. needed the cat for emotional support.

46. 55. When Lonnie and A.J. first moved into their apartment, a number of other tenants at Karen Court owned and maintained pets on the premises.

47. 56. After determining that it would take some time to get Genki from Florida, and given A.J.'s need for an emotional support animal to assist with A.J.'s disability, Lonnie and A.J. acquired another emotional support cat, Haim.

48. 57. When Genki was able to join Lonnie and A.J. in Colorado, Ms. Garcia reiterated that the cats would be fine as long as they had a letter documenting that the cats provided disability-related assistance.

49. 58. On January 22, 2015, Lonnie and A.J. acquired a letter from Catherine E. Eliasen, a licensed clinical social worker, which stated that A.J. had a disability and that having cats in his home helps him manage the symptoms of his disability.

50. 59. Lonnie and A.J. provided a copy of this letter to Ms. Garcia.

51. 60. Ms. Garcia placed a copy of this letter into Lonnie and A.J.'s file, which is kept by Defendants.

52.61. Genki and Haim provide A.J. with a routine and responsibilities, which help him manage his ADHD.  The cats wake A.J. up every morning and it is then his responsibility to feed them and change their litter box.

53.62. Staying regimented and scheduled by way of taking care of his cats has helped A.J. manage his ADHD without medication.

54.63. In addition to the structure Genki and Haim provide, the soothing, calming affection and mutual reliance between A.J. and the cats help alleviate many of the negative consequences of A.J.'s depression.  The cats give A.J. a reason to get out of bed and confidence in his ability to take care of them.

55.64. Lonnie has found that after a particularly stressful or emotional day for A.J., A.J. will only communicate with Lonnie after spending time alone with his companion cats.

56.65. Lonnie and A.J. lived at Karen Court with Genki and Haim without complaint or issue for nearly two and a half years.

### Defendants Unlawfully Changed their Pet Policy, Demanding a Doctor's Note and $300.00 Non-Refundable Fee for A.J.'s Companion Cats

57.66. On June 16, 2016, Defendants revised their pet policy to a "no-pet" policy.

58.67. The June 16, 2016 no-pet policy states, in pertinent part, that companion animals must meet the guidelines set by the Board of Directors of MHA, which includes the new requirement that a tenant provide a letter from a medical doctor concerning the need for a companion animal.

59.68. The no-pet policy explicitly states that MHA will not accept letters concerning the need for a companion animal from a psychologist, psychotherapist, or therapist.

60.69. A Joint Statement issued by HUD and the Department of Justice ("DOJ") on May 17, 2004 regarding the FHA provides that, "[a] doctor or other medical professional, a peer support group, a non-medical service agency, or a reliable third party who is in a position to know about the individual's disability may also provide verification of a disability." Joint Statement of the Dep't of Hous. and Urban Dev. and the Dep't of Justice, Reasonable Accommodations under the Fair Housing Act, 13-14 (May 17, 2004), available at http://www.hud.gov/offices/fheo/library/huddojstatement.pdf [hereinafter *Joint Statement on Reasonable Accommodations*].

61.70. Defendants' refusal to accept letters from reliable sources other than a medical doctor unlawfully limits Lonnie's and A.J.'s ability to provide documentation of A.J.'s disability-related needs for an assistance animal, in contravention of federal law and agency guidance.

62.71. The June 2016 no-pet policy revision also required tenants to pay a non-refundable pet fee of $300.00 for each pet.

63.72. Pursuant to the May 17, 2004 Joint Statement issued by HUD and DOJ, "The housing provider may not require the applicant to pay a fee or a security deposit as a condition of allowing the applicant to keep the assistance animal." *Joint Statement on Reasonable Accommodations* at 9.

64.73. Defendants' demand that individuals with disabilities pay a fee as a condition of keeping their companion animals is unlawful and discriminatory.

65.74. On July 12, 2016, Lonnie received a notice of violation and infraction for having a pet in his apartment.

66.75. Lonnie was told that he had until the end of the month to pay the fee.

67.76. At $300.00 per animal, Lonnie was facing a $600.00 fee to keep Genki and Haim.  For Lonnie, who pays $125 per month in rent based on his income, $600.00 is nearly five months of rent.

68.77. On July 20, 2016, Lonnie went to the Board of Directors meeting to request a reasonable accommodation for A.J.'s companion cats.

69.78. Lonnie explicitly requested that Defendants waive the no-pet policy and pet fees in order for A.J. to keep his two companion cats in the unit.

70.79. Lonnie provided Defendants with a copy of the January 2015 letter from A.J.'s licensed clinical social worker indicating that A.J. was disabled and that his two companion cats assist with his disability-related needs.

71.80. Lonnie also asked if he could pay the pet fee in a way that was more financially manageable for him, such as by paying an additional $50 with his rent each month, despite the fact that federal law dictates that disabled individuals be permitted to live with their companion animals without charge.

72.81. In response to these requests, Defendant Parker questioned how Lonnie could afford to keep pets when he was living in low-income housing.

73.82. Pursuant to an April 24, 2013 HUD Notice, housing providers are permitted to ask only for "reliable documentation of a disability and their disability-related need for an assistance animal."  U.S. DEP'T OF HOUS. AND URBAN DEV., SERVICE ANIMALS AND ASSISTANCE ANIMALS FOR PEOPLE WITH DISABILITIES IN HOUSING AND HUD-FUNDED PROGRAMS 3 (April 25, 2013), *available at* https://portal.hud.gov/hudportal/documents/huddoc?id=servanimals_ntcfheo2013-01.pdf [hereinafter *HUD Service and Assistance Animals Report*].

74 83. Defendant Parker's question about Lonnie's financial capability is outside the scope of what housing providers are permitted to ask and was intended to harass and embarrass Lonnie in retaliation for his having sought a reasonable accommodation for his son's disability.

75 84. On July 21, 2016, the day after the board meeting, Defendant Kincher sent Lonnie a letter denying his request for reasonable accommodation which read, in pertinent part:

> After considerable consideration, the MHA board of directors, [*sic*] made its decision to keep the zero pet policy enforced at Karen Court. It was also agreed upon that there will be a $300 non-refundable deposit for each pet that qualifies for being a certified therapeutic pet through the state of Colorado. The only exception to this rule would be a true "service" animal.

76 85. While the DOJ amended its regulations for Titles II and III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, *et seq.*, to exclude emotional support animals from the definition of "service animal," the April 24, 2013 HUD Notice explicitly outlines that, "this definition does not limit providers' obligations to make reasonable accommodations for assistance animals under the FHA or § 504." *HUD Service and Assistance Animals Report* at 1.

77 86. On July 22, 2016, Defendants sent Lonnie a notice of violation and infraction for having a pet in his apartment.

78 87. On July 27, 2016, Defendants again revised the MHA pet policy.

79 88. The July 27, 2016 pet policy revision mandates, among other things, that all residents who are eligible to keep a companion animal must:

- Demonstrate that they have the physical and financial capability to care for the companion animal;

- Provide a letter from a licensed psychiatrist attesting to the need for a companion animal; and

- Provide evidence of a nexus between the companion animal and the debility attested to by the licensed professional.

80. 89. Defendants' July 27, 2016 pet policy was issued for the purposes of discriminating and retaliating against Lonnie and A.J. for having made their requests for reasonable accommodation.

81. 90. The July 27, 2016 no-pet policy requirements far exceed the scope of what housing providers are permitted to request pursuant to HUD and DOJ guidance.

82. 91. In the July 27, 2016 no-pet policy revision, Defendants also set forth rules for residents with companion animals, including:

- One (1) companion animal maximum per household

- Residents shall not permit their companion animal to disturb, interfere, or diminish the peaceful enjoyment of other residents including but not limited to growling, barking, howling, and chirping.

- If companion animals are left unattended for a period of twelve hours or more, the MHA may enter the dwelling unit and remove the companion animal.

