**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 16-cv-02304-WJM-GPG

MEGAN MCFADDEN,
LONNIE WHITE, and
ANTONIO "A.J." WHITE,

      Plaintiffs,

V.

MEEKER HOUSING AUTHORITY, a governmental entity,
MELINDA PARKER, an individual,
MICHELLE BUCKLER, an individual,
EDY GEORGE, an individual, and
STACIE KINCHER, an individual,

      Defendants.

---

**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

Plaintiffs Megan McFadden, Lonnie White, and A.J. White, by and through their attorneys at RATHOD | MOHAMEDBHAI LLC, hereby submit this Motion for Partial Summary Judgment and in support thereof state as follows:

## **INTRODUCTION**

Although the extensive motions practice may suggest otherwise, this case is straightforward.  Defendants discriminated against Plaintiffs based upon their disabilities and then interfered with their right to live free of such discrimination.  For the following reasons, there is no dispute of genuine material fact that should deny Plaintiffs their request for summary judgment on Claims 1-5 and 7-10, and on all counterclaims brought against them.[1]

---

[1] As discussed below, Plaintiffs seek summary judgment against only Defendant MHA on Claims 4, 5, and 9.  Further, only the Whites seek summary judgment against Defendants on Claims 7, 8, and 9.

## MOVANTS' STATEMENT OF MATERIAL FACTS[2]

**Facts Relating to the Parties**

1. Defendants manage Meeker Family and Elderly Housing located at 980 Karen Court, Meeker, Colorado 81641 (referred to below interchangeably as "MHA" and "Karen Court"). *See* Scheduling Order [ECF No. 94] at 8, Undisputed Facts ("UF") ¶ 4.

2. Defendant Meeker Housing Authority ("MHA") was created pursuant to the Colorado Housing Authorities Law, C.R.S. § 29-4-201. *See* Scheduling Order at 8, UF ¶ 2.

3. MHA is financially subsidized by the U.S. Department of Housing and Urban Development ("HUD"), which allows for low-income individuals to live at MHA without paying the full market rent. *See* Scheduling Order at 8-9, UF ¶ 4.

4. Defendants receive subsidies from the federal government known as Housing Assistance Payments, which make up the difference between the reduced rent and the market value of the units. *See* Second Amended Answer ("SAC Answer") [ECF No. 253] ¶ 48.

5. Defendant Stacie Kincher began working as the Executive Director of MHA on or around May 16, 2016. *See* **Ex. 1**, *Defendants' Timeline of Events* at 1.

6. At all times pertinent to this matter, Defendants Melinda Parker, Michelle Buckler, and Edy George served on the MHA Board. *See* Scheduling Order at 9, UF ¶¶ 6-8.

7. Defendants must comply with all HUD regulations and guidelines in the management and operation of MHA. *See* **Ex. 2**, *Kincher-MHA Deposition* at 156:13-17;[3] **Ex. 3**, *George Deposition* at 23:3-10.

---

[2] Where there is a genuine dispute of material fact, Plaintiffs have put forth Defendants' position as true for purposes of this Motion. In doing so, Plaintiffs do not concede these factual disputes. Further, while some of the key disputes may be affirmatively acknowledged below, not all disputes will be noted herein.
[3] Plaintiffs noticed two separate depositions of Defendants MHA and Kincher. Upon Defendants' request, these depositions were combined so that Ms. Kincher's testimony bound both herself and MHA.

8. As Board members, Defendants Parker, Buckler, and George are "under a statutory duty to comply or to cause strict compliance with all provisions of [the Housing Authorities Law] and the laws of the state of Colorado, and, in addition thereto, with each term, provision, and covenant in any contract, on the part of the authority to be kept or performed by the authority."  C.R.S. § 29-4-206.

9. At all times giving rise to this matter, Plaintiffs lived at Karen Court and received subsidized housing for which they were eligible.  *See* Scheduling Order at 10, UF ¶¶ 11-13; *id.* at 13, UF ¶ 32; *see also* **Ex. 4**, *Whites' Move-In Paperwork*; **Ex. 5**, *McFadden Move-In Paperwork*.[4]

10. At all times pertinent to this matter, Plaintiff Lonnie White lived with his son A.J. White. *See* **Ex. 6**, *2016.09.13 Lonnie White Decl.* at ¶ 3; Scheduling Order at 10, UF ¶ 10.

**Facts Relating to Megan McFadden's Disability and Disability-Related Needs**

11. Ms. McFadden has a well-documented record of mental health disabilities, including chronic dysthymic disorder, major depressive disorder, post-traumatic stress disorder, and anxiety, which have been diagnosed by at least five health care professionals since January 2014.  *See generally* **Ex. 7**, *McFadden Treatment Records*;[5] *see also* **Ex. 8**, *Eliasen Dep.* at 127:11-18, 140:19-24 (describing Ms. McFadden's disabilities as impacting her activities of daily living); **Ex. 9**, *Vargas Dep.* at 32:1-11 (describing Ms. McFadden's depression and anxiety as significant enough to cause hospitalization); **Ex. 10**, *Krueger Dep.* at 24:16-25:1 (describing chronic dysthymic disorder as a "chronic, longstanding depressive disorder").

---

[4] Defendants have taken the position that Exhibits 4 and 5 – along with Exhibits 34, 39, and 43 – must be filed under seal pursuant to Local Rule 7.2.  Plaintiffs disagree that access to these filings should be restricted from the public.  However, pursuant to the terms of the Protective Order, Plaintiffs will file these Exhibits under seal until this Court orders that they be filed publicly.

[5] Due to the breadth of the medical records, Plaintiffs needed to split up Exhibits 7 and 13 into sub-parts for purposes of electronic filing.  All pincites associated with these exhibits reference the page number of the combined file, which can be recreated by combining the subparts in Adobe.

12. Since at least January 2014, Ms. McFadden has been prescribed medications – including Paroxetine (Paxil), Latuda, Lorazepam, Fluoxetine (Prozac), and Wellbutrin – to manage her mental health disabilities.  *See generally* **Ex. 7**.

13. As of March 23, 2015, Ms. McFadden had been suffering from a "low mood" for 1.5 years and from "anxiety attacks" for one year, resulting in visits to the ER.  **Ex. 7** at 113.

14. On January 19, 2016, Ms. McFadden reported to her therapist "having Panic Attacks, she had her heart racing, thought she was having a heart attack." **Ex. 7** at 16.  Ms. McFadden also reported "avoiding situations, feeling cut off from others, and difficulty concentrating," as well as "loss of pleasure, feeling down, trouble sleeping, feeling tired, and feeling bad about herself, along with occasional thought[s] she would be better off dead," reporting that "these symptoms make it 'very difficult' for her to function." *Id.*

15. On January 19, 2016, Ms. McFadden's therapist Catherine Eliasen, MSW, diagnosed her with "major depressive disorder, recurrent, moderate," generalized anxiety disorder, panic disorder without agoraphobia, and post-traumatic stress disorder ("PTSD").  **Ex. 7** at 23; *see also* **Ex. 8** at 28:9-17 (Eliasen describing herself as an expert in diagnosing patients with depression and anxiety).

16. As of April 6, 2016, Ms. McFadden was suffering from "[d]epressive symptoms of malaise, excessive sleeping, low motivation" and her anxiety was "not controlled" with medication. **Ex. 7** at 68; *see also* **Ex. 10** at 33:12-34:8 (testifying that Ms. McFadden's dosage of anti-anxiety medication was increased at this time).

17. On May 3, 2016, Ms. McFadden reported feeling suicidal the "Saturday before last" and noted that her prescription medication dosages had been "upped because she was having some 'pretty serious panic attacks.'" **Ex. 7** at 26.

4

18. On July 6, 2016, Ms. McFadden reported having a panic attack the previous week, describing the "absolute fear" she experienced and being "an emotional mess." **Ex. 7** at 40.

19. On July 22, 2016, Ms. McFadden reported a chief complaint of panic attacks, which she described as "causing issues with coping daily." **Ex. 7** at 137.

20. On October 13, 2016, Ms. McFadden reported that "she has more bad days than good days" and that "about two months ago she was very down; she had no plan for suicide but felt what is the point and others would be better off without her." **Ex. 7** at 52; *see also* **Ex. 11**, *Levi McFadden Dep.* at 97:18-98:9 (describing Ms. McFadden's suicidal ideation occurring as recently as between May and July 2017).

21. Ms. McFadden experiences approximately four to five panic attacks per month. *See* **Ex. 12**, *Second Megan McFadden Dep.* at 14:6-12; *see also id.* at 32:5-25 (testifying that panic attacks have led her to the ER room about four times); **Ex. 11** at 136:17-137:10 (describing panic attacks Ms. McFadden experienced in 2016 and 2017).

22. Ms. McFadden's companion dog "can tell when I am starting to get anxious and when I am starting to panic and he will come and actively distract me." **Ex. 12** at 20:24-21:1.  Chewy "is a great asset" for coping with stress. *Id.* at 39:3-4.

23. Ms. McFadden reports that Chewy has "[i]mmensely" improved the quality of her life, "an intricate part of my stability." **Ex. 12** at 48:22-25; *see also* **Ex. 7** at 29 (describing being "comforted by" Chewy).

24. When Ms. McFadden is suffering from depression and anxiety, Chewy "pulls me out of my head" so that she "can concentrate on something besides what is going on inside myself." **Ex. 12** at 49:11-15; *see also* **Ex. 7** at 137 (noting "good improvement of stress and anxiety

with use of her animal (dog) as emotional support"); *see also* **Ex. 11** at 138:15-139:3

(describing Chewy as mentally taking care of Ms. McFadden).

**<u>Facts Relating to A.J. White's Disability and Disability-Related Needs</u>**

25. A.J. White has a well-documented record of mental health disabilities, including cyclothymic

    disorder, dysthymic disorder, major depressive disorder, anxiety, and ADHD, which have

    been diagnosed by numerous health treatment providers since 2008.  *See generally* **Ex. 13**,

    *A.J. White Treatment Records* (highlighted for ease of reference); *see also* **Ex. 10** at 24:16-21

    (describing dysthymic disorder as encapsulating depression).

