**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 16-cv-2304-WJM-GPG

MEGAN MCFADDEN,
LONNIE WHITE, and
ANTONIO "A.J." WHITE,

      Plaintiffs,

v.

MEEKER HOUSING AUTHORITY, a Property Management Company,
MELINDA PARKER,
MICHELLE BUCKLER,
EDY GEORGE, and,
STACIE KINCHER,

      Defendants.

---

**ORDER GRANTING IN PART AND DENYING IN PART
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

Plaintiff Megan McFadden ("McFadden") previously resided in the federally subsidized Karen Court apartment complex in Meeker, Colorado. Plaintiffs Lonnie and A.J. White ("the Whites") also previously resided in Karen Court. All Plaintiffs claim that Defendants discriminated against them in violation of § 504 the Rehabilitation Act of 1973 ("Rehabilitation Act" or "§ 504"), 29 U.S.C. § 794, and the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601 *et seq.*, based on Defendants' policy concerning therapy pets. McFadden also brings a claim under Colorado state law for wrongful withholding of her security deposit.

The Defendants are the Meeker Housing Authority ("MHA"), three members of MHA's board of directors (Parker, Buckler, and George), and MHA's executive

director/property manager (Kincher). The Court will refer all defendants collectively as "Defendants," and to Parker, Buckler, George, and Kincher collectively as the "Individual Defendants."

Before the Court is Plaintiffs' Motion for Partial Summary Judgment. (ECF No. 354.) For the reasons explained below, the Court grants summary judgment in Plaintiffs' favor as to liability against MHA on Plaintiffs' Claims 1 and 4. The Court otherwise denies summary judgment, and grants qualified immunity to the Individual Defendants.

Also before the Court is Defendants' Motion for Leave to Submit Surreply to Motion for Partial Summary Judgment. (ECF No. 382.) Nothing below turns on matters addressed by the proposed surreply, and so the motion is denied as moot.

## I. LEGAL STANDARD

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Andersen v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986). A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). An issue is "genuine" if the evidence is such that it might lead a reasonable trier of fact to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita*

*Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  In addition, the

Court must resolve factual ambiguities against the moving party, thus favoring the right

to a trial.  *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

## II.  THRESHOLD EVIDENTIARY RULINGS

### A.  Medical Records

Plaintiffs' Exhibit 7 (spanning ECF Nos. 354-7 to 354-20) comprises 222 pages of

McFadden's medical records.  Plaintiffs' Exhibit 13 (spanning ECF Nos. 354-26 to

354-43) comprises 394 pages of A.J. White's medical records.  Sometimes Plaintiffs cite

to specific pages within these exhibits, but on five occasions Plaintiffs cite to one or the

other with a "see generally" signal.  (ECF No. 354 at 3–4, 6, ¶¶ 11, 12, 25, 26, 28.)

These "see generally" citations are in support of broad summary claims about

McFadden's or A.J. White's medical diagnoses.

Defendants respond that citing generally to exhibits that span hundreds of pages

violates the undersigned's Revised Practice Standard II.E.2, requiring "precise citations,

including page number or paragraph number" when the cited document "is over one

page in length."  Defendants therefore generally object that Plaintiffs have failed to carry

their burden to support the factual assertions in question.  (ECF No. 363 at 3.)

Plaintiffs reply that "it is the volume and completeness of the document that

supports Plaintiffs' long-standing record of a disability."  (ECF No. 372 at 2.)  Plaintiffs

further note that they "highlighted every relevant section in the files, amounting to 352

pages of highlighted records out of approximately 600 pages.  Listing 352 separate

page numbers would arguably not aid the Court or Defendants any more so than the

highlights."  (*Id.*)

Defendants are correct that Plaintiffs' approach violates the undersigned's

Revised Practice Standards—both II.E.2 and III.E.3.  Moreover, Plaintiffs' assertions do not appear to be of the kind that could not be supported by citations to particularly relevant pages, if only as "see, e.g." citations.  On the other hand, with insubstantial exceptions, Defendants do not dispute the facts for which these "see generally" records stand, but only their legal significance.  (*See* ECF No. 363 at 4–5, ¶¶ 11, 12, 25, 26, 28.)

The Court does not condone Plaintiffs' approach of throwing the burden on Defendants and the Court to search for the highlighted material supporting Plaintiffs' claims.  Under the circumstances, however, the Court finds that the prejudice to Plaintiffs in striking the offending allegations and thus resolving summary judgment on a fragmentary record outweighs the inconvenience Plaintiffs wrongly caused to Defendants and the Court.  Accordingly, and soley in the interest of justice, the Court will overlook Plaintiffs' violation of the undersigned's Revised Practice Standards.

## B.    Findings by HUD and CHFA

The events precipitating this lawsuit led to investigations by the U.S. Department of Housing and Urban Development ("HUD") and the Colorado Housing and Finance Authority ("CHFA").  Plaintiffs use these entities' investigatory findings and MHA's subsequent remedial measures as evidence against Defendants.  (*See, e.g.*, ECF No. 354 at 12, ¶ 72; *id.* at 14, ¶ 82; *id.* at 15–16, ¶¶ 91–94; *id.* at 19–20, ¶¶ 112, 118, 119, 121.)

As to the investigatory findings, Defendants argue that they are hearsay, cannot be presented in an admissible form at trial, and are otherwise unduly prejudicial.  (ECF No. 363 at 10, ¶ 72.)  *See also* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.").  Plaintiffs' reply brief ignores this objection, and the Court

otherwise finds it well-founded.  Plaintiffs have not provided any basis for admitting the investigatory findings, and so the Court sustains Defendants' objection and will not consider the investigatory findings as part of the summary judgment record.

As to remedial measures, Defendants object under Federal Rule of Evidence 407, which excludes evidence of subsequent remedial measures to prove "culpable conduct."  (ECF No. 363 at 13, ¶¶ 91–92.)  Plaintiffs reply that subsequent remedial measures "can be introduced for other purposes, including impeachment."  (ECF No. 372 at 7, ¶ 92.)  But Plaintiffs do not demonstrate any impeachment purpose relevant to summary judgment, and do not otherwise respond to the argument Defendants make here.  Accordingly, the Court again sustains Defendants' objection, and will not consider subsequent remedial measures as part of the summary judgment record.