- Damages caused by a companion animal will be withheld from a required $300.00 non-refundable security deposit.

83. 92. Defendants' limitations on companion animals are not reasonable and instead violate federal law.

84. 93. Defendants' decision to place a limit on companion animals to one per unit

is a form of discrimination and retaliation directed against Lonnie and A.J.

~~85.~~ 94. The July 27, 2016 no-pet policy revision also states, "The privilege of maintaining a companion animal in a facility owned/operated by the Meeker Housing Authority shall be subject to the rules set forth above.  This privilege may be revoked at any time, subject to the Meeker Housing Authority Board of Directors . . . ."

~~86.~~ 95. A companion animal is not a privilege but a federally protected right.

~~87.~~ 96. On August 5, 2016, Defendants sent Lonnie a 10-day notice of violation and infraction for having a pet in his apartment.

~~88.~~ 97. On August 12, 2016, Defendant Kincher asked Lonnie for proof of income despite the fact that Lonnie was not scheduled to have his income reassessed until November.

~~89.~~ 98. Defendant Kincher's request was motivated by Defendants' desire to harass and intimidate Lonnie in retaliation for his having asserted his federal rights and in discrimination of his son's need for companion animals.

**Defendants Served Plaintiff Lonnie White with Notice of Eviction in Violation of Federal Law**

~~90.~~ 99. On August 16, 2016, Defendants sent Lonnie a 30-Day Notice to Vacate.

~~91.~~ 100.      The August 16, 2016 Notice to Vacate listed the following reason:

> Pet policy violation and you no longer qualify due to the age of your son and he has graduated school.  Also you have not reported your income to the Housing Authority.

~~92.~~ 101.      The August 16, 2016 Notice to Vacate did not advise the Whites that should they remain in the unit, MHA may seek to enforce the termination of their lease only by bringing a judicial action, at which time the Whites may present a defense, as required by 24 C.F.R. § 247.4(a).

93.102.      The August 16, 2016 Notice to Vacate did not advise the Whites

that they had ten days in which to discuss the proposed termination of tenancy with their

landlord, per HUD guidelines and regulations.  *See* HUD Handbook 4350.3: Occupancy

Requirements of Subsidized Multifamily Housing Programs § 8-13(B)(2)(c)(4), *available*

*at* http://port al.hud.gov/hudportal/documents/huddoc?id= 43503HSGH.pdf [hereinafter

"HUD Handbook 4350.3"]; *see also* 24 C.F.R. § 880.607(c)(1) (stating that the owner

must advise the family facing termination that it has an opportunity to respond to the

termination notice).

94.103.      The August 16, 2016 Notice to Vacate did not advise the Whites

that persons with disabilities have the right to request reasonable accommodations to

participate in the hearing process, as required by HUD Handbook 4350.3, § 8-

13(B)(2)(c)(5).

95.104.      The August 16, 2016 Notice to Vacate was the first written notice

regarding issues of income that Lonnie received and came just three business days

after Defendant Kincher first asked for the information, which was not due until

November 2016.

96.105.      The August 16, 2016 Notice to Vacate was the first notice of any

kind – either written or oral – regarding A.J. White's age, and fails to specify what

provision of the lease has been violated that would allow for termination of the lease on

such grounds.

97.106.      On August 17, 2016, Lonnie acquired a second letter from

Catherine Eliasen, M.S.W, A.J.'s licensed clinical social worker.

98.107.      The August 17, 2016 letter states that A.J. is diagnosed with

ADHD, that he has increased difficulty coping with stress and can become depressed, and that it is helpful for A.J. to have his cats in his home to manage these symptoms.

99.108.     In the August 17, 2016 letter, Ms. Eliasen also indicates that A.J. has been able to manage his disabilities without medication due to the responsibility of caring for his cats and the calming affection they provide.

100.109.     Ms. Eliasen's letter further posits that having the care of his cats is much less expensive and certainly has less likelihood of negative side effects than medications.

101.110.     Detailed and extensive information or documentation of impairments is not required from disabled tenants seeking reasonable accommodations. *See Joint Statement on Reasonable Accommodations* at 13-14.

102.111.     On August 27, 2016, Lonnie sent Defendant Kincher an email message with A.J.'s disability letters attached, asking that she reconsider his eviction and assuring her that he was getting his income information together.

103.112.     On August 29, 2016, Defendant Kincher responded to Lonnie by email summarily denying Lonnie's request for reconsideration of eviction.

104.113.     In the August 29, 2016 email, Defendant Kincher disregarded A.J.'s therapist letter, stating that Defendants require a letter from a medical doctor.

105.114.     The August 29, 2016 email from Defendant Kincher also indicated that Lonnie had violated his lease by not claiming Supplemental Security Income from A.J. in his income information.

106.115.     A.J. does not receive Supplemental Security Income.

107.116.     Defendant Kincher concludes the August 29, 2016 letter by stating,

"[T]his has nothing to do with your pets."

108.117.    While the August 29, 2016 letter states that "this has nothing to do with your pets," Defendants cited Lonnie numerous times for violating the no-pet policy and listed pet violations as one of the reasons for his receiving a 30-Day Notice to Vacate.

109.118.    The 30-Day Notice to Vacate indicates that Lonnie and A.J. White will be forced to vacate by September 15, 2016.

110.119.    Defendants' actions have caused and continue to cause Lonnie and A.J. extreme anxiety, humiliation, and emotional distress.

111.120.    Due to Defendants' unlawful actions, Lonnie has been forced to apply for and place a deposit on an apartment that he cannot afford.

121.    If evicted, Lonnie may not be able to find another affordable home for he and A.J. to live in.

**MHA Defendants Retaliated Against Lonnie and A.J. White for Asserting Their Right to be Free of Disability Discrimination and Retaliation Through Litigation**

122.    In response to Plaintiffs' filing the present lawsuit, MHA Defendants have engaged in a campaign of harassment against Lonnie and A.J. White in attempts to constructively or directly evict them from Karen Courts.

123.    Plaintiffs filed the present lawsuit to assert their right to live free of disability discrimination and retaliation in their homes.

124.    In October 2016, MHA Defendants notified the Court of their ongoing duty to comply with all HUD regulations and guidelines, citing HUD Handbook 4350.3 in support.

125.    Despite taking this position with the Court, MHA Defendants have intentionally neglected their duties under HUD regulations and guidelines in order to craft a mechanism by which to constructively or directly evict the Whites.

126.    MHA Defendants have hired a second set of counsel for the primary purpose of learning how to evict the Whites under the guise of HUD compliance.

127.    MHA Defendants have also instructed their service provider – Able Real Estate Services, owned and operated by Mike McKenzie – to determine ways to increase the Whites' rent.

128.    On March 14, 2017, MHA Defendants notified the Whites that the Whites had failed timely to report to their annual recertification interview and that they were in danger of losing their housing assistance payments.

129.    On March 16, 2017, the Whites responded that they had not failed to undergo the annual recertification interview, as MHA Defendants had never provided the Whites with any written notices of the recertification as required by HUD regulations and guidelines.

130.    On March 21, 2017, MHA Defendants produced for the first time copies of two written notices that had never before been provided to the Whites regarding their obligation to undergo the recertification process.  The notices were back-dated to September 6, 2016 and October 4, 2016.

131.    On that same day, MHA Defendants admitted that no third notice was ever provided to the Whites, despite HUD regulations and guidelines requiring at least three written notices.  MHA Defendants blamed their failure to follow HUD regulations and guidelines on the present litigation.

132.    On March 23, 2017, the Whites explained to MHA Defendants that not only had these notices never before been provided to the Whites, but that the notices were also deficient on their face for failing to contain a number of required pieces of information, including but not limited to (1) the name of the staff person to contact to schedule the recertification, their contact information, and method of contact, (2) the location, days, and office hours that property staff would be available to undergo recertification, and (3) the list of information the tenant needed to bring to the interview.