26. A.J. White, who is about to turn 22 years old, first began treatment for his mental health

    disorders when he was just ten years old.  *See generally* **Ex. 13**; *id.* at 199.

27. A.J. White began receiving treatment at ten years old after being hospitalized for suicidal

    ideation.  A.J. White has been hospitalized for suicidal ideation about five times.  *See* **Ex. 13**

    at 37, 50, 61, 94, 96, 104, 164, 200, 227, 291, 366; *see also id.* at 227 (noting that he had

    previously attempted suicide); *id.* at 61 (establishing that when 12 years old, he continued to

    have "thoughts about hurting myself"); *id.* at 200 (admitting to thinking about suicide as of

    October 2013).

28. Over the years, A.J. White has been prescribed Zoloft, Sertraline, Vyvanse, Adderall, Celexa,

    Concerta, Strattera, Wellburtin, Trazodone, Abilify, Fluoxetine (Prozac), Lexipro, and

    Imipramine to manage his mental health disabilities.  *See generally* **Ex. 13.**

29. A.J. White reacts poorly to these medications, which negatively impact his depression,

    increase his feelings of anger, cause episodes of mania, and result in fatigue.  *See, e.g.*, **Ex.**

    **13** at 37, 50-51, 335-336.

30. After he first moved to Meeker, A.J. White reported suicidal ideation, stating that "he often thinks about suicide . . . to escape." **Ex. 13** at 209.  He also reported that "he has never felt joy and can't remember a time he felt happy about anything." *Id.* at 223.

31. Intake notes also show that A.J. White had suffered at least one anxiety attack in or around December 2013, which was not his first. **Ex. 13** at 229.  A.J. White's anxiety interacting with others impacts his ability to function in everyday life. *Id.*

32. On January 29, 2014, Catherine Eliasen, MSW, remarked that A.J. White showed an "extremely high measurement of depression and anxiety," was a "9 our [*sic*] of 9" on the depression scale, and was "severely depressed." **Ex. 13** at 233.

33. On March 5, 2014, A.J. White was "still very depressed." **Ex. 13** at 243.

34. On March 12, 2014, A.J. White reported that he had "got a cat" and that his depression was at a 5 out of 10 for most of the week.  **Ex. 13** at 255.

35. Less than one month later, Ms. Eliasen remarked that she was "seeing some gradual changes" in A.J. White's progress.  **Ex. 13** at 265.

36. On April 16, 2014, A.J. White rated his depression as a "3 out [of] 10," although his anxiety remained high at a "7-8 out of 10." **Ex. 13** at 267.

37. A.J. White's cats help him "stay focused, they help me be responsible and get up in the morning and take care of them, and give me a reason to wake up and feel happy." **Ex. 14**, *A.J. White Dep.* at 265:21-24; *see also id.* at 375:2-5; **Ex. 15**, *Lonnie White Dep.* at 37:12-17; **Ex. 8** at 170:10-23.

38. Having companion cats has ameliorated the effects of A.J. White's disabilities.  **Ex. 14** at 266:3-6, 338:20-339:1, 376:4-19, 384:4-10; *see also id.* at 384:11-15 (describing the benefits of having two cats instead of one); **Ex. 15** at 39:11-18; **Ex. 8** at 104:13-15, 168:1-6.

39. Indeed, during a six-month period without a companion cat, A.J. White reported a need for increased mental health treatment. **Ex. 14** at 74:5-16.

40. Ultimately, A.J. White's cats were so successful at helping him manage the symptoms of his disabilities that he stopped taking prescription medications. *See* **Ex. 8** at 70:1-5; **Ex. 14** at 315:5-16, 318:16-319:3, 356:23-357:1, 371:19-373:15.

41. Still, A.J. White continues to suffer from his disabilities. For example, in September 2016, A.J. White reported "problems with concentration," "a persistent negative emotional state," and "depressive symptoms." **Ex. 13** at 350.

42. When he first moved to Meeker, Colorado in or around early 2014, A.J. White had been receiving disability benefits in the form of Social Security Income ("SSI"). *See* **Ex. 13** at 254; **Ex. 14** at 362:3-8.

43. In May 2014, the State of Colorado diagnosed A.J. White with a "Most Significant Disability" through its Division of Vocational Rehabilitation, finding him eligible for assistance with job placement, job training, vocational counseling and guidance, and more. **Ex. 16**, *Vocational Rehabilitation Eligibility Determination*.

44. Throughout his high school education in Meeker, A.J. White was placed on an Individualized Education Plan ("IEP") in which he was consistently diagnosed with a "serious emotional disability" up through his June 2016 graduation. **Ex. 17**, *White IEP Records*.

45. A.J. White's disabilities are also observable and apparent upon interacting with him. *See* **Ex. 18**, *Barr Deposition* at 115:11-116:3; **Ex. 15** at 17:1-18:5, 22:23-23:2.

**Facts Relating to Defendants' Adoption and Enforcement of New Pet Policies During Summer 2016**

46. The Board's duties include the creation and adoption of policies for MHA, including its pet policies. *See* Scheduling Order at 9, UF ¶¶ 6-8; **Ex. 19**, *Buckler Deposition* at 24:22-25:3.

47. As the MHA Executive Director, Defendant Kincher's duties include the enforcement of policies for Defendant MHA. Scheduling Order at 9, UF ¶ 9.

48. Prior to June 15, 2016, Plaintiffs were permitted to keep companion animals in their units. *See* **Ex. 6** at ¶ 8; **Ex. 20**, *2016.09.13 A.J. White Decl.* at ¶ 11; **Ex. 12** at 10:13-24, 49:16-22.

49. On June 15, 2016, the MHA Board voted to change the Karen Court pet policy to reflect that the need for companion animals "[m]ust be documented by a MD – MHA will not accept letters from psychologist, psychotherapists, or therapist, etcetera." **Ex. 21**, *Board Meeting Minutes* at 2.

50. On June 16, 2016, Defendant Kincher drafted a pet policy reflecting the change approved by the Board the day before. **Ex. 22**, *2016.06.16 Revised Pet Policy* at 1. The new pet policy also stated that "[a]ll animals must be approved and registered with MHA," including through "[p]ayment of deposit." *Id.* at 2.

51. In or around June 2016, a representative of MHA called the Pioneers Medical Center and asked its doctors to be cautious in writing companion animal recommendation letters. *See* **Ex. 10** at 43:10-44:7, 45:7-46:6;[6] *see also id.* at 47:19-48:6 (describing the call as a "once in a lifetime" situation); **Ex. 24**, *2016.10.03 Harmon-Rathod Letter*; **Ex. 25**, *First Megan McFadden Dep.* at 57:9-58:14, 74:1-18; **Ex. 12** at 13:5-22.

52. On or around July 11, 2016, Defendant Kincher handed out copies of the "June 16, 2016 No-Pet Policy" to "all tenants." *See* **Ex. 26**, *MHA-Kincher Work Calendars* at 1 (July 11, 2016 entry); **Ex. 1** at 1 (July 12, 2016 entry).

53. On or around July 12, 2016, Defendant Kincher posted Notices of Violations and Infractions on Plaintiffs' doors for "[h]aving a pet in your apartment at Karen Court," a purported

---

[6] The Pines is the name of one of the two housing complexes that together constitute MHA. *See* **Ex. 23**, *2016.09.23 Barr Decl.* at ¶ 8.

violation of Section 16, Paragraph 1 of their leases.  **Ex. 27**, *McFadden-Kincher-MHA Correspondence* at 1; **Ex. 28**, *Whites-Kincher-MHA Correspondence* at 1.

54. On July 20, 2016, the MHA Board approved imposing a "$300 non-refundable deposit for therapeutic pets at Karen Court."  **Ex. 21** at 4.

**Facts Relating to Ms. McFadden's Requests for and Denials of Reasonable Accommodations**

55. On July 22, 2016, Defendant Kincher posted a second Notice of Violations and Infractions on Ms. McFadden's door for "[h]aving a pet in your apartment."  **Ex. 27** at 2.

56. On July 23, 2016, Ms. McFadden provided Defendant Kincher with a written request for a reasonable accommodation to allow her to keep her companion animal in her home without paying any fees.  **Ex. 27** at 3.

57. On July 25, 2016, Ms. McFadden reiterated her request for a reasonable accommodation to allow her to remain in her unit with her companion animal and without paying the $300 fee.  **Ex. 29**, *2016.07.25 Kincher-McFadden Conversation Tr.* at 3:12-14, 4:6-9, 5:2-6.

58. Ms. Kincher responded to Ms. McFadden's multiple requests by stating that the Board was "cracking down" on animals, that she was "tired of moving up the proper chains," and, "You're going to have to take us to court. . . .  Take us to court.  That's – that's really it."  **Ex. 29** at 3:6-7, 4:17-18, 5:12-17.

59. During the July 25, 2016 conversation, Ms. McFadden presented Ms. Kincher with a letter from Catherine Eliasen, a licensed social worker, in support of her need for a companion animal and stated that she would soon be providing a similar letter from her medical doctor.  **Ex. 29** at 3:16-18; **Ex. 30**, *McFadden Treatment Letters* at 1.

60. The next day, on July 26, 2016, Defendants held a special session board meeting "to discuss the reasonable accommodation request regarding Megan McFadden."  The MHA Board

"decided to waive the no-pet policy for her companion animal" as long as she produced "a letter from a psychiatrist" in support thereof <u>and</u> paid a "$300.00 security deposit" within 30 days.  **Ex. 21** at 5.

61. According to Defendants' testimony, they "granted" Ms. McFadden's reasonable accommodation request during this meeting.  *See* **Ex. 2** at 194:7-8, 201:5-21 (misstating date as August 26); **Ex. 3** at 86:9-12; *see also id.* at 87:7-16 (confirming that a non-disabled person would not need a reasonable accommodation).