### III.  FACTS

#### A.    Karen Court

MHA is a housing authority organized under the Colorado Housing Authorities Law, Colo. Rev. Stat. § 29-4-201.  (ECF No. 354 at 2, ¶ 2.)  MHA operates an apartment complex commonly known as "Karen Court."  (*Id.* ¶ 1.)  HUD financially subsidizes MHA.  (*Id.* ¶ 3.)  MHA offers Karen Court apartments to qualifying low-income persons at below market rent, and HUD pays MHA the difference between what the tenant pays and what the market commands.  (*Id.* ¶ 4.)

Kincher became MHA's Executive Director in May 2016.  (*Id.* ¶ 5.)  As relevant to this lawsuit, the MHA board of directors comprised Parker, Buckler, and George.  (*Id.* ¶ 6.)  The board members are volunteers.  (ECF No. 363 at 17, ¶ 1.)

**B. A.J. & Lonnie White**

A.J. White ("A.J.") began receiving mental health treatment in 2006, at age 10, due to suicidal ideations. (ECF No. 354 at 6, ¶¶ 26–27.) Healthcare professionals have since diagnosed him with, among other things, cyclothymic disorder, dysthymic disorder, major depressive disorder, anxiety, and ADHD. (*Id.* ¶ 25.) He has been prescribed many medications to manage these conditions. (*Id.* ¶ 28.)

A.J. moved to Meeker "in or around early 2014." (*Id.* at 8, ¶ 42.) He and his father, Lonnie White ("Lonnie"), moved into Karen Court in approximately February 2014, and received an FHA housing subsidy. (*Id.* at 3, ¶¶ 9–10; ECF No. 355-3 at 1.)[1] A.J. began attending high school in Meeker and had an individualized education plan ("IEP") up through his graduation in June 2016. (ECF No. 354 at 8, ¶ 44.) The IEP diagnosed him with a "serious emotional disability." (*Id.*) But he attended school regularly, was able to learn and concentrate, and maintained a 3.0 GPA through graduation. (ECF No. 363 at 19, ¶¶ 17–19.) He also worked part-time while in high school at a gas station and responsibly carried out his duties. (*Id.* at 19–20, ¶¶ 20–21.)

Much of this lawsuit centers around A.J.'s cats and their effect on him. A.J. first got a cat in March 2014, the month after he moved into Karen Court. (ECF No. 354 at 7, ¶ 34.) He got a second cat at some point not specified in the record. He claims that his cats help to manage his depression and anxiety by giving him purpose and otherwise making him feel happy. (*Id.* at 7–8, ¶¶ 34–40.) A.J. still continues to report depression and problems with concentration. (*Id.* at 8, ¶ 41.) But he has worked at the

---

[1] Although this lawsuit focuses on disability discrimination, Lonnie does not claim any disability. Rather, he sues as a person associated with another who has a disability (A.J.), and who has been affected by the alleged disability discrimination. *See* 42 U.S.C. § 3604(f)(2).

gas station full time since graduating from high school, and has been a competent employee, earning at least two raises.  (ECF No. 363 at 20, ¶ 22.)  He regularly interacts with customers and other employees as part of his job.  (*Id.* ¶ 23.)  He has never missed work because of depression, anxiety, or ADHD.  (*Id.* ¶ 24.)  He has only missed work for a two-week Hyatt Hotel Denver internship in 2016, which he completed successfully despite being apart from his cats.  (*Id.*)  A.J. handles his own personal hygiene, laundry, grocery shopping, cooking, transportation, and finances.  (*Id.* ¶ 25.)

## C. McFadden

McFadden moved into Karen Court in approximately December 2015 and also received an FHA housing subsidy.  (*Id.* at 3, ¶ 9; ECF No. 363 at 17, ¶ 4.)  Before and since moving into Karen Court, McFadden's healthcare professionals diagnosed her with, among other things, chronic dysthymic disorder, major depressive disorder, post-traumatic stress disorder, and anxiety.  (ECF No. 354 at 3, ¶ 11.)  She suffers four to five panic attacks per month.  (*Id.* at 5, ¶ 21.)  She has been prescribed various anti-depressant and anti-anxiety drugs.  (*Id.* at 4, ¶ 12.)

McFadden has a dog, Chewy, who can sense her anxiety and will then actively distract her.  (*Id.* at 5, ¶ 22.)  Chewy also provides McFadden something external to focus on when mired in negative thoughts and emotions.  (*Id.* ¶ 24.)

McFadden attributes her stress and depression to familial and financial problems.  (ECF No. 363 at 18, ¶¶ 11–12.)  Her depression only "occasionally" affects her such that she does not attend to personal hygiene.  (*Id.* ¶ 9.)  She usually takes care of her own personal hygiene, laundry, and cooking.  (*Id.* ¶ 7.)  She cares for her children and babysits others' children.  (*Id.* ¶¶ 7–8.)  She sometimes has trouble falling asleep, but then sleeps soundly 6–8 hours per night and uses no medication to assist her sleep.

(*Id.* ¶ 10.)

**D.     Disputes Over MHA's Pet Policies**

1.     <u>Changes to the Pet Policy</u>

Before June 15, 2016, Karen Court permitted tenants to keep therapy animals. (ECF No. 354 at 9, ¶ 48.)  On June 15, however, the MHA board discussed whether to change the policy.  (ECF No. 354-51 at 2.)[2]  The board was motivated, at least in part, by observations from the previous month of a dog chained behind one of the apartment buildings, and of tenants failing to clean up animal excrement on the complex grounds. (ECF No. 363 at 20–21, ¶¶ 26–31.)  Defendants also claim that the board was motivated by an incident in which one of McFadden's daughters was bitten by another tenant's therapy dog.  (*Id.* ¶¶ 27, 31.)  But Defendants represent that the dog bite occurred "about June 16" (*id.* ¶ 27) and Plaintiffs claim that it happened *on* June 16 (ECF No. 372 at 4, ¶ 49)—a day after the board meeting.  Regardless, the board voted at the June 15 meeting to tighten the therapeutic animal policy, including a requirement that the animal "be documented by a MD - MHA <u>will not</u> accept letters from psychologists, psychotherapists, or therapist[s], etcetera[.]"  (ECF No. 354-51 at 2 (underscoring in original).)