133.    The notices also unlawfully threatened to terminate the Whites' tenancy should they fail to respond, instead of simply notifying the Whites that their assistance may be terminated (i.e. that their rent would be raised to market value).

134.    According to the back-dated notices, the Whites were supposed to undergo their annual recertification by no later than February 1, 2017.

135.    If more than 15 months pass between two annual recertifications, HUD will cease providing housing assistance payments to a subsidized housing provider until such time that the annual recertification is submitted.  Knowing this, MHA Defendants waited until halfway through March (Month 14) before notifying the Whites that their Housing Assistance Payments were in danger of being terminated.

136.    If Housing Assistance Payments are terminated due to a housing provider's neglect or delay, the housing provider suffers the loss of the payment while the tenant continues to pay their previously calculated rent until such time as the annual recertification paperwork is processed and a 30-day notice of rent increase is provided. HUD Handbook 4350.3 § 7-8 ¶ D(1)(c)(2).

137.    Despite never having received a valid written notice regarding the annual

recertification process, the Whites offered in good faith to undergo the process to help ensure that MHA Defendants did not lose the housing assistance payments for the Whites' unit.

138.    The Whites and MHA scheduled the Whites' annual recertification interview on April 20, 2017.  Upon the Whites' arrival at the meeting, Defendant Kincher handed the Whites a notice dated April 19, 2017 informing them that their housing assistance payments would be terminated.

139.    The notice of termination is deficient in a number of ways.

140.    First, the notice states that the housing assistance payments would be terminated because after having reviewed the Whites' income on April 20, 2017, MHA discovered that the Whites were no longer eligible for a housing subsidy.  Considering that the Whites had only just arrived to provide MHA with information regarding their income, this reason cannot be considered valid.

141.    Second, the attachment to the notice includes a form sent to HUD terminating the housing assistance payments for the tenant's failure to timely undergo the income recertification process.  Because the reason for the termination is the owner's delay, the reason should have been listed as "Other."

142.    Third, the notice informs the Whites that their rent will be increased to $717 per month effective January 31, 2017.  Meanwhile, HUD regulations and guidelines do not allow for rent increases except on the first of the month.

143.    Fourth, the notice was never sent to the Whites' unit via certified mail, as required under HUD guidelines regardless of hand delivery.

144.    Fifth, the notice informed the Whites that they had until April 29, 2017 to

appeal the termination, which is only nine days after its delivery as opposed to the requisite ten days.

145.    The Whites filed an appeal of the Termination of Assistance on April 28, 2017, citing primarily the reasons listed above in support.

146.    Despite having filed an appeal, MHA Defendants have yet to notify the Whites of the appeal process or of the date of any hearing.

147.    On May 3, 2017, the Whites received on their door an unsigned notice from MHA Defendants informing them of multiple income discrepancies going back to 2014.

148.    According to the letter, MHA Defendants receive Enterprise Income Verification ("EIV") Reports on a quarterly basis informing them of all income discrepancies with all tenants.  HUD guidelines make it incumbent on housing providers to respond in a timely manner to all discrepancies found on EIV Reports.

149.    MHA Defendants now allege that between February 1, 2015 and January 31, 2016, the Whites failed to provide information regarding A.J.'s income, including after he graduated from high school.  Meanwhile, MHA Defendants have been aware since prior to the commencement of this litigation that A.J. did not graduate from high school until June 2016.

150.    Under HUD regulations and guidelines, a household has no duty to report the earnings of a full-time student (even if the student is no longer a minor) except if such a question is presented during the annual recertification on a written questionnaire. If such a question is presented, the housing provider must ask for information regarding the student's entire income, but it may not consider more than $480 per year as

household income.

151.   Upon review of the Whites' entire tenant file, the Whites never received any such questionnaire and thus are not at fault for any failure to provide this information.  Moreover, even if the information had been provided, the household income could only be increased by $480 per year.  HUD, meanwhile, only requires that discrepancies be rectified if the household earned a difference of more than $2,400 per year between their reported income and the EIV report.

152.   MHA Defendants have also been aware since at least November 18, 2016 that its former director Karen Garcia knew that A.J. White was working and decided not to undergo an interim recertification to report his income.  When a housing provider knowingly fails to undergo an interim recertification, the housing provider has waived the right to collect this amount from the tenants at a later date.

153.   Even after Ms. Kincher was hired to replace Ms. Garcia, MHA Defendants failed at any time to provide the Whites with written notice of an interim recertification.

154.   At the latest, Ms. Kincher was made personally aware that A.J. White was working full time and no longer in high school on August 27, 2016.

155.   The May 3, 2017 notice conspicuously fails to explain why the Whites had not been previously notified of discrepancies in their income considering that MHA receives quarterly EIV reports.

156.   The Whites are unaware of any other tenant undergoing this much scrutiny of their finances outside of a HUD-mandated review.  In fact, HUD conducted a compliance review of the property in September 2016 and did not report any discrepancies with the Whites' income, while reporting a large number of other

discrepancies for MHA Defendants to immediately rectify.

157.    In October 2016, MHA received an "Unsatisfactory" ranking in their HUD compliance review, the lowest ranking possible.  Since completing the necessary steps to retain its subsidized housing status, MHA has taken no steps to rectify its management or its knowledge of HUD regulations and guidelines with respect to any tenant except for the Whites.

158.   The May 3, 2017 notice also conspicuously fails to mention that MHA has been over-charging the Whites' rent since A.J. moved into the unit.  Because A.J. is disabled, the household is entitled to a $400 deduction in rent in addition to a deduction for all medical expenses, which include costs associated with caring for assistance animals.  Because the Whites' rent has been lower than $400 each month since they moved in, MHA Defendants owe the Whites a significant amount in overpaid rent during these last three and a half years.

159.   Despite knowing that MHA has been overcharging the Whites, MHA Defendants are now requiring that the Whites meet with MHA to enter into a repayment plan to pay unspecified amounts to HUD in order to continue remaining in their unit at Karen Court.

~~112.~~160.    MHA Defendants have taken these steps knowing that they are non-compliant with HUD regulations and guidelines in order to constructively evict the Whites through fear and intimidation, or to begin the process of evicting the Whites by subjecting them to a repayment plan seeking unspecified sums of money MHA Defendants know are not owed.

B. Plaintiff McFadden

**Plaintiff Megan McFadden Suffers from a Disability and Her Companion Dog Chewy Helps Her to Manage Her Disability**



*Megan and Chewy*

~~113.~~161.     Megan is a mother of two children, an eight-year-old daughter and a three-year-old son.

~~114.~~162.     Megan is a person with (1) a "handicap" as that term is defined in the FHA, 42 U.S.C. 3602(h), (2) a "disability" as that term is used in § 504; and (3) a "handicap" as defined in regulation implementing § 504, 24 C.F.R. § 8.3.

~~115.~~163.     Megan has a history of anxiety and depression for which she has been diagnosed and prescribed medication.

~~116.~~164.     Megan's anxiety and depression stem largely from trauma and abuse suffered when she was younger.

117.165.    Megan's anxiety and depression cause her to suffer severe panic attacks.

118.166.    Megan also experiences suicidal ideation as a symptom of her anxiety and depression.

119.167.    Megan's anxiety and depression as well as the resulting panic attacks and suicidal ideation substantially limit her ability to sleep, care for herself, complete daily tasks, work, interact with others, and cope with stress.

120.168.    In December 2015, Megan moved into a subsidized apartment at Karen Court where, because of her low income, she does not pay rent.

121.169.    In February 2016, Megan met her dog Chewy while visiting a friend.

122.170.    Megan's friend was looking for a home for Chewy and offered Megan the opportunity to take care of Chewy.

123.171.    Megan found that Chewy's companionship and calming presence improved her ability to cope with stress and mitigated her feelings of anxiety and depression.