62. However, according to Defendant Parker, the Board granted Ms. McFadden's reasonable accommodation request by allowing her to stay at MHA "as long as she got rid of the dog." **Ex. 31**, *Parker Dep.* at 51:18-25.

63. Although Defendants had "granted" Ms. McFadden's accommodation, Defendant Kincher provided Ms. McFadden with a 30-day Notice to Vacate the following day.  **Ex. 27** at 4.

64. On July 27, 2016, and in accordance with the Board's decision, Defendants drafted a revised pet policy requiring that tenants seeking to live with a companion animal procure a letter from a licensed psychiatrist – no longer accepting letters from medical doctors – and pay a $300 non-refundable "unit security deposit."  **Ex. 32**, *2016.07.27 Revised Pet Policy* at 2-3; *see also* **Ex. 1** at 1 (noting that the policy was handed out to tenants on July 27, 2016).

65. Defendants later testified that Ms. McFadden's verification letter from her medical doctor sufficiently established that she was disabled and in need of a companion animal.  **Ex. 2** at 278:3-280:21; **Ex. 31** at 51:12-16.

66. On August 5, 2016, Ms. McFadden sent Defendant Kincher an email reiterating her request for a reasonable accommodation, asking her to "remove the notice to vacate and say yes to my requests for accommodation."  **Ex. 27** at 5.

67. On August 12, 2016, Defendant Kincher denied Ms. McFadden's reasonable accommodation request through a letter entitled "Eviction Notice letter for McFadden." **Ex. 27** at 5-6.

68. On August 18, 2016, Ms. McFadden emailed Defendant MHA stating that "the other violations you cited me for were due to my need for my dog," adding, "I have repeatedly sent over the appropriate medical paperwork regarding my dog and I should be allowed to stay with my dog.  Please do not do this – my children and I need our home." **Ex. 27** at 7.

69. On August 22, 2016, Defendant Kincher wrote Ms. McFadden that "[t]he Meeker Housing Authority Board of Directors have reviewed [your] e-mail regarding your eviction. . . .  The board still stands by their decision of eviction, and the violations still apply." **Ex. 27** at 8.

70. On August 24, 2016, Ms. McFadden sent an email to Defendant Kincher expressing that she was "terribly afraid of becoming homeless with my children" and reiterating her request that Defendants "please let me stay with my dog." **Ex. 27** at 9.

71. On August 25, 2016, Defendant Kincher responded stating that she had "visited with the board and they would be happy to give you an extension if you were to find a new home for your dog in the process." **Ex. 27** at 9.

72. After repeated threats of eviction, Ms. McFadden moved out of her subsidized unit at Karen Court on September 8, 2016.  *See* **Ex. 33**, *CHFA Investigation Findings* at 1 (noting correct move-out date).  Defendants' paperwork lists Ms. McFadden's move-out as an eviction.  *See* **Ex. 34**, *2016.09.15 McFadden Move-Out Form* (misdated).

**<u>Facts Relating to the Whites' Requests for and Denials of Reasonable Accommodations</u>**

73. On July 20, 2016, Plaintiff Lonnie White attended the monthly MHA Board meeting.  At the meeting, Lonnie White asked for a reasonable accommodation for his son A.J. White to keep his two companion animals in their unit without paying the $300 fee, providing Defendants

with a copy of a January 22, 2015 letter from licensed social worker Catherine Eliasen in support. **Ex. 21** at 3; **Ex. 6** at ¶¶ 20-22; *see also* **Ex. 28** at 7.

74. The next day, on July 21, 2016, Defendant Kincher provided the Whites with a letter informing them that "the MHA board of directors, made its decision to keep the zero pet policy enforced at Karen Court.  It was also agreed upon that there will be a $300 non-refundable deposit for each pet that qualifies for being a certified therapeutic pet though [*sic*] the state of Colorado."  **Ex. 28** at 2.

75. On July 22, 2016, Defendant Kincher posted a second Notice of Violations and Infractions on the Whites' door for "[h]aving a pet in your apartment at Karen Court."  **Ex. 28** at 3.

76. Five days later, on July 27, 2016, Defendants drafted a revised pet policy limiting tenants to no more than one companion animal per unit knowing that A.J. White had more than one companion animal.  **Ex. 32** at 2; **Ex. 18** at 96:18-97:1; **Ex. 23**, *2016.09.23 Barr Decl.* at ¶ 43.

77. The following day, Defendant Kincher posted a third Notice of Violations and Infractions on the Whites' door for "[h]aving a pet in your apartment at Karen Court."  **Ex. 28** at 4.

78. On August 5, 2016, Defendant Kincher posted a fourth Notice of Violations and Infractions on the Whites' door for "[h]aving a pet in your apartment at Karen Court."  **Ex. 28** at 5 (second "Second" notice).

79. On August 16, 2016, Defendant Kincher provided the Whites with a 30-day Notice to Vacate for violating the pet policy.  **Ex. 28** at 6.

80. While the Notice to Vacate cites other purported violations of the Whites' lease, during their deposition Defendants MHA and Kincher admitted that "the eviction process" was only for the Whites' violations of the pet policy.  *See* **Ex. 2** at 461:14-21, 462:13-25.

81. On or around August 17, 2016, the Whites provided Defendants with another letter from A.J. White's therapist Catherine Eliasen verifying his disability and disability-related need for companion animals.  **Ex. 35**, *White Treatment Letters* at 2; **Ex. 1** at 1.

82. On August 27, 2016, Lonnie White sent Defendant Kincher an email reattaching copies of both of his son's disability-verification letters, asking that Defendants "[p]lease reconsider the eviction."  **Ex. 28** at 7; *see also* **Ex. 33** at 3 (CHFA finding that this paperwork was sufficient to verify A.J. White's disability).

83. On or around August 29, 2016, Defendant Kincher denied the Whites' reasonable accommodation request, stating in pertinent part, "You gave me a letter from your therapist but we would need a letter from a medical doctor to consider a diagnosis (per HUD)."  **Ex. 28** at 8.  While the letter states that the "eviction process" is unrelated to the Whites' "pets," Defendants MHA and Kincher testified that this statement was not accurate.  SMF ¶ 80.

84. On September 7, 2016, the Whites emailed Defendants another reasonable accommodation request, stating, in part, "I am asking you not [to] evict my son and I.  We need our home and my son needs his animals!"  **Ex. 28** at 9.

85. Less than two hours later, Defendant Kincher responded, in pertinent part, "Please be moved out on or before the 15th."  **Ex. 28** at 9.

86. Defendants Kincher and MHA later testified that both MHA and the Board would have granted the Whites' reasonable accommodation requests but for their having filed the present litigation.  **Ex. 2** at 220:6-23, 352:6-11, 352:20-24, 353:2-10.

**Additional Facts Relating to Defendants' Motive in Denying Plaintiffs' Requests for Reasonable Accommodations & Serving Notices to Vacate**

87. At no time prior to denying Plaintiffs' requests for reasonable accommodations did Defendants ever make a determination as to whether Ms. McFadden or A.J. White were disabled.  *See* **Ex. 36**, *MHA's Responses to Written Discovery* at ROG No. 7.

88. At no time prior to denying Plaintiffs' requests for reasonable accommodations did Defendants take any steps to determine whether the letters provided by Plaintiffs' healthcare professionals in support of their disabilities and disability-related need for assistance animals complied with HUD's documentation requirements.  *See* **Ex. 36** at ROG No. 8.

89. Former MHA Board member Robert Barr testified that Defendants intentionally created onerous requirements and then purposefully changed the pet policies to prevent tenants from being able to live with assistance animals.  *See* **Ex. 18** at 69:8-70:13, 79:4-18, 93:20-94:6, 97:2-18; **Ex. 23** at ¶¶ 27-30, 44-47.

90. Former MHA Board member Robert Barr testified that evicting Plaintiffs "was discussed as a last resort," explaining that if Plaintiffs "didn't get rid of [their assistance animals] they were going to throw [Plaintiffs] out."  **Ex. 18** at 78:22-79:2; *see also* **Ex. 23** at ¶¶ 44, 47.

**Facts Relating to Defendants' Non-Compliance with Federal Fair Housing Laws**

91. In July 2017, HUD's Fair Housing and Equal Opportunity Office ("HUD FHEO") made findings that Defendants were in violation of Section 504 of the Rehabilitation Act based, in part, on Defendants' pet policies.  *See* **Ex. 37**, *2017.07.25 HUD-Kincher Email* at 1; **Ex. 38**, *2017.09.14 Executed Voluntary Compliance Agreement* at 2-5.

92. In September 2017, Defendants entered into a Voluntary Compliance Agreement with HUD FHEO agreeing to "create a Reasonable Accommodation/Modification Policy and Procedure" that "do[es] not stipulate that the person verifying the disability and disability

related need for the reasonable accommodation/modification must be certified" as well as to "develop a comprehensive assistance animal policy" that does not include restrictions based on the number of animals or require fees/deposits.  **Ex. 38** at 4-5; *see also* **Ex. 19** at 38:5-11 (Buckler testifying that Defendants could not charge a deposit for a companion animal); **Ex. 2** at 202:10-203:6 (Kincher and MHA testifying to the same).

93. On December 13, 2017, Defendants sent HUD FHEO a proposed Reasonable Accommodation policy stating that any licensed health professional could verify a disability and that MHA could not request confidential medical records or specific details regarding a tenant's disability to verify the disability.  **Ex. 39**, *Applegate-HUD Emails* at 8; *see also* **Ex. 40**, *McKenzie-Kincher Emails* at 1-3 (notifying Defendants that verification of disability could come from any reliable third party).

94. On January 29, 2018, Defendants sent HUD FHEO a proposed Assistance Animal policy generally allowing for assistance animals at MHA and stating that no deposits or fees may be charged for an assistance animal.  **Ex. 39** at 13.

**Facts Relating to Defendants' Unsupported and Retaliatory Counterclaim Against Ms. McFadden and Their Unlawful Refusal to Return Ms. McFadden's Security Deposit**

95. On December 16, 2016, Defendants brought a counterclaim against Ms. McFadden for breach of contract, seeking lost rental income and repair costs.  Answer to Amended Complaint [ECF No. 82] at 28-29.