Defendants claim that the board drafted several pet policies for review by an outside attorney, and generally relied on advice of counsel in this endeavor, including advice that MHA could charge a pet deposit.  (ECF No. 363 at 21, ¶¶ 32–34.)  Plaintiffs generally dispute this, claiming that discovery in this lawsuit yielded no documents showing that the board's counsel received any draft pet policies or provided any advice.

_____

[2] Unless otherwise specified, all dates in the remainder of this Part III.D refer to the year 2016.

(ECF No. 372 at 9, ¶ 32; *id.* at 25.)

It is undisputed, however, that Kincher drafted a new pet policy on June 16 to reflect the board-approved change. (ECF No. 354 at 9, ¶ 50.) The policy required all animals to be "registered" with MHA, and also required a deposit. (*Id.*) Plaintiffs assert that, before drafting this policy, Kincher reviewed online sources and talked to other housing authorities in Colorado, all of which informed her that a pet deposit was impermissible for assistance animals. (ECF No. 372 at 10, ¶ 33.) Plaintiffs further assert that, around the same time, someone from MHA called a local medical center and asked doctors to be cautious in writing companion animal recommendation letters. (ECF No. 354 at 9, ¶ 51.) Defendants counter that the available evidence shows, at most, that someone from a different MHA-managed apartment complex called a particular doctor in the summer of 2015, not 2016. (ECF No. 363 at 7, ¶ 51.)

### 2. First Violation Notices

On July 11, Kincher distributed the new pet policy to all tenants. (ECF No. 354 at 9, ¶ 52.) The next day, she posted violation notices on McFadden's and the Whites' doors. (*Id.* ¶ 53.) In McFadden's case, Kincher deemed her in violation not only for Chewy, but also for a pet ferret. (ECF No. 372 at 10, ¶ 36.)

The MHA board held a monthly meeting on July 20, which Lonnie White attended. (ECF No. 354 at 12, ¶ 73.) He expressed "concern" about the new pet policy and the $300 nonrefundable deposit. (ECF No. 354-51 at 3.) The board "listened to his concern and said they would discuss and make [a] decision." (*Id.*) They then moved on to other business items, but "[d]iscussion moved back to the pet policy" towards the end of the meeting, apparently after Lonnie White had left. (*Id.* at 4.) A motion carried to formally approve the $300 nonrefundable deposit for therapeutic pets. (*Id.*) The next

day, Kincher informed the Whites of the board's decision.  (ECF No. 354 at 13, ¶ 74.)

### 3.     Additional Violation Notices

On July 22, Kincher again posted violation notices on McFadden's and the Whites' doors.  (ECF No. 354 at 10, ¶ 55; *id.* at 13, ¶ 75.)  The next day, McFadden e-mailed Kincher what appears to be a scanned image of a filled-out form letter announcing that she has "a disability as defined by the fair housing laws" and that she uses her dog as "an emotional service animal to assist [her] with the functional limitations related to [her] disability," and requesting "an accommodation for [her] disability," namely, waiver of the no-pet policy and the deposit.  (ECF No. 354-57 at 3.)  The document also announces that "a [verifying] letter from [her] doctor or other medical professional" is attached (*id.*), although it is not clear if such a letter was actually attached.

On July 25, McFadden secretly recorded a conversation between herself and Kincher.  (*See* ECF No. 354-59 (transcript); ECF No. 363 at 7, ¶ 57.)  In that conversation, McFadden announced that she was "officially submitting my request for a reasonable accommodation," including a supporting letter from someone not identified in the transcript.  (ECF No. 354-59 at 4.)  Plaintiffs claim that the letter was from Catherine Eliasen, a licensed social worker.  (ECF No. 354 at 10, ¶ 59.)

On July 26, the MHA board held a special meeting "to discuss the reasonable accommodation request regarding Megan McFadden."  (ECF No. 354-51 at 5.)  "It was decided to waive the no-pet policy for her companion animal," assuming she could "[g]et a letter from a psychiatrist" and pay the $300 security deposit within thirty days.  (*Id.*)  Nothing in the record indicated whether anyone informed McFadden of the board's decision.

4.     <u>More Policy Changes and Further Notices</u>

On July 27, Kincher served McFadden with a 30-day notice to vacate.  (ECF No. 354 at 11, ¶ 63.)  Defendants claim this was prompted by pets McFadden kept other than Chewy, including the ferret.  (ECF No. 363 at 9, ¶ 63.)  Also on July 27, MHA issued a revised companion animal policy requiring "[a] letter from a licensed psychiatrist qualified to attest to the need for the companion animal," and allowing only one therapy animal per authorized resident.  (ECF No. 354-62 at 2.)  Plaintiffs assert that the board was aware when it made this decision that A.J. claimed more than one therapy animal.  (ECF No. 354 at 13, ¶ 76.)  The next day, Kincher posted a third violation notice on the Whites' door.  (*Id.* ¶ 77.)

On August 5, McFadden sent Kincher an e-mail asking that she rescind the notice to vacate and approve her accommodation request.  (ECF No. 354-57 at 5.)  That same day, Kincher posted a fourth violation notice on the Whites' door.  (ECF No. 354 at 13, ¶ 78.)

On August 12, Kincher sent a letter stating that MHA was denying McFadden's accommodation request because "Meeker Housing Authority never received any information regarding [Chewy's status as] a companion animal until two [violation] notices were given.  Regarding your third and final infraction, you were written up for a ferret that is clearly not in the lease agreement."  (*Id.* at 12, ¶ 67; ECF No. 354-57 at 6.)