124.172.    When Megan is overwhelmed with feelings of fear, anxiety, and depression, petting Chewy helps calm her.

125.173.    Under the belief that she could not have a pet at Karen Court, Megan had Chewy live with family members offsite.

126.174.    In or around February 2016, Megan asked then-director Karen Garcia if Chewy could come to her apartment for visits.  Ms. Garcia agreed that such visits would be fine.

127.175.    Megan arranged for Chewy to visit the apartment three times per

week.

128.176.      These regular visits took place without complaint or incident.

129.177.      At some point thereafter, Chewy began to live with Megan full-time.

130.178.      Megan lived at Karen Court with Chewy without complaint or issue.

**Defendants Demanded a Doctor's Note and $300.00 Non-Refundable Fee for Megan to Keep Chewy**

131.179.      Pursuant to the June 16, 2016 no-pet policy, Defendants demanded that Megan pay a $300.00 non-refundable pet deposit and provide a letter from a medical doctor in order to keep having her companion animal visit her apartment.

132.180.      Ms. McFadden suffered a panic attack when Defendant Kincher informed her that Chewy would no longer be permitted to visit.

133.181.      On July 12, 2016, Megan acquired a letter from her licensed clinical social worker, Catherine Eliasen, MSW, explaining that Megan has a disability and that it is helpful for her to have Chewy in her home in order to manage her disability.

134.182.      Upon providing this letter to Defendants, Defendants notified Megan that they would not accept letters in support of permitting a pet on the premises from any source other than a medical doctor.

135.183.      On July 22, 2016, Megan acquired a letter from Dr. A. Michael Vargas, M.D., documenting that Megan was a patient of his and suffers from chronic depression and anxiety.

136.184.      Dr. Vargas's letter states that Megan has shown great improvement with the use of her companion dog in her home and recommends that Megan continue to use her companion dog for emotional support to manage her depression and anxiety and to mitigate suicidal ideations.

~~137.~~185.    On the same day, July 22, 2016, Defendants sent Megan a Second Notice of Violation and Infraction for having a pet in her apartment at Karen Court. Defendants never sent Ms. Megan a first notice.

~~138.~~186.    On July 25, 2016, Megan went to Defendant Kincher to request a reasonable accommodation, specifically that the no-pet policy and pet fee be waived for her companion animal.

~~139.~~187.    During this July 25, 2016 meeting, Defendant Kincher told Megan that she could not have pets because the Board was "cracking down."  Defendant Kincher also informed Megan that she already knew the Board would deny the request and that she was "tired of moving up the proper chains" with respect to submitting Megan's reasonable accommodation requests to the Board.

~~140.~~188.    At least twice during this meeting Defendant Kincher insisted that Megan would have to pay $300 per companion animal.  When Megan told Defendant Kincher that she could not legally charge a fee, Defendant Kincher said, "You're going to have to take us to court."  After Megan said that she had already filed a complaint with HUD, Ms. Kincher responded, "Take us to court.  That's really it."

~~141.~~189.    During this meeting, Megan provided Defendant Kincher with a letter from Ms. Eliasen, MSW.  She also informed Defendant Kincher that she would soon be providing a letter from a medical doctor, even though the law did not require her to do so.

### Defendants Ignored Megan's Doctors Letters, Denied Her Reasonable Accommodation Request, and Ordered Her to Vacate

~~142.~~190.    On July 27, 2016, Defendants sent Megan a 30-Day Notice to Vacate, citing in support her violations of the no-pet policy.

143.191.    The July 27, 2016 Notice to Vacate did not advise Ms. McFadden that should she remain in the unit, MHA may seek to enforce the termination of her lease only by bringing a judicial action, at which time Ms. McFadden may present a defense, as required by 24 C.F.R. § 247.4(a).

144.192.    The July 27, 2016 Notice to Vacate did not advise Ms. McFadden that she had ten days in which to discuss the proposed termination of tenancy with her landlord, per HUD guidelines and regulations.  *See* HUD Handbook 4350.3, § 8-13(B)(2)(c)(4).

145.193.    The July 27, 2016 Notice to Vacate did not advise Ms. McFadden that persons with disabilities have the right to request reasonable accommodations to participate in the hearing process, as required by HUD Handbook 4350.3, § 8-13(B)(2)(c)(5).

146.194.    On the same day, July 27, 2016, Defendants revised their pet policy for a second time in less than six weeks.

147.195.    On August 5, 2016, Megan sent Defendant Kincher an email message expressing her surprise that she had received a 30-Day Notice to Vacate after having requested a reasonable accommodation complete with a doctor's note.  In this email, Megan again asked Defendant Kincher to grant her a reasonable accommodation.

148.196.    Defendant Kincher denied Megan's request for a reasonable accommodation and noted that Defendant MHA never received any information regarding a companion animal until two notices were given.

149.197.    Pursuant to the May 17, 2004 Joint Statement issued by HUD and

DOJ, "[T]he Fair Housing Act does not require that a request be made in a particular manner or at a particular time."  *See Joint Statement on Reasonable Accommodations* at 10.

~~150.~~198.    After reiterating her request for a reasonable accommodation and resending Dr. Vargas's and Ms. Eliasen's letters, Defendant Kincher again denied Megan's request for a reasonable accommodation on August 22, 2016, claiming without support that HUD allows local public housing authorities to set their own pet regulations and charge nominal pet deposits.

~~151.~~199.    On August 24, 2016, Megan sent an email to Defendant Kincher expressing her fear that she would be homeless with children and requested again that she be allowed to stay with her dog or at least be given an extension.

~~152.~~200.    Defendants responded to Megan that an extension would only be conditioned on Chewy's removal from the unit.

~~153.~~201.    Unable to part with Chewy due to her medical needs, and in a constant state of anxiety and fear of harassment, Megan and her children were forced to vacate their home.

~~154.~~202.    As a result of the sudden upheaval and resulting uncertainty caused by Defendants' actions, Megan's eight-year-old daughter was forced to move in with her grandmother so that she could stay enrolled in her school, leaving Megan with limited access to her daughter and leaving her daughter with limited access to both her mother and her brother.

203.    Defendants' actions have caused Ms. McFadden and her children to suffer significant emotional distress and financial harm, amongst other injuries.

### MHA Defendants Retaliated Against Megan McFadden for Asserting Her Right to be Free of Disability Discrimination and Retaliation Through Litigation

204.    In response to Plaintiffs' filing the present lawsuit, MHA Defendants have engaged in a campaign of harassment against Megan McFadden.

205.    Plaintiffs filed the present lawsuit to assert their right to live free of disability discrimination and retaliation in their homes.

206.    In October 2016, MHA Defendants notified the Court of their ongoing duty to comply with all HUD regulations and guidelines, citing HUD Handbook 4350.3 in support.

207.    Despite taking this position with the Court, MHA Defendants have intentionally neglected their duties under HUD regulations and guidelines in order to craft a mechanism by which to bring a frivolous counterclaim against Ms. McFadden.

208.    Ms. McFadden was forced to move out of her subsidized unit at Karen Court on September 8, 2016 under threats of eviction for violating MHA Defendants' unlawful pet policy.

209.    In December 2016, MHA Defendants brought a counterclaim against Ms. McFadden seeking an unspecified amount of lost rental income and repair costs related to her having vacated the unit in September 2016.

210.    MHA Defendants discovered that Ms. McFadden had vacated her unit no later than September 9, 2016.

211.    On or around September 9, 2016, Ms. Kincher as Executive Director of MHA entered Ms. McFadden's unit to determine whether Ms. McFadden had completed her move-out.  Ms. Kincher then contacted Ms. McFadden to confirm that she had

moved out.