96. Defendants have never disclosed a copy of Ms. McFadden's lease, the purported contract that she breached.  *See* **Ex. 41**, *2017-04-19 Discovery Dispute Chart (McFadden) SJB edits* at 1, Row 1; *see also* **Ex. 42**, *Staggs Deposition* at 30:23-31:4 (deposition of Plaintiffs' expert).

97. Defendants never sent Ms. McFadden a demand for repair charges prior to or after allegedly incurring such costs.  **Ex. 41** at 1, Row 1 (responding to request for a "(2) Copy of written

demand for repair charges made upon Ms. McFadden and proof of service" with "(2) None"); *see also* **Ex. 2** at 109:16-110:4.

98. Despite the unit purportedly remaining empty for nearly three months, Defendants collected subsidies in Ms. McFadden's name for the full contract rent of her unit through December 2016.  *See* **Ex. 43**, *Schedule of Tenant Assistance Payments*.

99. Ms. McFadden paid a $50 security deposit when she moved into Karen Court.  *See* **Ex. 44**, *HUD 50059 – McFadden Transfer* (listing $50 security deposit on transfer paperwork); **Ex. 25** at 149:8-12.

100.   Defendants never provided Ms. McFadden with a security deposit disposition, nor have they ever returned Ms. McFadden's security deposit.  **Ex. 25** at 149:13-15; **Ex. 33** at 2 (CHFA finding that Defendants "should refund the security deposit in full" after failing to provide a security deposit disposition "as required").

101.   On May 11, 2017, Ms. McFadden gave Defendants notice of her intention to file legal proceedings for their failure to repay her security deposit, which she filed eight days later. **Ex. 45**, *2017.05.11 Wolf-Counsel Email* (attaching proposed Second Amended Complaint with the cause of action included therein); Motion for Leave to Amend [ECF No. 161].

**Facts Relating to Defendants' Retaliatory Termination of the Whites' Subsidy, Their Unlawful Refusal to Calculate Properly the Whites' Rental Amount, and Their Unsupported Counterclaims Against the Whites**

102.   On April 20, 2017, Defendants terminated the Whites' housing assistance (subsidy) for allegedly failing to undergo their annual recertification.  **Ex. 28** at 10-11; **Ex. 2** at 533:18-21 (testifying that Defendants terminated the Whites' subsidy because "[t]hey were not coming in to do their recertification.  That's the rules."); *see also id.* at 534:15-535:10 (stating that the reasons listed in the notice were "part of their recertification").

103.    HUD requires its housing providers to conduct annual recertifications to check for

changes in a tenant's income.  *See* **Ex. 46**, *HUD Handbook 4350.3, Chapter 7* § 7-4(A)(1).

104.    In advance of each annual recertification, HUD requires its housing providers to provide

three written "reminder" notices to tenants at specified times that must include several key

pieces of information, including (a) the name of the staff person at the property to contact

about scheduling a recertification interview, the contact information for this person, and how

the contact should be made; (b) the location, days, and office hours that property staff will be

available for recertification interviews; and (c) a list of the information that the tenant should

bring to the interview.  *See* **Ex. 46** at Figure 7-4; *id.* § 7-7 ¶ B(2).

105.    Defendants admit that at most, they provided the Whites with only two of the three

notices required by HUD before the Whites' February 2017 annual recertification.  *See* **Ex.**

**47**, *Gorham-Wolf Correspondence* at 1-2; **Ex. 2** at 519:12-14.[7]

106.    The two notices did not contain the HUD-required information listed above.  *See* **Ex. 49**,

*Whites' Annual Recertification Notices – 2016.*

107.    At the time they decided to terminate the Whites' subsidy, Defendants knew that the

Whites had not violated their duty to undergo the annual recertification because Defendants

had not provided "all three recertification reminder notices per HUD requirements."  **Ex. 40**

at 5; **Ex. 47** at 3-7.

108.    Defendants never formally rescinded the Notice of Termination nor did they notify the

Whites of any such rescission.  *See* **Ex. 2** at 551:7-8, 551:22-25.

---

[7] Plaintiffs dispute that Defendants provided any of the three required notices to the Whites.  *See* **Ex. 48**, *2017.03.06 Lonnie White Decl*.  However, for purposes of this motion Plaintiffs take as true Defendants' position that they provided the first two notices but not the third.

109.    On September 5, 2017 – and without leave of the Court – Defendants filed two

counterclaims against the Whites.[8]   *See* SAC Answer at 36-39.  Defendants alleged, in part,

that the Whites were liable for breach of contract by failing to abide by the terms of a

Repayment Agreement.   *See* SAC Answer at 37; *see also* **Ex. 50**, *Repayment Agreement*.

110.    On May 26, 2017, Defendants MHA and Kincher – along with their consultant Mike

McKenzie – drafted a Repayment Agreement stating that the Whites owed $3,944 in

overpaid subsidies to HUD.   *See* **Ex. 40** at 9-10; **Ex. 51**, *Kincher Responses to Written*

*Discovery* at ROG No. 10; **Ex. 2** at 556:14-20.

111.    Defendants admit that the payments purportedly owed under the Repayment Agreement

are owed to HUD, not to Defendants.   **Ex. 2** at 556:14-557:5.

112.    On August 24, 2017, CHFA found that the Whites' tenant file "does not support validity

of the repayment agreement" or "charging back-rent."   *See* **Ex. 33** at 3.

113.    On September 26, 2017, HUD directed Defendants to "[c]ancel the current repayment

agreement," which they never did.   *See* **Ex. 52**, *2017.09.26 HUD-MHA Letter* at 1.

114.    Lastly, Defendants allege that the Whites are liable for failing to make rent payments

from July 2017 through the date they moved.   *See* SAC Answer at 37-38.

115.    On June 5, 2017, Defendants recalculated the Whites' monthly rental payments to $644

per month, which was thereafter reduced to $636 per month.   **Ex. 28** at 12, 15.

116.    In calculating these amounts, Defendants refused to consider the Whites' $400 annual

disability deduction or their medical expenses deduction, citing the litigation as the basis for

their decision.   *See* **Ex. 2** at 350:8-14, 351:11-17, 480:5-15, 524:7-15; **Ex. 53**, *2017.02.01*

*Tenant Certification Worksheet* at 2; **Ex. 51** at RFA No. 8; *see also* **Ex. 40** at 8.

---

[8] Plaintiffs' motion to dismiss these counterclaims is currently pending before this Court.  [ECF No. 260].

117.    Each month, the Whites tendered their monthly rental payments deducting the $33.33 per

month for their disability deduction, which Defendants rejected.  *See* **Ex. 28** at 13-14, 16-17.

118.    On September 26, 2017, HUD directed Defendants to "provide a statement to [the

Whites] with the revised and corrected rent calculation, taking the proper disability

allowance of $400.00 into account."  **Ex. 52** at 1.

119.    Defendants never provided the Whites with such a letter, and instead sent the Whites a

security deposit disposition letter demanding three months of back-rent based on the prior,

unadjusted rent calculations.  *See* **Ex. 28** at 18-19.

120.    Defendants sent this letter more than one month after learning that they had also inflated

the Whites' income by $59.10 per month, meaning that Defendants had also been

overcharging the Whites' rent regardless of the disability deduction.  *See* **Ex. 54**, *2017.09.07*

*Whites' EIV Report*; *see also* **Ex. 33** at 4 (noting that the rent increase notice was inaccurate

as it miscalculated the Whites' income).

121.    In August 2017, CHFA made findings that "MHA does not appear to be working with the

[Whites] to remain in the unit pending completion of the litigation."  **Ex. 33** at 4.

## SUMMARY JUDGMENT STANDARD

Plaintiffs incorporate by reference the summary judgment standard set forth by this Court

in *Olivero v. Trek Bicycle Corp.*, 291 F. Supp. 3d 1209 (D. Colo. 2017).  Plaintiffs would add

that Defendants cannot survive summary judgment by casting "mere metaphysical doubt" upon

the evidence.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

Further, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted

by the record, so that no reasonable jury could believe it, a court should not adopt that version of

the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S.

372, 380 (2007).  While it is the jury's duty to weigh credibility, "in the rare circumstance where

the [non-moving party] relies almost exclusively on his own testimony, much of which is

contradictory and incomplete, it will be impossible for a district court to determine whether the

jury could reasonably find for the [non-moving party], and thus whether there are any 'genuine'

issues of material fact, without making some assessment of the [non-moving party]'s account."

*Jeffreys v. City of N.Y.*, 426 F.3d 549, 554 (2d Cir. 2005).  Yet "it remains the 'affirmative

obligation of the trial judge to prevent factually unsupported claims and defenses from

proceeding to trial.'"  *Giuffre v. Marys Lake Lodge, LLC*, No. 11-CV-00028-PAB-KLM, 2012

WL 4478806, at *4 (D. Colo. Sept. 28, 2012) (citations omitted).

### FAIR HOUSING ACT & REHABILITATION ACT LEGAL STANDARDS

Courts use the same or substantially similar standards of analysis when reviewing

disability discrimination claims brought under the Fair Housing Act ("FHA") and § 504 of the

Rehabilitation Act ("§ 504").[9]  *See generally Cinnamon Hills Youth Crisis Ctr., Inc. v. Saint

George City*, 685 F.3d 917 (10th Cir. 2012); *see also Roe v. Hous. Auth. of City of Boulder*, 909

F. Supp. 814, 821 (D. Colo. 1995) ("[B]ased on the explicit intent of Congress and the similar

goals of the ADA, the Rehab[ilitation] Act and the FHAA, I will analyze [the] claims together.").

The FHA applies to all buildings that include dwellings occupied as, or designed or

intended for, residences.  42 U.S.C. § 3602(b).  Section 504 extends to a "program or activity"

receiving federal financial assistance, which it defines as an instrumentality of a State or local

government or "an entire corporation, partnership, or other private organization, or an entire sole

proprietorship . . . (ii) which is principally engaged in the business of providing . . . housing . . .