On August 16, Kincher served the Whites with a thirty-day notice to vacate.  (ECF No. 354 at 13, ¶ 79.)  The reasons given in that notice are: "Pet policy violation and you no longer qualify due to the age of your son and he has graduated school—[a]lso you have not reported your income to the Housing Authority."  (ECF No. 354-58 at 6.)  At her deposition in this case, Kincher testified that "the eviction process was for"

the "pet violation," and not anything else at that time—specifically, not A.J.'s age.  (ECF No. 354-2 at 24.)

On August 17, the Whites provided MHA with "another letter from A.J. White's therapist Catherine Eliasen," *i.e.*, the same therapist that was apparently working with McFadden.  (ECF No. 354 at 14, ¶ 81.)  The letter stated that A.J. "is dealing with a chronic mental illness" which creates "increased difficulty coping with stress, and calming himself when agitated."  (ECF No. 354-65 at 1.)  "It is helpful when dealing with the symptoms," the letter continued, "for him to have his cats in his home.  The companionship and comfort that emotional support animals provide is soundly supported in research, and thus I am recommending that [he] continue to have his emotional support animals."  (*Id.*)

On August 18, McFadden responded to Kincher's August 12 letter about the ferret and Chewy, explaining that the ferret was temporary (and now gone, apparently) and that she needed Chewy, as documented by paperwork she had already submitted. (ECF No. 354-57 at 7.)  On August 22, Kincher wrote to McFadden that the MHA board had reviewed her response but it "stands by [its] decision of eviction, and the violations still apply."  (*Id.* at 8.)  On August 24 and 25, McFadden and Kincher exchanged e-mails about the date by which McFadden must vacate, and Kincher announced that the MHA board would permit her to stay until September 1, 2016 "if [she was] to find a new home for [her] dog in the process."  (*Id.* at 9.)

On August 27, Lonnie sent Kincher an e-mail reattaching copies of A.J.'s medical provider statements in support of his disability, and asking for reconsideration of the eviction.  (ECF No. 354 at 14, ¶ 82.)  On August 29, Kincher wrote back, asserting that

"there is nothing in your file that stated that your son was disabled.  You gave me a letter from your therapist but we would need a letter from a medical doctor to consider a diagnosis (per HUD)."  (ECF No. 354-58 at 8.)  Kincher also provided more explanation about one of the other asserted violations in the notice to vacate—income verification— and concluded, "your lack of information does not dismiss the eviction process.  Please understand this has nothing to do with your pets."  (*Id.*)  It is unclear whether Kincher's last sentence meant to convey that the eviction had nothing to do with the pet violations, or only that failure to provide income verification was a basis for eviction independent of the pet violations.  This is all the more confusing given her deposition testimony, noted above, that the only basis for the eviction was A.J.'s cats.

On September 7, the Whites e-mailed MHA another accommodation request, concluding with "[w]e need our home and my son needs his animals!"  (*Id.* at 9.)  Kincher responded later that same day that MHA was simply enforcing "the rules that you signed when you moved into Karen Court.  Please be moved out on or before the 15th."  (*Id.*)

### 5.   McFadden Moves Out

The next day, September 8, McFadden moved out of Karen Court.  (ECF No. 354 at 12, ¶ 72.)  MHA did not file eviction proceedings (ECF No. 372 at 11, ¶ 41), but it recorded the move-out on its paperwork as both a "tenant initiated" move and "an eviction for other than non-payment of rent" (ECF No. 355-6 (capitalization normalized)).

Defendants say that, sometime before McFadden's move-out, MHA "ultimately approved [her] request to keep her dog without paying a deposit."  (ECF No. 363 at 22, ¶ 37.)  In support, they cite Kincher's deposition in this case, where she states that an approval decision came sometime "after August 26."  (ECF No. 363-4 at 10.)  But the

cited excerpts say nothing about waiving the deposit, and in fact the transcript continues

with a discussion about the $300 deposit as if it was *not* waived:

> Q.     When you granted the request for Ms. McFadden to keep her companion animal, did you notify Ms. McFadden that she would have to pay a $300 nonrefundable pet deposit?
>
> A.     There was [*sic*] some stipulations on that.

(*Id.*)  The word "stipulations" echoes the board meeting minutes from July 26, where the

decision to grant McFadden's accommodation request was made "[w]ith the stipulations

of [McFadden] bringing in the correct paperwork [*i.e.*, a letter from a psychiatrist]."  (ECF

No. 354-51 at 5.)  This suggests that Kincher misremembered the MHA board's July 26

decision as something that happened on or after August 26.

McFadden claims she is still owed a $50 deposit paid on move-in.  The parties

dispute whether she ever paid a move-in deposit.  Plaintiffs point to McFadden's Karen

Court file, which contains a HUD form titled "Owner's Certification of Compliance with

HUD's Tenant Eligibility and Rent Procedures."  (ECF No. 354-74.)  The document

includes what appears to be disclosure of rent and other charges, and a "50" appears

on the line for "Security Deposit."  (*Id.*)  But the form contains no signatures, despite

signature blocks for "Head of Household" and "Owner/Agent."  (*Id.*)  The form also

appears to be some sort of documentation for a transfer from one apartment to another

in June 2016, well after McFadden moved into Karen Court.  (*Id.*)  Defendants, for their

part, deny that McFadden paid any deposit, whether $50 or otherwise.  (ECF No. 363

at 14, ¶¶ 99–100.)

6.     The Whites Obtain Preliminary Relief from this Court

As for the Whites, they filed this lawsuit on September 13 (ECF No. 1) and

received from this Court a temporary restraining order against eviction on September 15 (ECF No. 15). For reasons not relevant to recount here, the TRO was eventually converted into an All Writs Act injunction. (*See* ECF No. 57.)

## E.    The Whites' Eventual Departure

The Whites moved from Karen Court in October 2017 because they found an apartment with lower rent. (ECF No. 363 at 23, ¶ 47.) They claim they were forced to seek lower rent because MHA was making unsubstantiated income recertification demands and inflating the Whites' rent based on supposed failures to meet those demands. (ECF No. 354 at 19–20, ¶¶ 115–20.)