212.   MHA Defendants failed to notify HUD that Ms. McFadden had vacated her unit until October 31, 2016.  Between September 9, 2016 and October 31, 2016, MHA Defendants unlawfully submitted vouchers to HUD on behalf of Ms. McFadden and collected Housing Assistance Payments of approximately $1,565 in her name.

213.   Despite having received $1,565 from the federal government between September 9, 2016 and October 31, 2016 by claiming that Ms. McFadden continued to live at Karen Court, MHA Defendants are suing Ms. McFadden for $2,413 in lost rent.

214.   Another tenant began living in Ms. McFadden's unit on December 1, 2016. In turn, November 2016 is the only month that MHA Defendants did not receive rent for Ms. McFadden's unit, for a total loss of $921.

215.   Ms. McFadden is not liable for MHA's loss in rental income, as MHA Defendants intentionally chose to wait until late November 2016 to make all repairs. Insofar as the unit was uninhabitable until the repairs were completed, MHA Defendants are liable for the lost rental income suffered due to their delay.

216.   MHA Defendants understood that under HUD regulations and guidelines, as well as Colorado law, they had a duty to inspect Ms. McFadden's unit for any needed repairs and to send Ms. McFadden a list of all projected repairs and costs within 30 days of discovering that she vacated the unit.

217.   MHA Defendants also had a duty to offer Ms. McFadden a walk-through inspection of the unit before she moved out, which they failed to do.

218.   MHA Defendants never sent Ms. McFadden a list of the projected repairs and costs such that Ms. McFadden could not object to the repairs or their costs before

they were undertaken, in violation of state law and HUD regulations and guidelines.

219.   MHA Defendants neglected to make any repairs to Ms. McFadden's unit for more than two months, only beginning to make repairs in late-November 2016. These repairs were made in response to an application by a prospective tenant seeking to move into Ms. McFadden's unit on December 1, 2016.

220.   MHA Defendants never notified HUD of the needed repairs, which would have entitled MHA Defendants to a partial subsidy to mitigate their losses during the time Ms. McFadden's unit was being repaired.  MHA Defendants failed to mitigate their alleged loss in order to increase the value of their counterclaim against Ms. McFadden.

221.   In April 2017, MHA Defendants revealed for the first time their calculation that Ms. McFadden owed $3,281 for the costs of repair, an amount reflecting more than three and a half months of market rent for Ms. McFadden's unit.
Ms. McFadden had only lived in that specific unit beginning in June 2016, and yet MHA attributes to Ms. McFadden the need to replace curtains, paint the unit, replace the refrigerator, replace the carpet, and replace outlet and light covers.  These repairs, meanwhile, appear to have been needed on account of regular wear and tear.

222.   MHA Defendants have been on notice for many months that their failure to provide Ms. McFadden notice of the projected cost of repairs prior to engaging in the repairs and within 30 days of her vacating the unit precludes MHA Defendants from seeking the $3,281 in damages allegedly incurred.  MHA Defendants refuse, however, to dismiss the counterclaim against Ms. McFadden.

223.   MHA Defendants sued Ms. McFadden for breach of contract, specifically breach of her lease.

224.   After numerous requests to review Ms. McFadden's lease, MHA Defendants admit that they cannot locate a copy of it.  Despite having no copy of the lease, Defendants rely on the terms of the lease as the basis for the counterclaim against Ms. McFadden.

225.   Finally, after failing to serve Ms. McFadden a timely notice of repair costs, MHA Defendants never returned to Ms. McFadden her $50 security deposit, in violation of Colorado state law.

226.

~~155.~~  MHA Defendants have brought this counterclaim against Ms. McFadden knowing that it cannot move forward legally based upon their failure to follow state law and HUD regulations and guidelines.  MHA Defendants have taken these steps to retaliate against Ms. McFadden for having brought the present lawsuit, as well as to coerce, intimidate, and harass Ms. McFadden into dismissing her claims against MHA Defendants.

### III.   STATEMENT OF CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**Federal Fair Housing Act, as amended, 42 U.S.C. §§ 3601, *et seq.***
**Discrimination**
(All Plaintiffs Against All Defendants)

~~156.~~227.   Plaintiffs hereby incorporate all of the paragraphs of this ~~First~~ Second Amended Complaint as if fully set forth herein.

~~157.~~228.   Plaintiffs are "aggrieved person[s]" as defined in 42 U.S.C. § 3602(i) and suffered injuries as a result of Defendants' discriminatory actions and conduct.

~~158.~~229.   Plaintiff A.J. White's depression and ADHD are impairments that substantially limit one or more major life activities.

~~159.~~230.   Plaintiff Megan McFadden's anxiety and depression are impairments that substantially limit one or more major life activities.

~~160.~~231.   Plaintiffs A.J. and Megan are "handicapped" as defined in 42 U.S.C. § 3602(h), and this statutory term as used in this Complaint has the same meaning as "disabled."

~~161.~~232.   Plaintiff Lonnie White lives with and cares for A.J.

~~162.~~233.   Lonnie is the leaseholder for the unit in which A.J. lives.

~~163.~~234.   Plaintiffs requested reasonable accommodations from Defendants in response to Defendants' pet policies when each Plaintiff provided letters from mental health professionals indicating that they had a disability-related need for companion animals to stay in their apartment.

164.235.    Such a reasonable accommodation – an exemption from the no-pet policy and pet deposit – was necessary to afford Plaintiffs equal opportunity to use and enjoy their dwellings.

165.236.    The proposed accommodations would not have imposed and did not impose an undue financial or administrative burden on Defendants and did not require a fundamental alteration in the nature of Defendants' programs.  This is evidenced by the fact that until June 16, 2016, Defendants had permitted pets in units without suffering an undue financial or administrative burden.

166.237.    Waiver of Defendants' no-pet policy and pet deposit would have been a reasonable accommodation.

167.238.    Defendants, directly or through their agents, discriminated against Plaintiffs on the basis of disability through their conduct and acts, *inter alia*, as follows:

a. By failing to accept reliable documentation of Plaintiffs' disabilities and disability-related need for companion animals;

b. By demanding that Plaintiffs pay a fee as a condition of receiving a reasonable accommodation;

c. By demanding the immediate removal of Plaintiffs' companion animals;

d. By issuing Notices of Violation and Infraction to Plaintiffs for  keeping companion animals in their homes after Plaintiffs had provided reliable documentation of their need for the companion animals; and

e. By issuing Plaintiffs 30-Day Notices to Vacate.

168.239.    Defendants' unlawful conduct and acts deprived Plaintiffs of the equal opportunity to use and enjoy their dwelling at Karen Court.

169.240.     As a result of Defendants' discriminatory conduct, Plaintiffs have suffered significant injuries, damages, and losses.

## SECOND CLAIM FOR RELIEF
## 42 U.S.C. § 3617
## Retaliation
(All Plaintiffs Against All Defendants)

170.241.     Plaintiffs incorporate all of the paragraphs of this First Second Amended Complaint as if fully set forth herein.

171.242.     Plaintiffs engaged in conduct and speech in opposition to Defendants' discriminatory housing practices by exercising their rights afforded by federal fair housing laws.

172.243.     Plaintiffs requested reasonable accommodations because they reasonably believed that Defendants' refusal to accommodate their disabilities and disability-related needs was in violation of the FHA.

173.244.     Defendants, directly or through their agents, retaliated against Plaintiffs because Plaintiffs exercised rights afforded to them under federal fair housing laws.

174.245.     Defendants subjected Plaintiffs to adverse housing actions when they refused Plaintiffs' repeated requests for reasonable accommodations, demanded the removal of Plaintiffs' service animals, issued Plaintiffs Notices of Infraction, and issued Plaintiffs Notices to Vacate, forcing Plaintiffs to seek housing elsewhere.

175.246.     Defendants have offered no legitimate reasons for their adverse housing actions, refusing to change or waive their no-pet policy despite its unlawfulness.