." 29 U.S.C. § 794(b).  Because Defendant MHA receives federal assistance through HUD and

---

[9] The FHA, as amended, is sometimes abbreviated as the FHAA.  Plaintiffs refer to it as the FHA throughout.

runs a building occupied as residences, it can be held liable under both the FHA and § 504.  *See*

Statement of Material Facts ("SMF") ¶¶ 1-4.

Directors and officers of a housing provider who assist in the discriminatory conduct at

issue are individually liable for violations of the FHA.[10]  *See, e.g., Chavez v. Aber*, 122 F. Supp.

3d 581, 593 (W.D. Tex. 2015) (observing that "courts across the country have routinely imposed

individual liability for discriminatory actions under the FHA"); *Fielder v. Sterling Park*

*Homeowners Ass'n*, 914 F. Supp. 2d 1222, 1227-28 (W.D. Wash. 2012) (holding that "directors

who participate in, authorize, or ratify the commission of a civil rights or fair housing tort may

be held individually liable" and collecting cases); *United States v. Tropic Seas, Inc.*, 887 F. Supp.

1347, 1365 (D. Haw. 1995) ("Because the duty to comply with the Fair Housing Act is

nondelegable, a corporation's officers and directors may be held individually liable for their

failure to ensure the corporation's compliance.  This is so even where the individual director or

officer . . . did not subjectively intend to discriminate against the complainant.").

## ANALYSIS

### I.    Defendants Discriminated Against Plaintiffs in Violation of the FHA and the Rehabilitation Act

Under the FHA, it is unlawful to "discriminate against any person in the terms,

conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities

in connection with such dwelling, because of a handicap of [that person]."  42 U.S.C. §

3604(f)(2)(A); *see also* 29 U.S.C. § 794 (making it unlawful under § 504 for programs receiving

federal funding to subject disabled individuals to discrimination under any such program).

Prohibited discrimination expressly includes "a refusal to make reasonable accommodations in

---

[10] While the FHA provides for individual liability, there appears to be an open question in the Tenth Circuit about whether § 504 of the Rehabilitation Act extends to individuals.  In an abundance of caution, Plaintiffs are seeking summary judgment on Claims 4, 5, and 9 solely against Defendant MHA.

rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B); *see also Tesh v. U.S. Postal Serv.*, 349 F.3d 1270, 1275 (10th Cir. 2003) (Rehabilitation Act).  A plaintiff can also establish a violation of these antidiscrimination provisions by showing intentional discrimination or discriminatory impact.  *See Cinnamon Hills*, 685 F.3d at 919; *Roe*, 909 F. Supp. at 820 (citations omitted).

### A. Defendants Engaged in Disability Discrimination by Refusing to Engage in the Interactive Process

A housing provider is "required to engage in an interactive process to determine whether or not" a tenant requesting reasonable accommodations is disabled.  *Book v. Hunter*, No. 1:12-CV-00404-CL, 2013 WL 1193865, at *4 (D. Or. Mar. 21, 2013).  When a housing provider denies a reasonable accommodation request without engaging in such a process, it has per se violated the fair housing laws.  *See id.*  In *Book*, a tenant seeking to live with an emotional support animal was denied housing after she presented a letter from her medical doctor verifying her disability and disability-related need for the companion animal.  *Id.*  The housing provider rejected the rental application on the grounds that it did not allow pets.  *Id.* at *1.  By not independently determining whether the tenant was indeed disabled, the housing provider acted unlawfully because "under the FHA they were required to engage in an interactive process to determine whether or not that was the case."  *Id.* at *4.  Here, Defendants admit that they never made a determination about whether Ms. McFadden or A.J. White were disabled, nor did they take any steps to determine whether the letters verifying Plaintiffs' disabilities and disability-related need for assistance animals complied with HUD's documentation requirements.  *See* SMF ¶¶ 87-88.  In failing to take part in the interactive process, Defendants engaged in a per se violation of the FHA and § 504.

**B. Defendants Engaged in Disability Discrimination by Unreasonably Denying Plaintiffs Reasonable Accommodation Requests**

The law "imposes an affirmative duty upon landlords reasonably to accommodate the needs of handicapped persons." [11]  *United States v. California Mobile Home Park Mgmt. Co.*, 29 F.3d 1413, 1416 (9th Cir. 1994).  To prevail on a reasonable accommodation claim, a plaintiff must establish "(1) that the plaintiff or his associate is handicapped [under the law]; (2) that the defendant knew or reasonably should have known of the claimed handicap; (3) that accommodation of the handicap may be necessary to afford the handicapped person an equal opportunity to use and enjoy the dwelling; (4) that the accommodation is reasonable; and (5) that defendants refused to make such accommodation."  *Arnal v. Aspen View Condo. Ass'n, Inc.*, 226 F. Supp. 3d 1177, 1183 (D. Colo. 2016)).[12]  There is no genuine dispute that the record evidence establishes each of these elements.

1. Plaintiffs A.J. White and Ms. McFadden Are Disabled Under the Pertinent Statutes

An individual with a disability is a person having: (A) a physical or mental impairment that substantially limits one or more major life activities; (B) a record of such an impairment; or (C) being regarded as having such an impairment.  *See* 42 U.S.C. § 12102; 42 U.S.C. § 3602(h). The definition of "major life activities" includes "caring for oneself, . . . sleeping, . . . learning, reading, concentrating, thinking, communicating, and working."  *See* 42 U.S.C. § 12102(2)(A).

"The FHA is broad and inclusive in protecting against conduct which interferes with fair housing rights and is subject to generous construction."  *Matarese v. Archstone Pentagon City*,

---

[11] The FHA uses the term "handicap" instead of "disability."  Disability is the preferred term.  *See Bhogaita v. Altamonte Heights Condo. Ass'n, Inc.*, 765 F.3d 1277, 1285 n.2 (11th Cir. 2014).

[12] Under the Rehabilitation Act, an individual must also show that he is "otherwise qualified" to participate in the program and that the program receives federal financial assistance.  *See Robinson v. Kansas*, 117 F. Supp. 2d 1124, 1144 (D. Kan. 2000), *aff'd*, 295 F.3d 1183 (10th Cir. 2002).  There is no dispute that MHA receives federal financial assistance and that Plaintiffs were otherwise qualified to be tenants of MHA considering the successful processing of their rental applications.  *See* SMF ¶¶ 3-4, 9.

795 F. Supp. 2d 402, 430 (E.D. Va. 2011), *vacated in part on other grounds*, 468 F. App'x 283 (4th Cir. 2012).  This broad coverage is evidenced by the statute itself, which provides that individuals need not prove they suffer from a disability, but may establish disabled status through a record of disability or being regarded as disabled.  Here, there is no dispute that Plaintiffs satisfy the definition of disabled because they have extensive records of impairments that substantially limit one or more major life activities.  *See* SMF ¶¶ 11-45.  Furthermore, MHA Defendants have admitted that they consider Plaintiffs to be disabled, establishing "regarded as" disability.  *See* SMF ¶¶ 61, 65, 86.   Although Lonnie White is not himself disabled, his claims against Defendants are viable under both the FHA and the Rehabilitation Act because he is a person associated with an individual with a disability (his son) and because the discrimination experienced by his son directly injured him.  *See* SMF ¶ 10; 42 U.S.C. § 3604(f)(2); *Arnal*, 226 F. Supp. 3d at 1183; *Barber v. Colorado Dep't of Revenue*, No. 05CV00807-REB-CBS, 2006 WL 469021, at *2 (D. Colo. Jan. 4, 2006).

> a.  *Ms. McFadden and A.J. White Have a Record of a Disability*

Ms. McFadden and A.J. White have extensive records of their disabilities.  To have a sufficient record of impairment, a plaintiff "must have a history of, or have been misclassified as having, an impairment that has substantially limited a major life activity."  *Rakity v. Dillon Companies, Inc.*, 302 F.3d 1152, 1159 (10th Cir. 2002) (citing *Sorensen v. Univ. of Utah Hosp.*, 194 F.3d 1084, 1087 (10th Cir. 1999)); *see also* 29 C.F.R. § 1630.2(k).  Ms. McFadden has produced over 200 pages of treatment records from at least five different providers establishing that she has been suffering from chronic dysthymic disorder, major depressive disorder, PTSD, and anxiety since at least January 2014.  *See* SMF ¶¶ 11-21.  During the time she lived at MHA, Ms. McFadden reported having panic attacks, experiencing a loss of pleasure, trouble sleeping,

difficulty concentrating, and "occasional thought[s] she would be better off dead," all of which made it "'very difficult' for her to function." *See* SMF ¶ 14.  As the summer of 2016 approached, Ms. McFadden reported suicidal ideations as well as difficulty controlling her anxiety even on prescription medications. *See* SMF ¶¶ 16-17.  Ms. McFadden experiences approximately four to five panic attacks per month, some of which have led to emergency room visits. *See* SMF ¶ 21.  As the records establish, Ms. McFadden has consistently been prescribed medications to help her manage her mental health impairments, including Paroxetine (Paxil), Latuda, Lorazepam, Fluoxetine (Prozac), and Wellbutrin. *See* SMF ¶ 12.

A.J. White has produced nearly 400 pages of health treatment records establishing that he has been suffering from cyclothymic disorder, dysthymic disorder, major depressive disorder, anxiety, and ADHD since childhood. *See* SMF ¶¶ 25-36, 41-44.  Indeed, A.J. White's mental health disabilities are so severe that he began treatment for them when he was only ten years old after being hospitalized for suicidal ideation. *See* SMF ¶¶ 26-27.  Upon moving to Meeker, Colorado at the age of 17, A.J. White continued to report that "he often thinks about suicide . . . to escape," showing an "extremely high measurement of depression and anxiety."  SMF ¶¶ 30, 32.  Over the last ten years, A.J. White has been prescribed Zoloft, Sertraline, Vyvanse, Adderall, Celexa, Concerta, Strattera, Wellburtin, Trazodone, Abilify, Fluoxetine (Prozac), Lexipro, and Imipramine. *See* SMF ¶ 28.  A.J. White found the side effects of his medications often worsened his conditions. *See* SMF ¶ 29.  After discovering that his companion animals were more effective than the medications, A.J. White began exclusively using his cats to manage the symptoms of his disabilities. *See* SMF ¶ 40.