## IV.  ANALYSIS

## A.    Qualified Immunity

Plaintiffs assert their FHA and § 504 claims against all Defendants, meaning they seek to hold the Individual Defendants (the MHA board members and Kincher) personally liable, not just MHA itself.[3] Plaintiffs also allege that the Individual Defendants are "'persons' under 42 U.S.C. § 1983 . . . acting under color of state law." (ECF No. 237 ¶¶ 280, 282, 336, 338.) In other words, they allege that the Individual Defendants acted as government officials in depriving Plaintiffs of a right secured by the Constitution or a federal statute. *See* 42 U.S.C. § 1983.

Defendants deny that they are government officials. (*See* ECF No. 253 ¶¶ 282, 338.) But assuming they are government officials, they argue for qualified immunity (*see* ECF No. 363 at 35–38), which "shield[s] [them] from liability for civil damages

---

[3] As to their § 504 claims, Plaintiffs do not move for summary judgment on the Individual Defendants' liability (*see* ECF No. 354 at 1 n.1, 22 n.10), but neither do Plaintiffs abandon those claims as to the Individual Defendants.

insofar as their conduct d[id] not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

Plaintiffs respond that this argument contradicts the Individual Defendants' denial throughout this lawsuit that they are government officials. (ECF No. 372 at 26.) But Plaintiffs have not abandoned or disavowed their explicit allegations that the Individual Defendants acted under color of state law when they took the actions at issue in this lawsuit.[4] The Individual Defendants are thus entitled to presume that Plaintiffs plan to go to trial with the intent on proving the government-official allegations.[5] And in that light, the Individual Defendants may properly argue for qualified immunity.

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (internal quotation marks omitted). "The judges of the district courts . . . [may] exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). "A right is clearly established in this circuit when

_____

[4] Plaintiffs' response to Defendants' proposed surreply confirms that they are not abandoning their government-official allegations. (ECF No. 390 ¶ 3.) Plaintiffs further argue that "[a] party asserting that a fact is genuinely disputed must support the assertion with evidence, not allegations." (*Id.*) But the only dispute in this context is whether the Individual Defendants are government officials. Defendants are not asking the Court to find that a dispute exists. Rather, they are presenting one of the most common forms of argument in the law: "Assuming the facts are as the other side represents, we still win because . . . ."

[5] The Final Pretrial Order, developed and entered several months after the close of summary judgment briefing, continues to assert the relevant claims. (ECF No. 406 at 9, 10.)

a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as the plaintiff maintains." *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014) (internal quotation marks omitted). The plaintiff bears the burden of demonstrating that the law was clearly established at the relevant time. *Lybrook v. Members of Farmington Mun. Sch. Bd. of Educ.*, 232 F.3d 1334, 1337 (10th Cir. 2000).

Plaintiffs argue that, assuming the Individual Defendants may raise qualified immunity, the statutory right in question was clearly established in 2016. (ECF No. 372 at 26–30.) Plaintiffs concede that there is no on point Supreme Court or Tenth Circuit precedent, but argue based on what they believe to be a clearly established weight of authority from other courts that there is a "right to live with an assistance animal" as a disability accommodation. (*Id.* at 27.)

The Court finds "assistance animal" is too broad. "The Supreme Court has cautioned [lower] courts not to define clearly established law at a high level of generality, but to focus on whether the violative nature of particular conduct is clearly established." *Perea v. Baca*, 817 F.3d 1198, 1204 (10th Cir. 2016) (internal quotation marks and citations omitted). This "does not demand an absurd level of specificity," *Estate of Walter v. Corr. Healthcare Cos.*, Inc., 323 F. Supp. 3d 1199, 1213 (D. Colo. 2018), but Plaintiffs' "assistance animal" formulation is plainly engineered at allowing Plaintiffs to claim cases about hearing and seeing-eye dogs as part of the weight of relevant authority from other courts. The Court sees a meaningful distinction between service animals (dogs, usually, that perform tasks their owners cannot) and therapy pets, whose role is to provide the companionship that pets normally provide. Although

the Court need not rule as much in this context, the right to a service animal as a reasonable accommodation is likely clearly established. But the notion of a therapy pet as a reasonable accommodation is a more recent development.[6]

Plaintiffs cite only one circuit-level decision specifically confirming that a therapy pet may be a reasonable accommodation under the FHA. *See Castillo Condo. Ass'n v. U.S. Dep't of Hous. & Urban Dev.*, 821 F.3d 92, 98 (1st Cir. [May 2,] 2016) ("the Association's refusal to allow Giménez to keep an emotional support dog in his condominium unit as a reasonable accommodation for his disability [anxiety and depression] was unlawful").[7] Beyond that, Plaintiffs cite sub-regulatory HUD guidance from 2013 that specifies emotional support animals as something that may need to be reasonably accommodated under the FHA and § 504, despite recent amendments to ADA-implementing regulations that narrowed the definition of "service animal" to exclude emotional support animals. (ECF No. 354-85.) Plaintiffs also cite two HUD

---

[6] Plaintiffs point to a HUD regulation promulgated in 2008 for the proposition that HUD at that time "explicitly determin[ed] that the FHA applies to support and therapy animals, not just service animals." (ECF No. 372 at 29 n.9.) Plaintiffs exaggerate. First, the regulation was in the context of pet policies in housing projects specifically designed to serve "the elderly or persons with disabilities." 24 C.F.R. § 5.300. As far as the record reveals, that does not encompass Karen Court, and Plaintiffs do not explain why a reasonable MHA board member would have reason to pay attention to such regulations. Second, the regulation itself says that general pet policies in housing projects for the elderly or disabled do not apply "against animals that are necessary as a reasonable accommodation to assist, support, or provide service to persons with disabilities." *Id.* § 5.303(a). The scope of "assist, support, or provide service to" is ambiguous and it is only upon reading the Federal Register commentary that one learns that HUD had in mind, among other things, "providing emotional support to persons who have a disability related need for such support." 73 Fed. Reg. 63834 (Oct. 27, 2008). Plaintiffs cite no authority that Federal Register commentary can clearly establish federal statutory rights.