176.247.      Defendants treated Plaintiffs less favorably than similarly situated tenants at Karen Court who did not engage in protected opposition to Defendants' discriminatory housing practices.

177.248.      Defendants' conduct was engaged in with malice or with reckless indifference to the federally protected rights of Plaintiffs within the meaning of the FHA.

178.249.      As a result of Defendants' retaliatory actions, Plaintiffs have suffered significant injuries and losses.

**THIRD CLAIM FOR RELIEF**
**42 U.S.C. § 3617**
**Interference**
(All Plaintiffs Against All Defendants)

179.250.      Plaintiffs hereby incorporate all of the paragraphs of this First Second Amended Complaint as if fully set forth herein.

180.251.      Section 3617 of the FHA provides as follows: "It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by [the Fair Housing Act]."

181.252.      Plaintiffs A.J. and Megan are "handicapped" as defined in 42 U.S.C. § 3602(h), and this statutory term as used in this Complaint has the same meaning as "disabled."

182.253.      Plaintiff Lonnie lives with an individual who is "handicapped" as defined in 42 U.S.C. § 3602(h).

183.254.      By requesting reasonable accommodations, Plaintiffs exercised or enjoyed a right protected by the FHA.

184.255.     At least in part, Defendants' conduct and actions were motivated by intentional discrimination.

185.256.     Defendants' conduct and actions as described above constitute coercion, intimidation, a threat, or interference on account of Plaintiffs having exercised their rights protected under the FHA.

186.257.     Defendants' conduct, as described herein, constituted a pattern of harassment, invidiously motivated, due to Plaintiffs' disabilities or disability-related needs.

187.258.     As a result of Defendants' interference with Plaintiff's federally protected rights under the FHA, Plaintiffs have suffered significant injuries, damages, and losses.

**FOURTH CLAIM FOR RELIEF**
**§ 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794**
**Discrimination**
(All Plaintiffs Against All Defendants)

188.259.     Plaintiffs hereby incorporate all of the paragraphs of this First Second Amended Complaint as if fully set forth herein.

189.260.     Plaintiffs A.J. White and Megan McFadden have a "disability" as the term is used in § 504 and a "handicap" as defined in regulations implementing § 504, 24 C.F.R. § 8. 3.

190.261.     Plaintiff Lonnie White lives with a person with a "disability" as the term is used in § 504 and a "handicap" as defined in regulations implementing § 504, 24 C.F.R. § 8. 3.

191.262.     Defendants receive federal financial assistance through subsidies provided by HUD.

192.263.    Defendants failed and continue to fail to make the subsidized apartments of Defendant MHA usable by individuals with disabilities who benefit from and rely on companion animals to manage their disabilities.

193.264.    Defendants' no-pet policy has a disparate impact on individuals with disabilities who benefit from and rely on companion animals.

194.265.    Defendants' pet deposit requirement constitutes a form of intentional discrimination against individuals with disabilities that benefit from and rely on companion animals.

195.266.    Defendants' decision to maintain the no-pet policy and pet deposit against Plaintiffs despite repeated requests for reasonable accommodation is a form of discrimination against Plaintiffs on account of their disabilities or disability-related needs.

196.267.    In their conduct toward Plaintiffs, as set forth above, Defendants recklessly and intentionally discriminated against Plaintiffs on the basis of disability in violation of § 504.

197.268.    At a minimum, Defendants acted with deliberate indifference to the strong likelihood that pursuit of their no-pet policy would likely result in a violation of federally protected rights.

198.269.    As a result of Defendants' discriminatory conduct, Plaintiffs have suffered significant injuries, damages, and losses.

**FIFTH CLAIM FOR RELIEF**
**§ 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794**
**Retaliation**
(All Plaintiffs Against All Defendants)

199.270.    Plaintiffs hereby incorporate all of the paragraphs of this First

Second Amended Complaint as if fully set forth herein.

200.271.   Plaintiffs engaged in conduct and speech in opposition to Defendants' discriminatory housing practices by exercising their rights afforded by federal civil rights laws.

201.272.   Plaintiffs requested reasonable accommodations because they reasonably believed that Defendants' refusal to accommodate their disabilities was in violation of federal civil rights laws.

202.273.   Defendants, directly or through their agents, retaliated against Plaintiffs because they exercised rights afforded to them under federal civil rights laws.

203.274.   Defendants subjected Plaintiffs to adverse housing actions when they refused Plaintiffs' repeated requests for reasonable accommodations, demanded the removal of Plaintiffs' service animals, issued Plaintiffs Notices of Infraction, and issued Plaintiffs Notices to Vacate, forcing Plaintiffs to seek housing elsewhere.

204.275.   Defendants have offered no legitimate reasons for their adverse housing actions, refusing to change or waive their no-pet policy despite its unlawfulness.

205.276.   Defendants treated Plaintiffs less favorably than similarly situated tenants at Karen Court who did not engage in protected opposition to Defendants' discriminatory housing practices.

206.277.   Defendants' conduct was engaged in with malice or with reckless indifference to the federally protected rights of Plaintiffs within the meaning of § 504 of the Rehabilitation Act.

207.278.    As a result of Defendants' retaliatory actions, Plaintiffs have suffered significant injuries and losses.

**SIXTH CLAIM FOR RELIEF**
**42 U.S.C. § 1983 - Fourteenth Amendment**
**Deprivation of Property Without Due Process**
(Plaintiff Megan McFadden Against All Defendants)

208.279.    Plaintiffs hereby incorporate all of the paragraphs of this First Second Amended Complaint as if fully set forth herein.

209.280.    At all times relevant to this claim, Defendants Meeker, MHA, Parker, Buckler, George, and Kincher were "persons" under 42 U.S.C. § 1983.

210.281.    At all times relevant to this claim, Defendants Parker, Buckler, George, and Kincher in their collective role as the MHA Board acted as final policymakers for Meeker in their role adopting and implementing policies for the Meeker Housing Authority.

211.282.    At all times relevant to this claim, Defendants Parker, Buckler, George, and Kincher were acting under color of state law in their capacities as MHA Board members appointed by Meeker's Board of Trustees.

212.283.    At all times relevant to this claim, Defendant MHA acted as a final policymaker for Meeker in its role managing the Meeker Family and Elderly Housing project known as Karen Court, including enforcing policies adopted by its Board members appointed by Meeker's Board of Trustees.

213.284.    At all times relevant to this claim, Defendant MHA was acting under color of state law in its capacity as a public housing authority created pursuant to Colorado Revised Statute § 29-4-201, *et seq*.

214.285.    Plaintiffs' receipt of subsidized housing through their participation in the Project Based Section 8 Subsidy program administered by Defendants is a property interest protected by the due process clause of the Fourteenth Amendment.  *See Caulder v. Durham Hous. Auth.*, 433 F.2d 998, 1002 (4th Cir. 1970); *Goldberg v. Kelly*, 397 U.S. 254 (1970).

215.286.    Plaintiffs have a clearly established right under the Fourteenth Amendment not to be deprived of their property without due process of law.

216.287.    Any reasonable person acting under color of state law knew or should have known of this clearly established right.

217.288.    The Due Process Clause of the Fourteenth Amendment mandates the opportunity for a hearing before an individual is deprived of any significant property interest.  *See Boddie v. Connecticut*, 401 U.S. 371, 379 (1971).

218.289.    In the facilitation of compliance with the Fourteenth Amendment's Due Process Clause, HUD requires that landlords include a written statement on every termination notice advising tenants that they have ten days to respond to the Notice to Vacate and discuss the termination of their tenancy.  *See* HUD Handbook 4350.3, § 8-13(B)(2)(c)(4).

219.290.    Defendants failed to provide this requisite notice when they issued Plaintiff McFadden a 30-Day Notice to Vacate on July 27, 2016, thereby depriving Plaintiff McFadden of the right to prevent the termination of her lease outside of the eviction process.