Courts routinely find that complainants with similar mental health disorders as those suffered by Plaintiffs are disabled under the relevant statutes. *See, e.g.*, *Battle v. United Parcel*

*Serv., Inc.*, 438 F.3d 856, 861-62 (8th Cir. 2006) (depression); *Doe v. Region 13 Mental Health-Mental Retardation Comm'n*, 704 F.2d 1402, 1406-08 (5th Cir. 1983) (anxiety, insomnia, and depression); *Wilson v. Alamosa Sch. Dist.*, No. 06-cv-00607-WDM-CBS, 2009 WL 2139776, at *4 (D. Colo. July 15, 2009) (anxiety and stress); *Braswell v. Bd. of Educ. of Prince George's Cty.*, No. 12-CV-02434-AW, 2012 WL 5511005, at *1 (D. Md. Nov. 13, 2012) (ADHD).  As federal regulations proclaim, "it should easily be concluded" that major depressive disorder "substantially limit[s] the major life activities."  29 C.F.R. § 1630.2(j)(3)(iii).

Furthermore, through June 2016 A.J. White had been consistently diagnosed with a "serious emotional disability" in his Individualized Education Plan ("IEP"), documents that Defendants insisted were relevant to determining whether A.J. White was disabled.  *See* SMF ¶ 44; Defendants' Response to Discovery Motions [ECF No. 103] at 21-22.  Individuals found to be disabled under an IEP are generally considered disabled under the Rehabilitation Act.  *See Kimble v. Douglas Cty. Sch. Dist. RE-1*, 925 F. Supp. 2d 1176, 1181 (D. Colo. 2013) (Martinez, J.) (holding that Section 504 has a wider scope than the Individuals with Disabilities Education Act ("IDEA") such that students eligible for IDEA protection – including placement on IEPs – are a subset of those eligible for protection under Section 504).

Both the state and federal government have also determined that A.J. White is disabled.  A.J. White collected Supplemental Security Income ("SSI") as a minor, which ended soon after he moved to Meeker and turned 18.  *See* SMF ¶ 42.  To collect SSI, A.J. White had to show that he had a mental condition that "very seriously" limited his activities and which had lasted or would be expected to last at least one year.  Child Disability Starter Kit, SOCIAL SECURITY, https://www.ssa.gov/disability/disability_starter_kits_child_factsheet.htm#disability.  A.J. White was also diagnosed with a "most significant disability" by the Colorado Division of Vocational

Rehabilitation in May 2014, which determined that he was eligible for job placement assistance, job training, vocational counseling, and more.  *See* SMF ¶ 43.

Based on these substantial records of impairment, there is no genuine dispute that either Ms. McFadden or A.J. White are disabled for purposes of the FHA or Rehabilitation Act.

### b.   *Defendants Regard Ms. McFadden and A.J. White as Disabled*

Defendants cannot genuinely contend that Plaintiffs' disabilities are in dispute because they have admitted as much.  Defendants have repeatedly insisted that they <u>granted</u> Ms. McFadden's reasonable accommodation request on July 26, 2016.[13]   SMF ¶ 61; *see also* SMF ¶ 65 (Defendants admitting that the verification letter from Ms. McFadden's doctor was sufficient to establish that she was disabled).  And during their deposition, Defendants MHA and Kincher testified that Defendants would have approved the Whites' reasonable accommodation requests had this litigation not been initiated.  SMF ¶ 86.  A reasonable accommodation request cannot be approved without an implicit finding that the individual making the request is disabled.  *See Arnal v. Aspen View Condo. Ass'n, Inc.*, No. 15-CV-1044-WYD-MJW, 2016 WL 775693, at *3 (D. Colo. Feb. 29, 2016) ("To show that a requested accommodation may be necessary, there must be an identifiable relationship, or nexus, between the requested accommodation and the individual's disability." (quotation marks, alterations omitted)); *see also* SMF ¶ 61 (Defendant George testifying that a non-disabled person would not need a reasonable accommodation).

Defendants also cannot contend that Plaintiffs' disabilities are genuinely in dispute considering that they regard Plaintiffs as disabled.  A plaintiff alleging disability discrimination based on the "regarded as" theory must show that "(1) he has an actual or perceived impairment,

---

[13] While the request may have been approved, the conditions attached to the approval – including the provision of a $300 fee and a requirement that Ms. McFadden obtain a letter in support from a licensed psychiatrist – were unlawful and gave rise to the present lawsuit.

(2) that impairment is neither transitory nor minor, and (3) the [landlord] was aware of and therefore perceived the impairment at the time of the alleged discriminatory action." *Adair v. City of Muskogee*, 823 F.3d 1297, 1306 (10th Cir. 2016). Defendants at a minimum perceived Plaintiffs as having impairments neither transitory nor minor, as evidenced by their position that they did grant or would have granted Plaintiffs' requests to live indefinitely with assistance animals. And Defendants were aware of the impairments at the time of the discriminatory conduct, as the conduct arose from the requests for accommodation.

      *c. Plaintiffs Provided Sufficient Documentation of Their Disabilities*

      There is no genuine dispute that Plaintiffs provided sufficient documentation of their disabilities pursuant to HUD guidelines. *See* **Ex. 55**, *2013.04.25 HUD FHEO Notice: Service Animals and Assistance Animals for People with Disabilities in Housing and HUD-Funded Programs* at 3-4 (explaining that a social worker or other mental health professional may verify a tenant's disability and disability-related need for an emotional support animal); *see also* SMF ¶¶ 82, 93. Because Defendants recognize their duty to follow all HUD regulations and guidelines, there should be no further inquiry as to whether Plaintiffs are disabled for purposes of proving that they were entitled to the reasonable accommodations at MHA. *See* SMF ¶¶ 7-8.

      2. <u>Defendants Had Sufficient Notice that A.J. White and Ms. McFadden Were Disabled</u>

      At the time of their unlawful conduct, Defendants had been repeatedly put on notice of Plaintiffs' disabilities through Plaintiffs' many requests for reasonable accommodations and the provision of letters from their treatment providers in support thereof. *See generally* SMF ¶¶ 56-86; *Castellano v. Access Premier Realty, Inc.*, 181 F. Supp. 3d 798, 806 (E.D. Cal. 2016) (finding letters from tenant, tenant's daughter, and medical treatment provider stating that tenant was disabled and seeking an accommodation put housing provider on notice of tenant's

disabilities); *Arnal*, 226 F. Supp. 3d at 1184-85 (same); *Smith v. Powdrill*, No. CV 12-06388 DDP RZX, 2013 WL 5786586, at *6 (C.D. Cal. Oct. 28, 2013) (finding Plaintiffs' statements and accompanying letter from treatment provider sufficient to put housing provider on notice of tenant's disability).  Further, as former Board member Robert Barr testified, A.J. White's disabilities are observable and readily apparent upon meeting him.  SMF ¶ 45.

3. <u>Reasonable Accommodations Were Necessary to Afford Plaintiffs an Equal Opportunity to Use and Enjoy Their Dwellings</u>

There is no dispute that reasonable accommodations were necessary to afford Plaintiffs an equal opportunity to use and enjoy their dwellings.  "An accommodation is necessary when there is evidence showing that the desired accommodation will affirmatively enhance a disabled plaintiff's quality of life by ameliorating the effects of the disability." *Arnal*, 226 F. Supp. 3d at 1185; *see also Bronk v. Ineichen*, 54 F.3d 425, 429 (7th Cir. 1995).  The uncontroverted evidence establishes that Plaintiffs' companion animals affirmatively enhanced their quality of life by ameliorating the effects of their disabilities.  *See* SMF ¶¶ 22-24, 34-40; *Castellano*, 181 F. Supp. 3d at 807 (finding "no triable issue of fact as to whether accommodation was necessary" where evidence showed that the emotional support animal "made [the plaintiff] feel better, both mentally and physically, and helped her to get through the day").

4. <u>Plaintiffs' Requested Accommodations Were Reasonable</u>

"An accommodation is reasonable under the FHA when it imposes no fundamental alteration in the nature of the program or undue financial or administrative burdens." *Arnal*, 226 F. Supp. 3d at 1185–86.  Courts regularly hold that exempting a tenant from a no-pet policy constitutes a reasonable accommodation "because such an accommodation does not unduly burden or fundamentally alter the nature of the apartment complex." *Bryant Woods Inn, Inc. v.*

*Howard Cnty., Md.*, 124 F.3d 597, 604 (4th Cir. 1997) (citation omitted); *see also Bronk*, 54 F.3d at 429; *Green v. Hous. Auth. of Clackamas Cnty.*, 994 F. Supp. 1253, 1257 (D. Or. 1998).

HUD has made it clear that exceptions to no-pet policies must typically be made to permit assistance animals, which includes emotional support animals, to reside with their owners. *See* 24 C.F.R. § 100.204; **Ex. 55** at 3; **Ex. 56**, *2004.05.17 HUD-DOJ Joint Statement: Reasonable Accommodations under the FHA* at 6-7; *see also Meyer v. Holley*, 537 U.S. 280, 287 (2003) (holding that HUD's interpretation of the FHA is entitled to *Chevron* deference); *Pfaff v. U.S. Dep't of Hous. & Urban Dev.*, 88 F.3d 739, 747 (9th Cir. 1996) (same).