[7] Plaintiffs cite a number of extra-circuit district court cases in the same vein, but district court cases do not generate clearly established law. *Woodward v. City of Worland*, 977 F.2d 1392, 1397 (10th Cir. 1992) ("a district court decision will not ordinarily clearly establish the law even of its own circuit" (citation and internal quotation marks omitted)). In any event, all of these cases are from 2011 or later, confirming the recent development of the notion of a therapy pet as a reasonable accommodation. (*See* ECF No. 372 at 27–28.)

administrative law judge decisions sustaining a charge of discrimination against housing providers that denied emotional support animals as a reasonable accommodation. *Sec'y ex rel. Archibald v. Riverbay Corp.*, 2012 WL 1655364, at *1 (May 7, 2012); *Sec'y ex rel. Evan v. Dutra*, 1996 WL 657690, at *1 (Nov. 12, 1996). Assuming these authorities "count" in the clearly established law analysis,[8] they do not amount to a "weight of authority from other courts show[ing] that the right must be as the plaintiff maintains." *Thomas*, 765 F.3d at 1194.

The Court accordingly finds that Plaintiffs have failed to carry their burden to overcome Defendants' assertion of qualified immunity. The Individual Defendants will be dismissed.[9]

## B. Discrimination: Failure to Reasonably Accommodate

Plaintiffs move for summary judgment as to liability, leaving only a question of damages for trial, as to Claims 1 and 4 of their second amended complaint. Those claims are, respectively, discrimination under the FHA and discrimination under § 504.

### 1. Elements

As to persons with a "handicap" (now more commonly known as a "disability"), the FHA makes it unlawful to "refus[e] to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford

---

[8] *Cf. Green v. Post*, 574 F.3d 1294, 1310 n.10 (10th Cir. 2009) ("[i]n determining whether the law was clearly established," courts in the Tenth Circuit "may not rely upon unpublished decisions").

[9] The Individual Defendants did not affirmatively move for summary judgment on qualified immunity, but instead raised it for the first time—in the entire litigation—in their response brief. But Plaintiffs took up the challenge without arguing waiver, and with no caveats about factual issues that might need a trial to resolve. In these unique circumstances, and considering that qualified immunity shifts the burden to Plaintiffs, the Court finds that dismissing the Individual Defendants is appropriate, despite the procedural posture.

such person equal opportunity to use and enjoy a dwelling."  42 U.S.C. § 3604(f)(3)(B).

> To state a claim of discrimination under the FHA for failure to accommodate, a plaintiff must show: (1) that the plaintiff or his associate is handicapped as defined by the FHA; (2) that the defendant knew or reasonably should have known of the claimed handicap; (3) that accommodation of the handicap may be necessary to afford the handicapped person an equal opportunity to use and enjoy the dwelling; (4) that the accommodation is reasonable; and (5) that defendants refused to make such accommodation.

*Arnal v. Aspen View Condo. Ass'n, Inc.*, 226 F. Supp. 3d 1177, 1183 (D. Colo. 2016).

Under Rehabilitation Act § 504, "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794.  "A prima facie case under § 504 consists of proof that (1) plaintiff is [disabled] under the Act; (2) he is 'otherwise qualified' to participate in the program; (3) the program receives federal financial assistance; and (4) the program discriminates against plaintiff."  *Hollonbeck v. U.S. Olympic Comm.*, 513 F.3d 1191, 1194 (10th Cir. 2008).[10]

The parties do not dispute that the middle two elements of the § 504 claim ("otherwise qualified" and federal financial assistance) are satisfied.  In addition, MHA does not dispute Plaintiffs' position that proof of the second through fifth elements of an FHA reasonable accommodation claim amounts to proof of the fourth element of a

---

[10] If the plaintiff wishes to recover compensatory damages, he or she must additionally prove that the "discrimination was intentional."  *Barber ex rel. Barber v. Colo. Dep't of Revenue*, 562 F.3d 1222, 1228 (10th Cir. 2009).  "Intentional discrimination does not require a showing of personal ill will or animosity toward the disabled person; rather, intentional discrimination can be inferred from a defendant's deliberate indifference to the strong likelihood that pursuit of its questioned policies will likely result in a violation of federally protected rights."  *Id.* at 1228–29 (internal quotation marks omitted).

§ 504 claim.  Accordingly, for present purposes, the Court will analyze only the elements of the FHA claim, except where noted.

      2.    <u>Handicap/Disability</u>

      a.    *FHA vs. § 504 Definitions*

Under the FHA, a "handicap" is "(1) a physical or mental impairment which substantially limits one or more of such person's major life activities, (2) a record of having such an impairment, or (3) being regarded as having such an impairment." 42 U.S.C. § 3602(h).

> As used in this definition:
>
> (a) Physical or mental impairment includes:
>
> > (1) Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: Neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive; digestive; genito-urinary; hemic and lymphatic; skin; and endocrine; or
>
> > (2) Any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.  The term physical or mental impairment includes, but is not limited to, such diseases and conditions as orthopedic, visual, speech and hearing impairments, cerebral palsy, autism, epilepsy, muscular dystrophy, multiple sclerosis, cancer, heart disease, diabetes, Human Immunodeficiency Virus infection, mental retardation, emotional illness, drug addiction (other than addiction caused by current, illegal use of a controlled substance) and alcoholism.
>
> (b) Major life activities means functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working.

24 C.F.R. § 100.201.

Section 504 covers at least as much, but is potentially broader.  Section 504

defines "individual with a disability" by cross-reference to the Americans with Disabilities Act ("ADA"). *See* 29 U.S.C. § 705(20)(B). Similar to the FHA, a "disability" under the ADA is "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). Also similar to the FHA, "major life activities . . . include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." *Id.* § 12102(2)(A). But, unlike the FHA, the ADA expands "major life activities" to include "the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." *Id.* § 12102(2)(B).

Moreover, the ADA says that "[t]he term 'substantially limits' shall be interpreted consistently with the findings and purposes of the ADA Amendments Act of 2008 [a.k.a. the 'ADAAA']." *Id.* § 12102(4)(B). The ADAAA includes the following among its findings and purposes:

> [I]t is the intent of Congress that the primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations[;] . . . the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis.