220.291.    "The purpose of the requirement of the federal regulations and the lease agreement that a tenant must be afforded an opportunity to meet with the landlord

to discuss a proposed termination of tenancy is to attempt to resolve the controversy in a mutually satisfactory manner, that will, if possible, avoid the tenant's loss of subsidized housing while protecting the rights of the landlord." *Gorsuch Homes, Inc. v. Wooten*, 597 N.E.2d 554, 560 (Ohio App. 1992).

221.292.    Defendants also failed to include a notice advising Plaintiff McFadden that should she remain in her unit, Defendants MHA could seek to enforce the termination of her lease only by bringing a judicial action, at which time Ms. McFadden would have been able to present a defense.  *See* 24 C.F.R. § 247.4(a).

222.293.    Defendants also failed to include a notice advising Ms. McFadden that persons with disabilities have the right to request reasonable accommodations to participate in the hearing process.  *See* HUD Handbook 4350.3, § 8-13(B)(2)(c)(5).

223.294.    Providing Plaintiff McFadden with the required written notices listed above, as well as the opportunity to meet with the landlord to discuss the proposed termination of her tenancy, would not have substantially burdened any government interests and are, in fact, required under HUD regulations and guidelines.

224.295.    By failing to provide these notices, Defendants violated Plaintiff McFadden's procedural due process rights under the Fourteenth Amendment.

225.296.    Defendants' actions or omissions described herein deprived Plaintiff McFadden of the rights, privileges, liberties, and immunities secured by the laws of the United States of America, and caused her other damages.

226.297.    The acts or omissions of Defendants were the legal and proximate cause of Plaintiff McFadden's damages, including but not limited to lost government benefits; psychological, emotional, and mental anguish; distress, humiliation,

embarrassment, and degradation; pain and suffering; and Plaintiff McFadden's attorneys' fees and costs in bringing this action.

298.   Plaintiff McFadden has been and continues to be damaged by Defendants' violation of her procedural due process rights under the Fourteenth Amendment.

### SEVENTH CLAIM FOR RELIEF
### 42 U.S.C. § 3617
### Retaliation
#### (All Plaintiffs Against Defendants Meeker Housing Authority, Stacie Kincher, Melinda Parker, Edy George, and Michelle Buckler)

299.   Plaintiffs hereby incorporate all of the paragraphs of this Second Amended Complaint as if fully set forth herein.

300.   Plaintiffs engaged in conduct and speech in opposition to Defendants' discriminatory housing practices by exercising their rights afforded by federal fair housing laws, specifically by filing the present complaint.

301.   MHA Defendants, directly or through their agents, retaliated against Plaintiffs because Plaintiffs exercised rights afforded to them under federal fair housing laws, specifically their right to bring this lawsuit.

302.   MHA Defendants subjected the Whites to adverse housing actions in the form of failing to provide the Whites with annual recertification notices, unlawfully terminating the Whites' housing assistance payments, seeking unspecified sums of money from the Whites to repay sums not owed, targeting the Whites for auditing, and revealing highly sensitive confidential medical information regarding A.J. White to third parties.  MHA Defendants have engaged in this conduct with the intent of constructively or directly evicting the Whites.

303.   MHA Defendants subjected Ms. McFadden to adverse actions in the form of filing a frivolous counterclaim against her seeking damages which were either not incurred by MHA Defendants or not attributable to Ms. McFadden, and the collection of which MHA Defendants know is legally barred.  MHA Defendants have engaged in this conduct with the intent of retaliating against Ms. McFadden and coercing, intimidating, or threatening her to dismiss the present claims against MHA Defendants.

304.   MHA Defendants are aware that their allegedly legitimate reasons for these adverse housing actions are not compliant with state and federal law as well as HUD regulations and guidelines, and yet MHA Defendants continue to procced with this course of unlawful conduct.

305.   MHA Defendants have treated Plaintiffs less favorably than similarly situated tenants at Karen Court who did not engage in protected opposition to MHA Defendants' discriminatory housing practices.

306.   MHA Defendants' conduct was engaged in with malice or with reckless indifference to the federally protected rights of Plaintiffs within the meaning of the FHA.

307.   As a result of MHA Defendants' retaliatory actions, Plaintiffs have suffered significant injuries and losses.

### EIGHTH CLAIM FOR RELIEF
### 42 U.S.C. § 3617
### Interference
(All Plaintiffs Against Defendants Meeker Housing Authority, Stacie Kincher, Melinda Parker, Edy George, and Michelle Buckler)

308.   Plaintiffs hereby incorporate all of the paragraphs of this Second Amended Complaint as if fully set forth herein.

309.   Section 3617 of the FHA provides as follows: "It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by [the Fair Housing Act]."

310.   Plaintiffs Megan McFadden and A.J. White are "handicapped" as defined in 42 U.S.C. § 3602(h), and this statutory term as used in this Complaint has the same meaning as "disabled."

311.   Plaintiff Lonnie White lives with an individual who is "handicapped" as defined in 42 U.S.C. § 3602(h).

312.   By filing the present lawsuit, Plaintiffs exercised or enjoyed a right protected by the FHA.

313.   MHA Defendants have coerced, intimidated, threatened, and interfered with the Whites' exercise or enjoyment of this right by subjecting the Whites to adverse housing actions in the form of failing to provide the Whites with annual recertification notices, unlawfully terminating the Whites' housing assistance payments, seeking unspecified sums of money from the Whites to repay sums not owed, targeting the Whites for auditing, and revealing highly sensitive confidential medical information regarding A.J. White to third parties.  MHA Defendants have engaged in this conduct with the intent of constructively or directly evicting the Whites.

314.   MHA Defendants have coerced, intimidated, threatened, and interfered with Ms. McFadden's exercise or enjoyment of this right by subjecting Ms. McFadden to adverse housing actions in the form of filing a frivolous counterclaim against her seeking

damages which were either not incurred by MHA Defendants or not attributable to Ms. McFadden, and the collection of which MHA Defendants know is legally barred.  MHA Defendants have engaged in this conduct with the intent of retaliating against Ms. McFadden and coercing, intimidating, or threatening her to dismiss the present claims against MHA Defendants.

315.   At least in part, MHA Defendants' conduct and actions were motivated by intentional discrimination.

316.   MHA Defendants' conduct and actions as described above constitute coercion, intimidation, a threat, or interference on account of Plaintiffs' having exercised their rights protected under the FHA.

317.   MHA Defendants' conduct, as described herein, constitutes a pattern of harassment, invidiously motivated, due to Plaintiffs' assertion of their civil rights under the FHA, as well as due to their disabilities and their disability-related needs.

318.   As a result of MHA Defendants' interference with Plaintiffs' federally protected rights under the FHA, Plaintiffs have suffered significant injuries, damages, and losses.

**NINTH CLAIM FOR RELIEF**
**§ 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794**
**Retaliation**
(All Plaintiffs Against Defendants Meeker Housing Authority, Stacie Kincher, Melinda Parker, Edy George, and Michelle Buckler)

319.   Plaintiffs hereby incorporate all of the paragraphs of this Second Amended Complaint as if fully set forth herein.

320.   Plaintiffs engaged in conduct and speech in opposition to Defendants' discriminatory housing practices by exercising their rights afforded by federal fair housing laws, specifically by filing the present complaint.

321.   MHA Defendants, directly or through their agents, retaliated against Plaintiffs because Plaintiffs exercised rights afforded to them under federal fair housing laws, specifically their right to bring this lawsuit.

322.   MHA Defendants subjected the Whites to adverse housing actions in the form of failing to provide the Whites with annual recertification notices, unlawfully terminating the Whites' housing assistance payments, seeking unspecified sums of money from the Whites to repay sums not owed, targeting the Whites for auditing, and revealing highly sensitive confidential medical information regarding A.J. White to third parties.  MHA Defendants have engaged in this conduct with the intent of constructively or directly evicting the Whites.