In addition to the per se reasonableness of Plaintiffs' accommodation requests, it should be emphasized that Plaintiffs were merely seeking to maintain the status quo.  Defendants had allowed Plaintiffs to keep their companion animals in their units prior to June 2016, with the Whites having their cats for nearly two and a half years at that time.  SMF ¶ 48.  What is more, Defendants insist that they would have allowed Plaintiffs to live at Karen Court with their assistance animals so long as they provided sufficient documentation from a licensed psychiatrist and paid a deposit.  *See* SMF ¶¶ 60, 64.  Defendants have since sent HUD FHEO proposed policies that would allow for tenants to live with assistance animals without paying a fee or deposit if their disabilities are verified by a licensed professional.  *See* SMF ¶¶ 93-94.  These facts "are strong evidence that providing [Plaintiffs] with an exception to the 'no-pet' policy would impose no fundamental alteration of Defendants' housing services nor pose undue financial or administrative burdens."  *Castellano*, 181 F. Supp. 3d at 807.

5. <u>Defendants Unreasonably Refused to Accommodate Plaintiffs</u>

It cannot be genuinely disputed that Defendants unreasonably denied Plaintiffs' repeated requests for accommodations.  "A housing provider's duty reasonably to accommodate a person

with a disability arises when the provider becomes aware of the person's disability and the disabled person makes a request for a reasonable accommodation." *Boulder Meadows v. Saville*, 2 P.3d 131, 137 (Colo. App. 2000) (citing *Jankowski Lee & Assoc. v. Cisneros*, 91 F.3d 891 (7th Cir. 1996)).  "Once allowed [an] opportunity [to conduct a meaningful review of the request], a violation occurs when the disabled resident is first denied a reasonable accommodation, irrespective of the remedies granted in subsequent proceedings." *Arnal*, 226 F. Supp. 3d at 1186.

Plaintiffs repeatedly requested reasonable accommodations to allow them to continue living at MHA with their companion animals.  *See generally* SMF ¶¶ 56-86.  Each time, Defendants unreasonably denied the requests, insisting that Plaintiffs pay a $300 fee per animal, which they now admit was unlawful.  *See generally id.*  Defendants also refused to accept verification letters from Plaintiffs' therapists, first requiring that Plaintiffs obtain letters from medical doctors and then changing the requirement once Ms. McFadden secured that documentation.  *See* SMF ¶¶ 49, 59-60, 64, 83.[14]  Defendants later admitted that Ms. McFadden's letter from her medical doctor was sufficient to establish her disabilities, despite the immediate change to the pet policy.  *See* SMF ¶ 65.  These acts constitute evidence that Defendants' repeated denials were unreasonable.  *Cf. Sanders v. SWS Hilltop, LLC*, No. 6:17-CV-00256-MC, 2018 WL 934608, at *5 (D. Or. Feb. 16, 2018) (explaining that, amongst other behavior, inflating the deposit and refusing to replace a filthy carpet for a rental applicant who asked to live with an assistance animal "falls comfortably within the scope of" conduct prohibited under the FHA).

---

[14] Notably, Defendants never insisted that the Whites obtain a letter from a psychiatrist.  Instead, Defendants directed the Whites to obtain a letter from a medical doctor on August 29, 2016, more than one month after rejecting the same from Ms. McFadden.  *See* SMF ¶¶ 60, 63, 83.

As a result of Defendants' unreasonable denials, Ms. McFadden was evicted.  *See* SMF ¶ 72.  The Whites were spared only because of this Court's injunction; accordingly, they were forced to reside with A.J. White's assistance animals in a state of legal limbo.  *See* [ECF No. 15]. That uncertainty, coupled with Defendants' retaliatory conduct discussed below, has caused the Whites both economic loss and emotional distress.

### C.  Defendants Engaged in Disability Discrimination by Demanding that Plaintiffs Pay a $300 Non-Refundable Pet "Deposit" to Keep Their Assistance Animals

Defendants also discriminated against Plaintiffs in the terms, conditions, or privileges of rental of a dwelling by demanding that they each pay a $300.00 non-refundable "deposit" (fee) per companion animal.  SMF ¶¶ 50, 54, 60, 64, 74.  Under the FHA, "[h]ousing providers may not require persons with disabilities to pay extra fees or deposits as a condition of receiving a reasonable accommodation."  **Ex 56** at 4 ("A request for a reasonable accommodation may not be unreasonably denied, or conditioned on payment of a fee or deposit or other terms and conditions applied to applicants or residents with pets . . . .").  Beyond the *Chevron* deference owed to HUD's interpretation of the FHA, "a plain reading of § 3604(f)(3)(B) suggests that imposing an additional security deposit for a service animal made necessary by a tenant's handicap is discriminatory.  Requiring such a deposit constitutes a failure to provide the reasonable accommodation of waiving a general pet deposit or no-pet policy."  *Intermountain Fair Hous. Council v. CVE Falls Park, L.L.C.*, No. 2:10-CV-00346-BLW, 2011 WL 2945824, at *6 (D. Idaho July 20, 2011).  As noted above, Defendants have since conceded that their demands for a deposit were impermissibly made.  *See* SMF ¶ 92.

Based on the arguments raised under Part I, Plaintiffs seek summary judgment on Claims 1 and 4 of their Second Amended Complaint [ECF No. 237].  *See Castellano*, 181 F. Supp. 3d at 809 (granting summary judgment on substantially similar facts).

## II.   Defendants Interfered with Plaintiffs' Right to Live Free of Disability Discrimination

The FHA prohibits unlawfully coercing, intimidating, threatening, or interfering with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, any right granted or protected by the FHA.  42 U.S.C. § 3617.  "The Supreme Court has instructed that we are to treat the language of the FHA as broad and inclusive."  *Walker v. City of Lakewood*, 272 F.3d 1114, 1129 (9th Cir. 2001) (quoting *Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 209 (1972)) (internal quotation marks and alterations omitted).  "Interference, in particular, has been broadly applied to reach all practices which have the effect of interfering with the exercise of rights under the federal fair housing laws."  *Smith*, 2013 WL 5786586 at *9 (quoting *Walker*, 272 F.3d at 1129) (quotation marks and alterations omitted).  "Interference is the act of meddling in or hampering an activity or process."  *Castellano*, 181 F. Supp. 3d at 809.

Defendants meddled in or hampered Plaintiffs' ability to secure reasonable accommodations in many ways.  Immediately after changing the MHA no-pet policy unlawfully to require verification of disability from a medical doctor, Defendants contacted Plaintiffs' doctors and directed them not to supply such letters.  SMF ¶ 51.  Once Ms. McFadden was able to obtain a letter from a medical doctor outside of Meeker, Defendants moved the goal posts, changing their policy to require a letter from a psychiatrist.  SMF ¶¶ 59-60, 64.  Similarly, just six days after Defendants learned that the Whites were seeking an accommodation for two companion animals, Defendants quickly changed their policy to limit the number of companion animals to one per unit.  SMF ¶ 76.  While implementing rapid fire changes to the pet policy directly responsive to Plaintiffs' accommodation requests, Defendants simultaneously began serving Plaintiffs Notices of Violations and Infractions, Notices to Vacate, and threats of

eviction.  *See generally* SMF ¶¶ 63, 67, 69, 75, 77-79, 83, 85.  Defendants MHA and Kincher went so far as to tell Ms. McFadden to "take us to court."  SMF ¶ 58.

Upon the commencement of such litigation, Defendants escalated their efforts to interfere with Plaintiffs' exercise of their rights.  For example, in April 2017 Defendants terminated the Whites' housing subsidy despite the Whites' ongoing compliance with HUD regulations and guidelines.  *See* SMF ¶¶ 102-108.  Defendants then inflated the Whites' monthly rental payments by refusing to make gross income deductions required by HUD, admitting that they refused to do so because of the pending litigation.  *See* SMF ¶¶ 116-117, 120.  HUD ordered Defendants to adjust the Whites' rent, to no avail.  *See* SMF ¶¶ 118-119.  Indeed, in a document disclosed to Plaintiffs long after the close of discovery, Plaintiffs learned that Defendants had been aware since September 7, 2017 that they had miscalculated the Whites' income and were over-charging their rent irrespective of the disputed disability deduction.  *See* SMF ¶ 120.  And still, Defendants have never corrected the overcharges on the Whites' rent.  *See* SMF ¶ 119.

Responding to a request for reasonable accommodations by serving Notices of Violations and Infractions and Notices to Vacate constitutes interference because it "would give a person in [Plaintiff's] position pause in seeking to enforce her right to obtain a reasonable accommodation for her handicap."  *Castellano*, 181 F. Supp. 3d at 809; *see also Smith*, 2013 WL 5786586 at *10.  The same is true for the other conduct engaged in by Defendants.  Based on the arguments raised under Part II, Plaintiffs seek summary judgment on Claims 3 and 8 of their Second Amended Complaint [ECF No. 237].[15]

---

[15] At this time, only the Whites seek a finding of summary judgment in their favor on Claim 8.

III.     **Defendants Retaliated Against Plaintiffs for Opposing Defendants'
Discriminatory Practices**

The FHA and § 504 prohibit retaliation against those who assert their right to live free

from disability discrimination.  *See* 42 U.S.C. § 3617; *Hwang v. Kansas State Univ.*, 753 F.3d

1159, 1165 (10th Cir. 2014).  Retaliation claims brought under these laws are analyzed under the

same standards used for analyzing retaliation claims brought pursuant to Title VII.  *See Oxford*

*House, Inc. v. City of Baton Rouge, La.*, 932 F. Supp. 2d 683, 700 (M.D. La. 2013).

To establish a prima facie case of retaliation, a plaintiff must show that (1) they engaged

in protected opposition to discrimination, (2) the defendants took adverse action against them,

and (3) a causal connection existed between the protected activity and the adverse action.  *See,*

*e.g.*, *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1234 (10th Cir. 2000); *Reinhardt v.*

*Albuquerque Pub. Sch. Bd. of Educ.*, 595 F.3d 1126, 1131 (10th Cir. 2010).  Requesting a

reasonable accommodation to keep an assistance animal is a protected activity.  *See, e.g.*,

*Chavez*, 122 F. Supp. 3d at 600.

There is no genuine dispute that Defendants retaliated against Plaintiffs for engaging in

protected activities.  Plaintiffs engaged in protected conduct when they repeatedly requested

reasonable accommodations during the summer of 2016.  In response thereto, Defendants took

adverse actions against Plaintiffs, including evicting Ms. McFadden and threatening to evict the

Whites on numerous occasions.  *See Boisclair Corp.*, 351 F.3d 361, 363-64 (8th Cir. 2003) (per

curiam) (holding that threats of eviction – even if never carried out – constitute adverse action).