Pub. L. No. 110-325, § 2(b)(5). Regulations promulgated under the ADA emphasize this purpose:

> An impairment is a disability . . . if it substantially limits the ability of an individual to perform a major life activity as

> compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting.

29 C.F.R. § 1630.2(j)(ii).

Nominally, then, a § 504 "disability" (incorporating the ADA definitions) seems easier to prove than an FHA "handicap." Congress specifically directed that the ADA definition of "disability" be broad, and that any questions on that account be easily resolved, so that the focus remains on whether the other party complied with legal requirements. The FHA does not contain similar language.

Although the Court could find no case law explicitly addressing the subject, the Court is confident that Congress did not intend for the ADAAA to create two standards for disability (one for the ADA/§ 504, and another for the FHA). At a minimum, the ADAAA is strong evidence of Congress's intent as to the meaning of disability protections generally. Accordingly, the Court finds that the meaning of "substantially limits" in the FHA should be interpreted congruent with the ADA/§ 504 definition of that term. This is all the more appropriate given the FHA's broadly remedial purposes. *See, e.g.*, *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209 (1972) ("The language of the [FHA] is broad and inclusive."); *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967) ("we are guided by the familiar canon of statutory construction that remedial legislation should be construed broadly to effectuate its purposes").

### b. *"Record of Disability"*

Plaintiffs argue that they have a "record of disability" as a matter of law, thus satisfying one of the three disjunctive prongs of the "disability" definition. (ECF No. 354 at 24–28.) MHA's primary counterargument is that Plaintiffs have not shown lack of a

genuine dispute over whether they have a record of disability, particularly, whether they have a record of a claimed impairment that "substantially limits" any major life activity. (ECF No. 363 at 23–29.)  MHA emphasizes the many things Plaintiffs have accomplished and can do for themselves.  (*See* Parts III.B & III.C, above.)

The Tenth Circuit has stated that "whether the impairment substantially limits a major life activity is ordinarily a question of fact for the jury."  *Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1142 (10th Cir. 2011).  But this sentiment traces to pre-ADAAA cases, where the "substantially limits" test was stricter.  *See Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1129 (10th Cir. 2003).  The Court does not doubt that "substantially limits" is still a question of fact, but it is also one that, post-ADAAA, "should not demand extensive analysis."  Pub. L. No. 110-325, § 2(b)(5).

Here, there is no question that McFadden and A.J. have both been repeatedly diagnosed with emotional disorders or mental illnesses that affect the major life activity of effective mental functioning.  *See* 42 U.S.C. § 12102(2)(A)–(B) (ADA/§ 504); 24 C.F.R. § 100.201 (FHA).[11]  These disorders or illnesses "need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting."  29 C.F.R. § 1630.2(j)(ii).  In other words, that McFadden and A.J. can care for themselves and outwardly present as normally functioning does not mean they are not disabled.  No reasonable jury, properly instructed, could fail to conclude that McFadden's and A.J.'s extensive medical histories

---

[11] The FHA regulation does not identify effective mental functioning as a major life activity with the same clarity as the ADA.  Nonetheless the regulation states that major life activities are "functions *such as* caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working."  *Id.* (emphasis added).  Effective mental functioning is akin, and often a prerequisite, to many of the specifically named activities.

establish a record of disability under both the FHA and § 504.  Accordingly, Plaintiffs are entitled to summary judgment on this element.

        c.     *"Regarded As" Disabled*

Plaintiffs also argue that MHA indisputably "regarded" McFadden and A.J. White as disabled.  (ECF No. 354 at 28–29.)  This argument largely relies on Kincher's statements that MHA granted or would have granted the requested accommodations, the implication being that MHA would not have so acted or intended to act without coming to regard McFadden and A.J. as disabled.

Because Plaintiffs need only prove one version of the disability definition, and "record of" satisfies that burden, the Court need not reach the "regarded as" argument. *See* 42 U.S.C. § 3602(h); 42 U.S.C. § 12102(1).  To the extent it may still matter at the forthcoming trial, the Court notes that approval of, or intent to approve, an accommodation does not necessarily mean the person has come to regard the requesting party as disabled.  For example, one can agree to an accommodation to avoid contention while still harboring significant doubts about the presence of a disability.

        3.    <u>Notice</u>

The next element Plaintiffs must prove is that MHA "knew or reasonably should have known of the claimed handicap" or disability. *Arnal*, 226 F. Supp. 3d at 1183. There is no reasonable, genuine factual dispute here.  As described above (Parts III.D.2 through III.D.4), McFadden and Lonnie communicated the relevant claimed disabilities in person and in writing on multiple occasions to MHA's agents (the Individual Defendants).  The same evidence shows that the Individual Defendants deliberated about those claims.  Thus, Plaintiffs have shown an entitlement to judgment as a matter

of law on the notice element.

4.  Accommodation May Be Necessary

The third element is "that accommodation of the handicap may be necessary to afford the handicapped person an equal opportunity to use and enjoy the dwelling." *Arnal*, 226 F. Supp. 3d at 1183. "An accommodation is necessary when there is evidence showing that the desired accommodation will affirmatively enhance a disabled plaintiff's quality of life by ameliorating the effects of the disability." *Id.* at 1185.

Plaintiffs have presented evidence from competent professional sources that McFadden and A.J. receive important mental health benefits from having their pets. MHA presents no countervailing evidence. Plaintiffs have therefore established as a matter of law that accommodation, in the form of keeping pets, may have been necessary to afford McFadden and A.J. an equal opportunity (as compared to non-disabled individuals) to use and enjoy their apartments at Karen Court.

5.  Reasonableness of the Accommodation

The fourth element of Plaintiffs' discrimination claims is "that the accommodation is reasonable." *Arnal*, 226 F. Supp. 3d at 1183. "An accommodation is reasonable under the FHA when it imposes no fundamental alteration in the nature of the program or undue financial or administrative burdens." *Id.* at 1185–86.