323.   MHA Defendants subjected Ms. McFadden to adverse actions in the form of filing a frivolous counterclaim against her seeking damages which were either not incurred by MHA Defendants or not attributable to Ms. McFadden, and the collection of which MHA Defendants know is legally barred.  MHA Defendants have engaged in this conduct with the intent of retaliating against Ms. McFadden and coercing, intimidating, or threatening her to dismiss the present claims against MHA Defendants.

324.   MHA Defendants are aware that their allegedly legitimate reasons for these adverse housing actions are not compliant with state and federal law as well as HUD regulations and guidelines, and yet MHA Defendants continue to procced with this course of unlawful conduct.

325.    MHA Defendants have treated Plaintiffs less favorably than similarly situated tenants at Karen Court who did not engage in protected opposition to MHA Defendants' discriminatory housing practices.

326.    MHA Defendants' conduct was engaged in with malice or with reckless indifference to the federally protected rights of Plaintiffs within the meaning of the FHA.

327.    As a result of MHA Defendants' retaliatory actions, Plaintiffs have suffered significant injuries and losses.

**TENTH CLAIM FOR RELIEF**
**C.R.S. § 38-12-103 – Return of Security Deposit**
**Failure to Return Security Deposit**
(Plaintiff McFadden Against Defendants Meeker Housing Authority, Stacie Kincher, Melinda Parker, Edy George, and Michelle Buckler)

328.    Plaintiffs hereby incorporate all of the paragraphs of this Second Amended Complaint as if fully set forth herein.

329.    Under Colorado law, a landlord is required to return a tenant's security deposit within one month of the surrender and acceptance of the premises unless the tenant is provided with a written statement listing the exact reasons for the retention of any portion of the security deposit.  A security deposit may not be retained to cover normal wear and tear.

330.    Ms. McFadden surrendered her unit at Karen Court on September 8, 2016, and MHA Defendants accepted the premises on September 9, 2016.

331.    MHA Defendants have never refunded Ms. McFadden her security deposit.

332.    MHA Defendants never sent Ms. McFadden a letter indicating that they would be retaining any portion of the security deposit in order to cover the costs of repairs to her unit.

333.    The failure of MHA Defendants to provide Ms. McFadden with this notice constitutes a forfeiture of all rights to withhold any portion of the security deposit.

334.    MHA Defendants willfully retained Ms. McFadden's security deposit such that Ms. McFadden is entitled to treble damages along with reasonable attorneys' fees and costs associated with the collection of this amount.

**ELEVENTH CLAIM FOR RELIEF**
**42 U.S.C. § 1983 - Fourteenth Amendment**
**Deprivation of Property Without Due Process**
(Plaintiffs Lonnie and A.J. White Against All Defendants)

335.    Plaintiffs hereby incorporate all of the paragraphs of this Second Amended Complaint as if fully set forth herein.

336.    At all times relevant to this claim, Defendants Meeker, MHA, Parker, Buckler, George, and Kincher were "persons" under 42 U.S.C. § 1983.

337.    At all times relevant to this claim, Defendants Parker, Buckler, George, and Kincher in their collective role as the MHA Board acted as final policymakers for Meeker in their role adopting and implementing policies for the Meeker Housing Authority.

338.    At all times relevant to this claim, Defendants Parker, Buckler, George, and Kincher were acting under color of state law in their capacities as MHA Board members appointed by Meeker's Board of Trustees.

339.    At all times relevant to this claim, Defendant MHA acted as a final policymaker for Meeker in its role managing the Meeker Family and Elderly Housing

project known as Karen Court, including enforcing policies adopted by its Board members appointed by Meeker's Board of Trustees.

340.    At all times relevant to this claim, Defendant MHA was acting under color of state law in its capacity as a public housing authority created pursuant to Colorado Revised Statute § 29-4-201, *et seq*.

341.    Plaintiffs' receipt of subsidized housing through their participation in the Project Based Section 8 Subsidy program administered by Defendants is a property interest protected by the due process clause of the Fourteenth Amendment.  *See Caulder v. Durham Hous. Auth.*, 433 F.2d 998, 1002 (4th Cir. 1970); *Goldberg v. Kelly*, 397 U.S. 254 (1970).

342.    Plaintiffs have a clearly established right under the Fourteenth Amendment not to be deprived of their property without due process of law.

343.    Any reasonable person acting under color of state law knew or should have known of this clearly established right.

344.    The Due Process Clause of the Fourteenth Amendment mandates the opportunity for a hearing before an individual is deprived of any significant property interest.  *See Boddie v. Connecticut*, 401 U.S. 371, 379 (1971).

345.    A tenant in subsidized housing has the following constitutional rights before the termination of his benefits: (1) timely and adequate notice detailing the reasons for a proposed termination; (2) an opportunity to confront and cross-examine adverse witnesses; (3) the right to be represented by counsel to delineate the issues, present the factual contentions in an orderly manner, conduct cross-examinations, and generally to safeguard his interests; (4) a decision, based on evidence adduced at the

hearing, in which the reasons for decision and the evidence relied on are set forth; and (5) an impartial decisionmaker. *Caulder v. Durham Hous. Auth.*, 433 F.2d ay 1004.

346. Defendants unlawfully terminated the Whites' benefits on April 20, 2017 without providing timely and adequate notice detailing the reasons for the proposed termination.

347. Defendants unlawfully terminated the Whites' benefits without being provided any adjudicatory rights, including the basic right to a hearing.

348. By failing to provide an adequate notice of termination of assistance in addition to a hearing on the matter, Defendants violated the Whites' procedural due process rights under the Fourteenth Amendment.

349. Defendants' actions or omissions described herein deprived Plaintiffs Lonnie and A.J. White of the rights, privileges, liberties, and immunities secured by the laws of the United States of America, and caused them other damages.

350. The acts or omissions of Defendants were the legal and proximate cause of Plaintiffs Lonnie and A.J. Whites' damages, including but not limited to lost government benefits; psychological, emotional, and mental anguish; distress; humiliation, embarrassment, and degradation; pain and suffering; and attorneys' fees and costs in bringing this action.

351. Plaintiffs Lonnie and A.J. White have been and continue to be damaged by Defendants' violation of their procedural due process rights under the Fourteenth Amendment.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, and award them all relief as allowed by law, including, but not limited to the following:

a.  A declaration that Defendants have violated the FHA, § 504 of the Rehabilitation Act, and the Fourteenth Amendment of the United States Constitution.

b.  Issuance of a temporary restraining order and preliminary injunction prohibiting Defendants and their agents from initiating eviction proceedings against Plaintiffs Lonnie and A.J. White.

c.  All appropriate equitable relief including changes to Defendants' policies concerning persons with disabilities and other declaratory and injunctive remedies, as appropriate;

d.  Actual economic damages as established at trial;

e.  Compensatory damages, including, but not limited to, those for past and future pecuniary and non-pecuniary losses, emotional distress, suffering, loss of reputation, humiliation, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses;

f.  Punitive and/or liquidated damages for all claims allowed by law in an amount to be determined at trial;

g.  Pre-judgment and post-judgment interest at the highest lawful rate;

h.  Attorneys' fees and costs; and

i.  Such further relief as justice requires.

**PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE**

DATED this ~~17th~~ 219th day of ~~November~~~~February~~May, 201~~7~~6.

RATHOD | MOHAMEDBHAI LLC

*s/ Laura B. Wolf*
Laura B. Wolf
Siddhartha H. Rathod
Matthew J. Cron
Qusair Mohamedbhai
2701 Lawrence Street, Suite 100
Denver, CO 80205
(303) 578-4400 (t)
(303) 578-4401 (f)
lw@rmlawyers.com
sr@rmlawyers.com
mc@rmlawyers.com
qm@rmlawyers.com

ATTORNEYS FOR PLAINTIFFS