Plaintiffs can also establish a causal connection between their protected activity and the

adverse actions by way of close temporal proximity.  The Tenth Circuit has "held that a one and

one-half month period between protected activity and adverse action may, by itself, establish

causation." *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (citation

omitted); *see also Meiners v. Univ. of Kan.*, 359 F.3d 1222, 1231 (10th Cir. 2004) (same).  As

discussed above, Defendants' Notices of Violations and Infractions and their Notices to Vacate

came just days after Plaintiffs requested reasonable accommodations.  *See* SMF ¶¶ 63, 73, 75,

77-79.  Defendants also immediately changed their pet policy to make it more onerous after

Plaintiffs were able to comply with the earlier policy's terms.  *See* SMF ¶¶ 59, 64.  When

Plaintiffs continued to assert their rights, Defendants threatened eviction.  SMF ¶¶ 67, 69, 80, 82-

85.  Defendants intentionally engaged in this conduct to prevent Plaintiffs from living at MHA

with their assistance animals, regardless of their disability-related needs.  *See* SMF ¶¶ 89-90.

After Plaintiffs brought this lawsuit, Defendants terminated the Whites' housing

assistance allegedly because the Whites failed to undergo their annual recertification.  SMF ¶

102.  Yet, Defendants had long known that they had failed to provide timely or compliant annual

recertification notices such that the Whites could not be penalized for missing the annual

recertification deadline.  SMF ¶¶ 103-107.  Not only have Defendants never formally rescinded

this notice, but after finally processing the Whites' recertification, Defendants intentionally

inflated the Whites' rental amount because of this litigation.  SMF ¶¶ 108, 115-116, 120.  CHFA

even found that "MHA does not appear to be working with the [Whites] to remain in the unit

pending completion of the litigation."  SMF ¶ 121.  "Threats and intimidation after plaintiff filed

a complaint of housing discrimination is direct evidence of retaliation in violation of the FHA."

*Chavez*, 122 F. Supp. 3d at 600 (internal quotation marks and citation omitted).

Based on the arguments raised under Part III, Plaintiffs seek summary judgment on

Claims 2, 5, 7, and 9 of their Second Amended Complaint [ECF No. 237].[16]  *Cf. Matarese*, 795

F. Supp. 2d at 442-43 (entering judgment for Plaintiffs on retaliation claim where Defendants

---

[16] At this time, only the Whites seek a finding of summary judgment in their favor on Claims 7 and 9.

refused to renew Plaintiff's lease, increased Plaintiffs' month-to-month rent, and refused to consider Plaintiff's rental application to another Defendant-owned apartment complex in response to requests for accommodations and the filing of fair housing complaints and litigation).

## IV.   Defendants Unlawfully Withheld Ms. McFadden's Security Deposit

Colorado law provides that a landlord must return a tenant's security deposit within one month of the surrender and acceptance of the premises unless the tenant is provided with a written statement listing the exact reasons for the retention of any portion of the security deposit. C.R.S. § 38-12-103(1).  Ms. McFadden paid a $50 security deposit when she first became a tenant of Meeker Housing Authority.  SMF ¶ 99.  This security deposit has never been returned to Ms. McFadden, nor have Defendants ever sent Ms. McFadden a written statement listing any basis for the retention of her security deposit.  SMF ¶ 100.  Ms. McFadden gave Defendants notice of her intention to file legal proceedings eight days before filing such an action, and Defendants again failed to return her security deposit.  SMF ¶ 101.

## V.   Ms. McFadden is Entitled to Summary Judgment on the Counterclaim Brought Against Her by Defendants

The counterclaim brought against Ms. McFadden is factually and legally unsupported. Specifically, Defendants have filed a breach of contract claim against Ms. McFadden contending that she breached the terms of her lease by damaging her housing unit and failing to pay the repair costs.  *See* SAC Answer at 34-36.  Defendants also contend that Ms. McFadden owes rent for the three months in which the unit was "uninhabitable."  *See id.*

Defendants have filed a breach of contract claim against Ms. McFadden but have never produced to Plaintiffs a copy of Ms. McFadden's lease.  SMF ¶¶ 95-96.  Defendants have informed Plaintiffs that they need not produce a copy of Ms. McFadden's lease because she would have signed a HUD Model Lease.  Presuming this to be true, Defendants' claims for

repair costs are barred by the lease terms themselves.  Specifically, the provisions quoted by Defendants state that a tenant must pay repair costs "within 30 days after receipt of the Landlord's demand for the repair charges."  SAC Answer at 35.  Defendants never sent Ms. McFadden a demand for repair charges and thus are barred from pursuing this claim.  SMF ¶ 97.

Defendants also cannot recover their purported loss of rental income as there is no evidence that Defendants suffered any loss.  Evidence obtained through forensic imaging establishes that MHA was unlawfully submitting claims for subsidy payments in Ms. McFadden's name through December 2016, the three months the unit remained unoccupied.  SMF ¶ 98.  Because Ms. McFadden was receiving a full subsidy on her unit, these subsidy payments covered the entire rental payment owed on the unit.  *See id.*

## VI.    Defendants Cannot Succeed on Their Counterclaims Against the Whites

On September 5, 2017 and without leave of the Court, Defendants pled two counterclaims against the Whites.  *See* Motion to Dismiss and Strike [ECF No. 260] at 3-4.  Even if not stricken by this Court, neither counterclaim can survive.  For their first claim, Defendants pled breach of contract seemingly incorporating three causes of action into one: (1) a claim that the Whites failed to report a change in their income, causing an overpayment of their subsidy; (2) a claim that the Whites failed to make payments owed under a Repayment Agreement; and (3) a claim that the Whites failed to pay rent.  *See* SAC Answer at 37-38.  For their second claim, Defendants again alleged that the Whites failed to disclose their income.  *See id.* at 38-39.

With respect to the allegation that the Whites failed accurately to report their income, MHA attempts to stand in the shoes of HUD, the only proper claimant.  MHA is a housing provider that receives federal funding, which in turn allows for Plaintiffs to live in subsidized housing.  SMF ¶ 3.  Defendants receive subsidies from the federal government known as HAP

payments, which make up the difference between the reduced rent and the market value of the units, thereby ensuring Defendants lose no rental income as a result of renting to low-income individuals.  SMF ¶ 3.  Thus, regardless of any reporting mistakes or misrepresentations made by a tenant, MHA receives the full contract rent for every unit. MHA thus does not have standing to bring any claims on the Whites' purported failure to disclose their income or the overpayment of their subsidy.  *See, e.g.*, *Smith v. U.S. Immigration & Customs Enf't*, 249 F. Supp. 3d 1203, 1206 (D. Colo. 2017) (standing requires an "injury in fact").

The same is true with respect to the Repayment Agreement.  Defendants admit that the amounts listed on the Repayment Agreement are owed to HUD, not them.  SMF ¶ 111.  Moreover, both HUD and CHFA have inspected the Repayment Agreement and have found it to be unsupported, resulting in HUD's directive to rescind the agreement.  SMF ¶¶ 112-113.

The only claim raised in which Defendants allege a harm to themselves are their allegations that the Whites failed to make required rental payments to MHA directly.  *See* SAC at 37-38.  However, the record evidence shows that the Whites submitted full rental payments every month less the HUD-approved disability deduction.  *See* SMF No. ¶¶ 116-117, 119.  Defendants rejected these payments, improperly calculating the Whites' income to deny that A.J. White was disabled for purposes of this litigation.  Defendants then failed to adjust the Whites' rental amount after receiving an EIV discrepancy report establishing that they had inflated the Whites' base income when calculating their rental obligation.  *See* SMF ¶ 120.  Knowing that they were not entitled to the inflated rents, Defendants went so far as to send the Whites a final demand for unpaid rent in these sums, withholding their security deposit.  SMF ¶ 119.  Defendants cannot bring a counterclaim for sums they know are not owed.

DATED this 9th day of May 2018.

RATHOD | MOHAMEDBHAI LLC

*s/ Laura B. Wolf*_____
Laura B. Wolf
Siddhartha H. Rathod
Qusair Mohamedbhai
Matthew J. Cron
2701 Lawrence Street, Suite 100
Denver, Colorado 80205
(303) 578-4400
(303) 578-4401 (f)
lw@rmlawyers.com
sr@rmlawyers.com
qm@rmlawyers.com
mc@rmlawyers.com

ATTORNEYS FOR PLAINTIFFS

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 9, 2018, I electronically filed the foregoing
**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT** with the Clerk of the
Court using the CM/ECF system, which will send electronic notification to the following:

Stephen J. Baity
Godin & Baity, LLC
621 17th Street, Suite 1900
Denver, CO 80293
(303) 572-3100
sbaity@godinbaity.com

*Attorney for Defendants Meeker Housing Authority, Melinda Parker, Michelle Buckler, Edy
George, and Stacie Kincher*

Karen H. Wheeler
Jami A. Maul
Kory M. Edmark
Wheeler Waters, P.C.
8400 E. Prentice Ave., Suite 1010
Greenwood Village, Colorado 80111
Telephone: (303) 221-4787
Karen@wheelerwaters.com
Jami@wheelerwaters.com
Kory@wheelerwaters.com

*Attorneys for Defendant Stacie Kincher*

Reagan Larkin
Marilyn S. Chappell
Jon F. Sands
Sweetbaum Sands Anderson, P.C.
1125 17th Street, Suite 2100
Denver, CO 80202
Telephone: (303) 296-3377
Fax: (303) 296-7343
Rlarkin@sweetbaumsands.com
mchappell@sweetbaumsands.com
jsands@sweetbaumsands.com

*Attorneys for Defendants Meeker Housing Authority, Melinda Parker, Michelle Buckler, and Edy
George*

Rathod | Mohamedbhai LLC

*s/ Laura B. Wolf*
Laura B. Wolf