Again, a reasonable jury could only find for Plaintiffs here. MHA has offered no evidence that allowing McFadden and A.J. to keep their pets in their Karen Court apartment would impose a fundamental alteration to Karen Court or saddle it with undue financial or administrative burdens. McFadden kept Chewy in her apartment for six months before the pet policy change, and A.J. had at least one cat for almost two-and-a-half years before the change. MHA does not allege that Chewy or A.J.'s cats posed

specific or unusual problems.  As far as the record reveals, the only action needed to accommodate McFadden's and A.J. White's pets is inaction.  Consequently, Plaintiffs deserve judgment as a matter of law on this element.

6.  Refusal to Accommodate

The final element is "that defendants refused to make [the requested] accommodation."  *Arnal*, 226 F. Supp. 3d at 1183.  To be liable under this element, the defendant

> must . . . have been given an opportunity to make a final decision with respect to [the plaintiff's] request, which necessarily includes the ability to conduct a meaningful review of the requested accommodation to determine if such an accommodation is required by law. [¶] Once allowed that opportunity, a violation occurs when the disabled resident is first denied a reasonable accommodation, irrespective of the remedies granted in subsequent proceedings.

*Id*. at 1186.  There can be no reasonable dispute that MHA received the opportunity to make an informed final decision, and that it denied the accommodation as to both McFadden and the Whites.  (*See* Parts III.D.2 through III.D.4, above.)

MHA nonetheless insists that it did *not* deny either request.  (ECF No. 363 at 30–31.)  Concerning McFadden, MHA says there is a dispute of fact over whether the notices to vacate were prompted by pets other than Chewy, presumably referring to the ferret.  (*Id.* at 30.)  This is not so much an argument that MHA did *not* deny the accommodation request, but that grant or denial is irrelevant because there was an independent, nondiscriminatory basis to evict McFadden.  Although the ferret was at times an issue, the communications between McFadden and Kincher closest to the date she was required to move out focus on the need to remove Chewy.  (*See* Part III.D.4, above.)  The fact that a ferret might have previously been part of MHA's considerations

is, at best, a "mere scintilla" of contrary evidence, and not enough to avoid summary judgment. *Adler*, 144 F.3d at 678 n.5.

Also as to McFadden, MHA points to Kincher's testimony that MHA decided to grant the accommodation in full, apparently sometime in late August. As the Court previously discussed (Part III.D.5), there is no record support even in Kincher's testimony that the $300 fee was waived. Moreover, MHA fails to present evidence that it *informed* McFadden of its decision to grant her requested accommodation. Surely an accommodating party cannot satisfy its obligations by deciding to grant the accommodation and then not telling the requesting party of that decision. In this light, there is no material dispute that MHA denied McFadden's request.

As to the Whites, MHA says that the request "was never denied; A.J. and Lonnie White voluntarily moved out of Karen Court on or about October 1, 2017. Until then, the cats remained in the White's [*sic*] apartment." (ECF No. 363 at 31 (citation omitted).) The argument is a *non sequitur*. MHA repeatedly denied the Whites' request, in writing, and told them to vacate by September 15, 2016 (*see* Parts III.D.2 through III.D.4, above)—an outcome this Court prevented by issuing a TRO. Accordingly, no reasonable jury could agree with MHA that it never denied the Whites' request.

* * *

For all these reasons, the Court grants summary judgment in Plaintiffs' favor as to MHA's liability under Plaintiffs' Claims 1 and 4.[12]

---

[12] Plaintiffs have asserted theories of liability under Claims 1 and 4 that do not rest on denial of a reasonable accommodation. (*See* ECF No. 354 at 23, 33.) In light of the foregoing disposition, the Court need not address these arguments.

## C.    Interference & Retaliation

The FHA makes it "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of" the rights it grants.  42 U.S.C. § 3617.  Based on this statute, Plaintiffs assert separate causes of action against Defendants for interference with FHA rights and retaliation for exercise of FHA rights.  Plaintiffs also assert a § 504 retaliation cause of action.  *See Hwang v. Kansas State Univ.*, 753 F.3d 1159, 1165 (10th Cir. 2014) ("We've long explained that the Rehabilitation Act prohibits not just discrimination on the basis of disability but retaliation against those who report disability discrimination.").  Interference and retaliation causes of action heavily overlap, including a requirement that the plaintiff prove the defendant was motivated to interfere or retaliate at least in part by intent to discriminate.  *See Carrillo v. Romero*, 2013 WL 6133362, at *3 (D. Colo. Nov. 21, 2013).

There are many genuine disputes over whether Defendants possessed the necessary intent to be liable for interference or retaliation.  Summary judgment for Plaintiffs is inappropriate on their claims for interference and retaliation.

## D.    McFadden's $50 Deposit

There is likewise a genuine factual dispute over whether McFadden ever paid a $50 deposit.  The sole evidence is an ambiguous, unsigned form.  (*See* Part III.D.5, above.)  This is not nearly enough to take the question away from a jury.  Summary judgment is therefore denied on this cause of action.

## V.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.   Plaintiffs' Motion for Partial Summary Judgment (ECF No. 354) is GRANTED as to liability on Plaintiffs' Claims 1 and 4 against MHA, but otherwise DENIED;

2.   Defendants Melinda Parker, Michelle Buckler, Edy George, and Stacie Kincher are entitled to qualified immunity and are therefore TERMINATED as parties—counsel shall update their captions to so reflect;

3.   If any party believes this outcome obviates the need to decide any issue in any of the pending motions to strike or exclude (ECF Nos. 421, 435–37, 440–41), that party shall file a notice stating as much no later than **March 1, 2019**;

4.   Defendants' Motion for Leave to Submit Surreply to Motion for Partial Summary Judgment (ECF No. 382) is DENIED AS MOOT; and

5.   This matter REMAINS SET for a Final Trial Preparation Conference on April 10, 2019, at 1:30 PM, and a 5-day jury trial commencing on May 6, 2019, at 8:30 AM, both in Courtroom A801.

Dated this 15th day of February, 2019.

BY THE COURT:

William J. Martinez
United States District Judge