### 3.5.1 Impeachment of Witnesses Because of Inconsistent Statements

You should also ask yourself whether there was evidence that a witness testified falsely about an important fact. And ask whether there was evidence that at some other time a witness said or did something, or didn't say or do something, that was different from the testimony the witness gave during this trial.

But keep in mind that a simple mistake doesn't mean a witness wasn't telling the truth as he or she remembers it. People naturally tend to forget some things or remember them inaccurately. So, if a witness misstated something, you must decide whether it was because of an innocent lapse in memory or an intentional deception. The significance of your decision may depend on whether the misstatement is about an important fact or about an unimportant detail.

3 Fed. Jury Prac. & Instr. § 105:04 (6th ed.), 3 Fed. Jury Prac. & Instr. § 105:04 (6th ed.)

---

**3 Fed. Jury Prac. & Instr. § 105:04 (6th ed.)**

Federal Jury Practice And Instructions  |  February 2019 Update

**Civil**

Kevin F. O'Malley, Jay E. Grenig [a0], Hon. William C. Lee [a1]

**Part V. General Instructions for Federal Civil Cases**

**Chapter 105. Instructions at Close of Evidence: Credibility of Witnesses**

§ 105:04. Impeachment—Inconsistent statement or conduct

A witness may be discredited or impeached by contradictory evidence or by evidence that at some other time the witness has said or done something, or has failed to say or do something that is inconsistent with the witness' present testimony.

If you believe any witness has been impeached and thus discredited, you may give the testimony of that witness such credibility, if any, you think it deserves.

If a witness is shown knowingly to have testified falsely about any material matter, you have a right to distrust such witness' other testimony and you may reject all the testimony of that witness or give it such credibility as you may think it deserves.

An act or omission is "knowingly" done, if the act is done voluntarily and intentionally, and not because of mistake or accident or other innocent reason.

**NOTES**

*In General*

To the extent there is a conflict in a witness' testimony, such conflict affects weight of testimony, not its admissibility. See Palazzo ex rel. Delmage v. Corio, 232 F.3d 38, 44 (2d Cir.2000). English v. Cody, 241 F.3d 1279, 1285 (10th Cir.2001) (alleged inconsistencies in witness' testimony at preliminary hearing and at trial did not undermine his testimony as a whole).

Where a prior inconsistent statement is admitted solely to impeach the witness, upon request the jury should be cautioned at the time the statement is introduced at when a limiting instruction is given when the court instructs the jury as to the law, or both, that they are to consider the statement only as affecting the credibility of the witness. United States v. Miller, 664 F.2d 94, 97–98 (5th Cir.1981), cert. denied, 459 U.S. 854, 103 S.Ct. 121, 74 L.Ed.2d 106 (1982) (limiting use of statement by jury is usually done by jury instruction); United States v. McDonald, 620 F.2d 559, 565 (5th Cir.1980)

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.   1

3 Fed. Jury Prac. & Instr. § 105:04 (6th ed.), 3 Fed. Jury Prac. & Instr. § 105:04 (6th ed.)

(where prior statement does not fall within Fed.R.Evid. 801(d)(1)(A), the jury must be instructed that statement is offered solely to impeach credibility of witness).

Where a trial court does not give a requested specific instruction on prior **inconsistent** statements this omission may not constitute reversible error where the jury charge as a whole substantially covers general credibility considerations. United States v. Angiulo, 897 F.2d 1169, 1208, (1st Cir.), cert. denied, 498 U.S. 845, 111 S.Ct. 130, 112 L.Ed.2d 98 (1990); United States v. Monzon, 869 F.2d 338, 346 (7th Cir.), cert. denied, 490 U.S. 1075, 109 S.Ct. 2087, 104 L.Ed.2d 650 (1989) (defendant not entitled to specific instruction on prior **inconsistent** statement where instruction actually given by court told jury that it should consider **inconsistencies** in witness testimony in determining credibility). But see United States v. Livingston, 816 F.2d 184, 192 (5th Cir.1987) (even in absence of request, failure to give limiting instruction on use of prior **inconsistent** statements can sometimes be plain error).

The failure to give a portion of the falsus in uno instruction was held not to be prejudicial error in United States v. Baron, 602 F.2d 1248, 1254 (7th Cir.), cert. denied, 444 U.S. 967, 100 S.Ct. 456, 62 L.Ed.2d 380 (1979). Cf. Virginian Ry. v. Armentrout, 166 F.2d 400, 405–06 (4th Cir.1948) (harsh falsus in uno falsus in omnibus rule has little place in modern jurisprudence).

In the Eighth Circuit, to introduce a witness' own earlier statement for impeachment, (1) the statements must be **inconsistent**, (2) the **inconsistency** must be relevant, (3) the **inconsistent** statement must, on request, be disclosed to opposing counsel, the witness allowed to question the witness, and (4) the district court should instruct the jury about the limited purpose of the earlier statement. United States v. Larry Reed & Sons Partnership, 280 F.3d 1212, 1215 (8th Cir.2002). When neither party requests a limiting instruct, the trial court's failure to issue such an instruction is reviewed for plain error. McKnight ex rel. Ludwig v. Johnson Controls, Inc., 36 F.3d 1396, 1403 n. 6 (8th Cir.1994).

Fed. R. of Evid. 801(d)(1)(B) permits the introduction of a declarant's consistent out-of-court statements to rebut a charge of recent fabrication. Tome v. United States, 513 U.S. 150, 165, 115 S.Ct. 696, 705, 130 L.Ed.2d 574 (1995).

See Fed. R. Evid. 613. See generally Graham, Handbook of Federal Evidence §§ 613 and 801; Modern View as to Propriety and Correctness of Instructions Referable to Maxim "Falus in Uno, Falsus in Omnibus," 4 A.L.R.2d 1077.

See § 15:06, Credibility of Witnesses—**Inconsistent** Statement (Falsus In Uno Falsus In Omnibus).

*Fifth Circuit*

**2.11 Impeachment by Witness's Inconsistent Statements**

WESTLAW  © 2019 Thomson Reuters. No claim to original U.S. Government Works.                    2

Kennedy, Rachel 3/27/2019
For Educational Use Only

3 Fed. Jury Prac. & Instr. § 105:04 (6th ed.), 3 Fed. Jury Prac. & Instr. § 105:04 (6th ed.)

In determining the weight to give to the testimony of a witness, consider whether there was evidence that at some other time the witness said or did something, or failed to say or do something, that was different from the testimony given at the trial.

A simple mistake by a witness does not necessarily mean that the witness did not tell the truth as he or she remembers it. People may forget some things or remember other things inaccurately. If a witness made a misstatement, consider whether that misstatement was an intentional falsehood or simply an innocent mistake. The significance of that may depend on whether it has to do with an important fact or with only an unimportant detail.

Fifth Circuit Pattern Civil Jury Instructions, Instruction No. 2.11 (2014).

***Seventh Circuit***

#### 1.14  Prior Inconsistent Statements *[Or Acts]*

You may consider statements given by *[Party] [Witness under oath]* before trial as evidence of the truth of what he said in the earlier statements, as well as in deciding what weight to give his testimony.

With respect to other witnesses, the law is different. If you decide that, before the trial, one of these witnesses made a statement *[not under oath] [or acted in a manner]* that is **inconsistent** with his testimony here in court, you may consider the earlier statement *[or conduct]* only in deciding whether his testimony here in court was true and what weight to give to his testimony here in court.

[In considering a prior **inconsistent** statement[s] *[or conduct]*, you should consider whether it was simply an innocent error or an intentional falsehood and whether it concerns an important fact or an unimportant detail.]

#### Committee Comments

a. **Statements Under Oath and Admissions by Party-Opponents:** Where prior **inconsistent** statements have been admitted only for impeachment, Fed. R. Evid. 105 gives a party the right to a limiting instruction explaining that use of the prior **inconsistent** statement is limited to credibility. *See*  United States

3 Fed. Jury Prac. & Instr. § 105:04 (6th ed.), 3 Fed. Jury Prac. & Instr. § 105:04 (6th ed.)

v. Hall, 109 F.3d 1227, 1237 (7th Cir. 1997) (instruction on impeachment need be given only if impeachment was reasonably raised by the evidence). A court should not give such a limiting instruction, however, if the prior **inconsistent** statement was "given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding or in a deposition," Fed. R. Evid. 801(d)(1)(A), or if the prior statement is considered an admission by a party-opponent under Fed. R. Evid. 801(d)(2). These statements are not hearsay and may be used to prove the truth of the matters asserted. This instruction should be adapted to fit the situation in which the prior **inconsistent** statements have been admitted.

b. **Prior Inconsistent Conduct:** Bracketed material in the second paragraph regarding **inconsistent** conduct is used by state courts in Indiana and Illinois and is consistent with Seventh Circuit standards. *See* ILLINOIS PATTERN INSTRUCTIONS (CIVIL) § 1.01(4) (2000); Indiana Pattern Jury Instructions—Civil 2d 3.05 (2003); *see also* Molnar v. Booth, 229 F.3d 593, 604 (7th Cir. 2000) (evidence of prior **inconsistent** conduct of defendant in sexual harassment case admissible for impeachment of defendant's testimony that he had never asked out a person under his supervision).

c. **Weighing the Effect of a Discrepancy:** The third paragraph of this instruction regarding how the jury should weigh the effect of a discrepancy is based on the general principle that jurors are free to credit or discredit evidence in light of what they observe at trial and their own experience. *See* U.S. v. Boykins, 9 F.3d 1278, 1286 n.1 (7th Cir. 1993) (approving an instruction which included the following language: "In weighing the effect of discrepancy [in evidence], always consider whether it pertains to a matter of importance or an unimportant detail, and whether the discrepancy results from innocent error or intentional falsehood."); United States v. Baron, 602 F.2d 1248, 1254 (7th Cir. 1979) (finding no prejudicial error where court did not instruct that jury may reject all testimony of a witness shown to testify falsely regarding any material matter where court "told the jurors that they could find from **inconsistencies** in [the] testimony and failures of recollection as well from other facts that [the] testimony was totally unworthy of belief, but that they were not required to find that he was lying solely on the basis of differences in recollections over details"); *see also* United States v. Monzon, 869 F.2d 338, 346 (7th Cir. 1989) (disapproving of *falsus in uno, falsus in omnibus* instruction and upholding 7th Cir. Crim. Instruction; defendant has right only to instruction that jury should consider **inconsistencies** in witness testimony in determining witness credibility).

Federal Civil Jury Instructions of the Seventh Circuit, Instruction No. 1.14 (2010).

*Eleventh Circuit*

3.5.1
**Impeachment of Witnesses Because of Inconsistent Statements**

You should also ask yourself whether there was evidence that a witness testified falsely about an important fact. And ask whether there was evidence that at some other time a witness said

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.   4

**Kennedy, Rachel 3/27/2019**
**For Educational Use Only**

**3 Fed. Jury Prac. & Instr. § 105:04 (6th ed.), 3 Fed. Jury Prac. & Instr. § 105:04 (6th ed.)**

or did something, or didn't say or do something, that was different from the testimony the witness gave during this trial.

But keep in mind that a simple mistake doesn't mean a witness wasn't telling the truth as he or she remembers it. People naturally tend to forget some things or remember them inaccurately. So, if a witness misstated something, you must decide whether it was because of an innocent lapse in memory or an intentional deception. The significance of your decision may depend on whether the misstatement is about an important fact or about an unimportant detail.

Eleventh Circuit Pattern Jury Instructions (Civil Cases), Instruction No. 3.5.1 (2013).

Westlaw. © 2019 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

**Footnotes**

a0          Professor of Law, Marquette University School of Law.

a1          Judge, United States District Court, Northern District of Indiana.

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**   © 2019 Thomson Reuters. No claim to original U.S. Government Works.                    5



**U.S. DEPARTMENT OF JUSTICE**
CIVIL RIGHTS DIVISION



**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
OFFICE OF FAIR HOUSING AND EQUAL OPPORTUNITY

*Washington, D.C.*
*May 17, 2004*

**JOINT STATEMENT OF**
**THE DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
**AND THE DEPARTMENT OF JUSTICE**

***REASONABLE ACCOMMODATIONS UNDER THE***
***FAIR HOUSING ACT***

## Introduction

The Department of Justice ("DOJ") and the Department of Housing and Urban Development ("HUD") are jointly responsible for enforcing the federal Fair Housing Act[1] (the "Act"), which prohibits discrimination in housing on the basis of race, color, religion, sex, national origin, familial status, and disability.[2]  One type of disability discrimination prohibited by the Act is the refusal to make reasonable accommodations in rules, policies, practices, or services when such accommodations may be necessary to afford a person with a disability the equal opportunity to use and enjoy a dwelling.[3]  HUD and DOJ frequently respond to complaints alleging that housing providers have violated the Act by refusing reasonable accommodations to persons with disabilities.  This Statement provides technical assistance regarding the rights and obligations of persons with disabilities and housing providers under the Act relating to

---

[1]     The Fair Housing Act is codified at 42 U.S.C. §§ 3601 - 3619.

[2]     The Act uses the term "handicap" instead of the term "disability."  Both terms have the same legal meaning.  *See* <u>Bragdon</u> v. <u>Abbott</u>, 524 U.S. 624, 631 (1998) (noting that definition of "disability" in the Americans with Disabilities Act is drawn almost verbatim "from the definition of 'handicap' contained in the Fair Housing Amendments Act of 1988").  This document uses the term "disability," which is more generally accepted.

[3]     42 U.S.C. § 3604(f)(3)(B).

reasonable accommodations.[4]

## Questions and Answers

**1. What types of discrimination against persons with disabilities does the Act prohibit?**

The Act prohibits housing providers from discriminating against applicants or residents because of their disability or the disability of anyone associated with them[5] and from treating persons with disabilities less favorably than others because of their disability. The Act also makes it unlawful for any person to refuse "to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford ... person(s) [with disabilities] equal opportunity to use and enjoy a dwelling."[6] The Act also prohibits housing providers from refusing residency to persons with disabilities, or placing conditions on their residency, because those persons may require reasonable accommodations. In addition, in certain circumstances, the Act requires that housing providers allow residents to

---

[4]     Housing providers that receive federal financial assistance are also subject to the requirements of Section 504 of the Rehabilitation Act of l973. 29 U.S.C. § 794. Section 504, and its implementing regulations at 24 C.F.R. Part 8, prohibit discrimination based on disability and require recipients of federal financial assistance to provide reasonable accommodations to applicants and residents with disabilities. Although Section 504 imposes greater obligations than the Fair Housing Act, (*e.g.*, providing and paying for reasonable accommodations that involve structural modifications to units or public and common areas), the principles discussed in this Statement regarding reasonable accommodation under the Fair Housing Act generally apply to requests for reasonable accommodations to rules, policies, practices, and services under Section 504. *See* U.S. Department of Housing and Urban Development, Office of Public and Indian Housing, Notice PIH 2002-01(HA) (www.hud.gov/offices/fheo/disabilities/PIH02-01.pdf) and "Section 504: Frequently Asked Questions," (www.hud.gov/offices/fheo/disabilities/ sect504faq.cfm#anchor272118).

[5]     The Fair Housing Act's protection against disability discrimination covers not only home seekers with disabilities but also buyers and renters without disabilities who live or are associated with individuals with disabilities 42 U.S.C. § 3604(f)(1)(B), 42 U.S.C. § 3604(f)(1)(C), 42 U.S.C. § 3604(f)(2)(B), 42 U.S.C. § (f)(2)(C). *See also* H.R. Rep. 100-711 – 24 (reprinted in 1988 U.S.C.A.N. 2173, 2184-85) ("The Committee intends these provisions to prohibit not only discrimination against the primary purchaser or named lessee, but also to prohibit denials of housing opportunities to applicants because they have children, parents, friends, spouses, roommates, patients, subtenants or other associates who have disabilities."). *Accord*: Preamble to Proposed HUD Rules Implementing the Fair Housing Act, 53 Fed. Reg. 45001 (Nov. 7, 1988) (citing House Report).

[6]     42 U.S.C. § 3604(f)(3)(B).  HUD regulations pertaining to reasonable accommodations may be found at 24 C.F.R. § 100.204.

- 2 -

make reasonable structural modifications to units and public/common areas in a dwelling when those modifications may be necessary for a person with a disability to have full enjoyment of a dwelling.[7]   With certain limited exceptions (*see* response to question 2 below), the Act applies to privately and publicly owned housing, including housing subsidized by the federal government or rented through the use of Section 8 voucher assistance.

### 2.  Who must comply with the Fair Housing Act's reasonable accommodation requirements?

Any person or entity engaging in prohibited conduct – *i.e.*, refusing to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford a person with a disability an equal opportunity to use and enjoy a dwelling – may be held liable unless they fall within an exception to the Act's coverage.  Courts have applied the Act to individuals, corporations, associations and others involved in the provision of housing and residential lending, including property owners, housing managers, homeowners and condominium associations, lenders, real estate agents, and brokerage services.  Courts have also applied the Act to state and local governments, most often in the context of exclusionary zoning or other land-use decisions. *See e.g.*, City of Edmonds v. Oxford House, Inc., 514 U.S. 725, 729 (1995); Project Life v. Glendening, 139 F. Supp. 703, 710 (D. Md. 2001), aff'd 2002 WL 2012545 (4th Cir. 2002).  Under specific exceptions to the Fair Housing Act, the reasonable accommodation requirements of the Act do not apply to a private individual owner who sells his own home so long as he (1) does not own more than three single-family homes; (2) does not use a real estate agent and does not employ any discriminatory advertising or notices; (3) has not engaged in a similar sale of a home within a 24-month period; and (4) is not in the business of selling or renting dwellings.  The reasonable accommodation requirements of the Fair Housing Act also do not apply to owner-occupied buildings that have four or fewer dwelling units.

### 3.  Who qualifies as a person with a disability under the Act?

The Act defines a person with a disability to include (1) individuals with a physical or mental impairment that substantially limits one or more major life activities; (2) individuals who are regarded as having such an impairment; and (3) individuals with a record of such an impairment.

The term "physical or mental impairment" includes, but is not limited to, such diseases and conditions as orthopedic, visual, speech and hearing impairments, cerebral palsy, autism, epilepsy, muscular dystrophy, multiple sclerosis, cancer, heart disease, diabetes, Human Immunodeficiency Virus infection, mental retardation, emotional illness, drug addiction (other than addiction caused by current, illegal use of a controlled substance) and alcoholism.

---

[7]      This Statement does not address the principles relating to reasonable modifications.  For further information see the HUD regulations at 24 C.F.R. § 100.203.  This statement also does not address the additional requirements imposed on recipients of Federal financial assistance pursuant to Section 504, as explained in the Introduction.

The term "substantially limits" suggests that the limitation is "significant" or "to a large degree."

The term "major life activity" means those activities that are of central importance to daily life, such as seeing, hearing, walking, breathing, performing manual tasks, caring for one's self, learning, and speaking.[8]  This list of major life activities is not exhaustive.  *See e.g.*, Bragdon v. Abbott, 524 U.S. 624, 691-92 (1998)(holding that for certain individuals reproduction is a major life activity).

**4.  Does the Act protect juvenile offenders, sex offenders, persons who illegally use controlled substances, and persons with disabilities who pose a significant danger to others?**

No, juvenile offenders and sex offenders, by virtue of that status, are <u>not</u> persons with disabilities protected by the Act.   Similarly, while the Act does protect persons who are recovering from substance abuse, it does <u>not</u> protect persons who are currently engaging in the current illegal use of controlled substances.[9]  Additionally, the Act does not protect an individual with a disability whose tenancy would constitute a "direct threat" to the health or safety of other individuals or result in substantial physical damage to the property of others unless the threat can be eliminated or significantly reduced by reasonable accommodation.

**5.  How can a housing provider determine if an individual poses a direct threat?**

The Act does not allow for exclusion of individuals based upon fear, speculation, or stereotype about a particular disability or persons with disabilities in general.  A determination that an individual poses a direct threat must rely on an individualized assessment that is based on reliable objective evidence (*e.g.*, current conduct, or a recent history of overt acts).  The assessment must consider:  (1) the nature, duration, and severity of the risk of injury; (2) the probability that injury will actually occur; and (3) whether there are any reasonable accommodations that will eliminate the direct threat.  Consequently, in evaluating a recent history of overt acts, a provider must take into account whether the individual has received intervening treatment or medication that has eliminated the direct threat (*i.e.*, a significant risk of substantial harm).  In such a situation, the provider may request that the individual document

---

[8]      The Supreme Court has questioned but has not yet ruled on whether "working" is to be considered a major life activity.  <u>See</u> <u>Toyota Motor Mfg, Kentucky, Inc. v. Williams</u>, 122 S. Ct. 681, 692, 693 (2002).  If it is a major activity, the Court has noted that a claimant would be required to show an inability to work in a "broad range of jobs" rather than a specific job.  *See* <u>Sutton</u> v. <u>United Airlines, Inc</u>., 527 U.S. 470, 492 (1999).

[9]       *See*, *e.g*., <u>United States</u> v. <u>Southern Management Corp</u>., 955 F.2d 914, 919 (4th Cir. 1992) (discussing exclusion in 42 U.S.C. § 3602(h) for "current, illegal use of or addiction to a controlled substance").

- 4 -

how the circumstances have changed so that he no longer poses a direct threat.  A provider may also obtain satisfactory assurances that the individual will not pose a direct threat during the tenancy.  The housing provider must have reliable, objective evidence that a person with a disability poses a direct threat before excluding him from housing on that basis.

     **Example 1**:  A housing provider requires all persons applying to rent an apartment to complete an application that includes information on the applicant's current place of residence.  On her application to rent an apartment, a woman notes that she currently resides in Cambridge House.  The manager of the apartment complex knows that Cambridge House is a group home for women receiving treatment for alcoholism.  Based solely on that information and his personal belief that alcoholics are likely to cause disturbances and damage property, the manager rejects the applicant.  The rejection is unlawful because it is based on a generalized stereotype related to a disability rather than an individualized assessment of any threat to other persons or the property of others based on reliable, objective evidence about the applicant's recent past conduct.  The housing provider may not treat this applicant differently than other applicants based on his subjective perceptions of the potential problems posed by her alcoholism by requiring additional documents, imposing different lease terms, or requiring a higher security deposit.  However, the manager could have checked this applicant's references to the same extent and in the same manner as he would have checked any other applicant's references.  If such a reference check revealed objective evidence showing that this applicant had posed a direct threat to persons or property in the recent past and the direct threat had not been eliminated, the manager could then have rejected the applicant based on direct threat.

     **Example 2**:  James X, a tenant at the Shady Oaks apartment complex, is arrested for threatening his neighbor while brandishing a baseball bat.  The Shady Oaks' lease agreement contains a term prohibiting tenants from threatening violence against other residents.  Shady Oaks' rental manager investigates the incident and learns that James X threatened the other resident with physical violence and had to be physically restrained by other neighbors to keep him from acting on his threat.  Following Shady Oaks' standard practice of strictly enforcing its "no threats" policy, the Shady Oaks rental manager issues James X a 30-day notice to quit, which is the first step in the eviction process.  James X's attorney contacts Shady Oaks' rental manager and explains that James X has a psychiatric disability that causes him to be physically violent when he stops taking his prescribed medication.  Suggesting that his client will not pose a direct threat to others if proper safeguards are taken, the attorney requests that the rental manager grant James X an exception to the "no threats" policy as a reasonable accommodation based on James X's disability.  The Shady Oaks rental manager need only grant the reasonable accommodation if James X's attorney can provide satisfactory assurance that James X will receive appropriate counseling and

- 5 -

periodic medication monitoring so that he will no longer pose a direct threat during his tenancy.   After consulting with James X, the attorney responds that James X is unwilling to receive counseling or submit to any type of periodic monitoring to ensure that he takes his prescribed medication.  The rental manager may go forward with the eviction proceeding, since James X continues to pose a direct threat to the health or safety of other residents.

**6.  What is a "reasonable accommodation" for purposes of the Act?**

A "reasonable accommodation" is a change, exception, or adjustment to a rule, policy, practice, or service that may be necessary for a person with a disability to have an equal opportunity to use and enjoy a dwelling, including public and common use spaces.  Since rules, policies, practices, and services may have a different effect on persons with disabilities than on other persons, treating persons with disabilities exactly the same as others will sometimes deny them an equal opportunity to use and enjoy a dwelling.  The Act makes it unlawful to refuse to make reasonable accommodations to rules, policies, practices, or services when such accommodations may be necessary to afford persons with disabilities an equal opportunity to use and enjoy a dwelling.

To show that a requested accommodation may be necessary, there must be an identifiable relationship, or nexus, between the requested accommodation and the individual's disability.

**Example 1:**  A housing provider has a policy of providing unassigned parking spaces to residents.  A resident with a mobility impairment, who is substantially limited in her ability to walk, requests an assigned accessible parking space close to the entrance to her unit as a reasonable accommodation.  There are available parking spaces near the entrance to her unit that are accessible, but those spaces are available to all residents on a first come, first served basis.  The provider must make an exception to its policy of not providing assigned parking spaces to accommodate this resident.

**Example 2:**  A housing provider has a policy of requiring tenants to come to the rental office in person to pay their rent.  A tenant has a mental disability that makes her afraid to leave her unit.  Because of her disability, she requests that she be permitted to have a friend mail her rent payment to the rental office as a reasonable accommodation.  The provider must make an exception to its payment policy to accommodate this tenant.

**Example 3:**  A housing provider has a "no pets" policy.  A tenant who is deaf requests that the provider allow him to keep a dog in his unit as a reasonable accommodation.  The tenant explains that the dog is an assistance animal that will alert him to several sounds, including knocks at the door, sounding of the smoke detector, the telephone ringing, and cars coming into the driveway.  The housing

- 6 -

provider must make an exception to its "no pets" policy to accommodate this tenant.

**7.  Are there any instances when a provider can deny a request for a reasonable accommodation without violating the Act?**

Yes.  A housing provider can deny a request for a reasonable accommodation if the request was not made by or on behalf of a person with a disability or if there is no disability-related need for the accommodation.  In addition, a request for a reasonable accommodation may be denied if providing the accommodation is not reasonable – *i.e.*, if it would impose an undue financial and administrative burden on the housing provider or it would fundamentally alter the nature of the provider's operations.  The determination of undue financial and administrative burden must be made on a case-by-case basis involving various factors, such as the cost of the requested accommodation, the financial resources of the provider, the benefits that the accommodation would provide to the requester, and the availability of alternative accommodations that would effectively meet the requester's disability-related needs.

When a housing provider refuses a requested accommodation because it is not reasonable, the provider should discuss with the requester whether there is an alternative accommodation that would effectively address the requester's disability-related needs without a fundamental alteration to the provider's operations and without imposing an undue financial and administrative burden. If an alternative accommodation would effectively meet the requester's disability-related needs and is reasonable, the provider must grant it.   An interactive process in which the housing provider and the requester discuss the requester's disability-related need for the requested accommodation and possible alternative accommodations is helpful to all concerned because it often results in an effective accommodation for the requester that does not pose an undue financial and administrative burden for the provider.

> **Example:**  As a result of a disability, a tenant is physically unable to open the dumpster placed in the parking lot by his housing provider for trash collection. The tenant requests that the housing provider send a maintenance staff person to his apartment on a daily basis to collect his trash and take it to the dumpster. Because the housing development is a small operation with limited financial resources and the maintenance staff are on site only twice per week, it may be an undue financial and administrative burden for the housing provider to grant the requested daily trash pick-up service.  Accordingly, the requested accommodation may not be reasonable.  If the housing provider denies the requested accommodation as unreasonable, the housing provider should discuss with the tenant whether reasonable accommodations could be provided to meet the tenant's disability-related needs – for instance, placing an open trash collection can in a location that is readily accessible to the tenant so the tenant can dispose of his own trash and the provider's maintenance staff can then transfer the trash to the dumpster when they are on site.  Such an accommodation would not involve a

- 7 -

fundamental alteration of the provider's operations and would involve little financial and administrative burden for the provider while accommodating the tenant's disability-related needs.

There may be instances where a provider believes that, while the accommodation requested by an individual is reasonable, there is an alternative accommodation that would be equally effective in meeting the individual's disability-related needs. In such a circumstance, the provider should discuss with the individual if she is willing to accept the alternative accommodation. However, providers should be aware that persons with disabilities typically have the most accurate knowledge about the functional limitations posed by their disability, and an individual is not obligated to accept an alternative accommodation suggested by the provider if she believes it will not meet her needs and her preferred accommodation is reasonable.

### 8.  What is a "fundamental alteration"?

A "fundamental alteration" is a modification that alters the essential nature of a provider's operations.

> **Example:**  A tenant has a severe mobility impairment that substantially limits his ability to walk.  He asks his housing provider to transport him to the grocery store and assist him with his grocery shopping as a reasonable accommodation to his disability.  The provider does not provide any transportation or shopping services for its tenants, so granting this request would require a fundamental alteration in the nature of the provider's operations.  The request can be denied, but the provider should discuss with the requester whether there is any alternative accommodation that would effectively meet the requester's disability-related needs without fundamentally altering the nature of its operations, such as reducing the tenant's need to walk long distances by altering its parking policy to allow a volunteer from a local community service organization to park her car close to the tenant's unit so she can transport the tenant to the grocery store and assist him with his shopping.

### 9.  What happens if providing a requested accommodation involves some costs on the part of the housing provider?

Courts have ruled that the Act may require a housing provider to grant a reasonable accommodation that involves costs, so long as the reasonable accommodation does not pose an undue financial and administrative burden and the requested accommodation does not constitute a fundamental alteration of the provider's operations.  The financial resources of the provider, the cost of the reasonable accommodation, the benefits to the requester of the requested accommodation, and the availability of other, less expensive alternative accommodations that would effectively meet the applicant or resident's disability-related needs must be considered in determining whether a requested accommodation poses an undue financial and administrative

- 8 -

burden.

### 10.  What happens if no agreement can be reached through the interactive process?

A failure to reach an agreement on an accommodation request is in effect a decision by the provider not to grant the requested accommodation.  If the individual who was denied an accommodation files a Fair Housing Act complaint to challenge that decision, then the agency or court receiving the complaint will review the evidence in light of applicable law and decide if the housing provider violated that law.  For more information about the complaint process, see question 19 below.

### 11.  May a housing provider charge an extra fee or require an additional deposit from applicants or residents with disabilities as a condition of granting a reasonable accommodation?

No.  Housing providers may not require persons with disabilities to pay extra fees or deposits as a condition of receiving a reasonable accommodation.

**Example 1**:  A man who is substantially limited in his ability to walk uses a motorized scooter for mobility purposes.  He applies to live in an assisted living facility that has a policy prohibiting the use of motorized vehicles in buildings and elsewhere on the premises.  It would be a reasonable accommodation for the facility to make an exception to this policy to permit the man to use his motorized scooter on the premises for mobility purposes.  Since allowing the man to use his scooter in the buildings and elsewhere on the premises is a reasonable accommodation, the facility may not condition his use of the scooter on payment of a fee or deposit or on a requirement that he obtain liability insurance relating to the use of the scooter.  However, since the Fair Housing Act does not protect any person with a disability who poses a direct threat to the person or property of others, the man must operate his motorized scooter in a responsible manner that does not pose a significant risk to the safety of other persons and does not cause damage to other persons' property.  If the individual's use of the scooter causes damage to his unit or the common areas, the housing provider may charge him for the cost of repairing the damage (or deduct it from the standard security deposit imposed on all tenants), if it is the provider's practice to assess tenants for any damage they cause to the premises.

**Example 2:**  Because of his disability, an applicant with a hearing impairment needs to keep an assistance animal in his unit as a reasonable accommodation. The housing provider may not require the applicant to pay a fee or a security deposit as a condition of allowing the applicant to keep the assistance animal. However, if a tenant's assistance animal causes damage to the applicant's unit or the common areas of the dwelling, the housing provider may charge the tenant for

- 9 -

the cost of repairing the damage (or deduct it from the standard security deposit imposed on all tenants), if it is the provider's practice to assess tenants for any damage they cause to the premises.

### 12.  When and how should an individual request an accommodation?

Under the Act, a resident or an applicant for housing makes a reasonable accommodation request whenever she makes clear to the housing provider that she is requesting an exception, change, or adjustment to a rule, policy, practice, or service because of her disability.  She should explain what type of accommodation she is requesting and, if the need for the accommodation is not readily apparent or not known to the provider, explain the relationship between the requested accommodation and her disability.

An applicant or resident is not entitled to receive a reasonable accommodation unless she requests one.  However, the Fair Housing Act does not require that a request be made in a particular manner or at a particular time.  A person with a disability need not personally make the reasonable accommodation request; the request can be made by a family member or someone else who is acting on her behalf.  An individual making a reasonable accommodation request does not need to mention the Act or use the words "reasonable accommodation."  However, the requester must make the request in a manner that a reasonable person would understand to be a request for an exception, change, or adjustment to a rule, policy, practice, or service because of a disability.

Although a reasonable accommodation request can be made orally or in writing, it is usually helpful for both the resident and the housing provider if the request is made in writing. This will help prevent misunderstandings regarding what is being requested, or whether the request was made.  To facilitate the processing and consideration of the request, residents or prospective residents may wish to check with a housing provider in advance to determine if the provider has a preference regarding the manner in which the request is made.  However, housing providers must give appropriate consideration to reasonable accommodation requests even if the requester makes the request orally or does not use the provider's preferred forms or procedures for making such requests.

> **Example:**  A tenant in a large apartment building makes an oral request that she be assigned a mailbox in a location that she can easily access because of a physical disability that limits her ability to reach and bend.  The provider would prefer that the tenant make the accommodation request on a pre-printed form, but the tenant fails to complete the form. The provider must consider the reasonable accommodation request even though the tenant would not use the provider's designated form.

### 13.  Must a housing provider adopt formal procedures for processing requests for a reasonable accommodation?

- 10 -

No.  The Act does not require that a housing provider adopt any formal procedures for reasonable accommodation requests.  However, having formal procedures may aid individuals with disabilities in making requests for reasonable accommodations and may aid housing providers in assessing those requests so that there are no misunderstandings as to the nature of the request, and, in the event of later disputes, provide records to show that the requests received proper consideration.

A provider may not refuse a request, however, because the individual making the request did not follow any formal procedures that the provider has adopted.  If a provider adopts formal procedures for processing reasonable accommodation requests, the provider should ensure that the procedures, including any forms used, do not seek information that is not necessary to evaluate if a reasonable accommodation may be needed to afford a person with a disability equal opportunity to use and enjoy a dwelling.  See Questions 16 - 18, which discuss the disability-related information that a provider may and may not request for the purposes of evaluating a reasonable accommodation request.

**14.   Is a housing provider obligated to provide a reasonable accommodation to a resident or applicant if an accommodation has not been requested?**

No.  A housing provider is only obligated to provide a reasonable accommodation to a resident or applicant if a request for the accommodation has been made.  A provider has notice that a reasonable accommodation request has been made if a person, her family member, or someone acting on her behalf requests a change, exception, or adjustment to a rule, policy, practice, or service because of a disability, even if the words "reasonable accommodation" are not used as part of the request.

**15.   What if a housing provider fails to act promptly on a reasonable accommodation request?**

A provider has an obligation to provide prompt responses to reasonable accommodation requests.  An undue delay in responding to a reasonable accommodation request may be deemed to be a failure to provide a reasonable accommodation.

**16.   What inquiries, if any, may a housing provider make of current or potential residents regarding the existence of a disability when they have not asked for an accommodation?**

Under the Fair Housing Act, it is usually unlawful for a housing provider to (1) ask if an applicant for a dwelling has a disability or if a person intending to reside in a dwelling or anyone associated with an applicant or resident has a disability, or (2) ask about the nature or severity of such persons' disabilities.  Housing providers may, however, make the following inquiries, provided these inquiries are made of all applicants, including those with and without disabilities:

- 11 -

- An inquiry into an applicant's ability to meet the requirements of tenancy;

- An inquiry to determine if an applicant is a current illegal abuser or addict of a controlled substance;

- An inquiry to determine if an applicant qualifies for a dwelling legally available only to persons with a disability or to persons with a particular type of disability; and

- An inquiry to determine if an applicant qualifies for housing that is legally available on a priority basis to persons with disabilities or to persons with a particular disability.

**Example 1:**  A housing provider offers accessible units to persons with disabilities needing the features of these units on a priority basis.  The provider may ask applicants if they have a disability and if, in light of their disability, they will benefit from the features of the units.  However, the provider may not ask applicants if they have other types of physical or mental impairments.  If the applicant's disability and the need for the accessible features are not readily apparent, the provider may request reliable information/documentation of the disability-related need for an accessible unit.

**Example 2:**  A housing provider operates housing that is legally limited to persons with chronic mental illness.  The provider may ask applicants for information needed to determine if they have a mental disability that would qualify them for the housing.  However, in this circumstance, the provider may not ask applicants if they have other types of physical or mental impairments.  If it is not readily apparent that an applicant has a chronic mental disability, the provider may request reliable information/documentation of the mental disability needed to qualify for the housing.

In some instances, a provider may also request certain information about an applicant's or a resident's disability if the applicant or resident requests a reasonable accommodation.  See Questions 17 and 18 below.

**17.  What kinds of information, if any, may a housing provider request from a person with an obvious or known disability who is requesting a reasonable accommodation**?

A provider is entitled to obtain information that is necessary to evaluate if a requested reasonable accommodation may be necessary because of a disability.  If a person's disability is obvious, or otherwise known to the provider, and if the need for the requested accommodation is also readily apparent or known, then the provider may not request any additional information

- 12 -

about the requester's disability or the disability-related need for the accommodation.

If the requester's disability is known or readily apparent to the provider, but the need for the accommodation is not readily apparent or known, the provider may request only information that is necessary to evaluate the disability-related need for the accommodation.

> **Example 1:** An applicant with an obvious mobility impairment who regularly uses a walker to move around asks her housing provider to assign her a parking space near the entrance to the building instead of a space located in another part of the parking lot. Since the physical disability (*i.e.*, difficulty walking) and the disability-related need for the requested accommodation are both readily apparent, the provider may not require the applicant to provide any additional information about her disability or the need for the requested accommodation.

> **Example 2:** A rental applicant who uses a wheelchair advises a housing provider that he wishes to keep an assistance dog in his unit even though the provider has a "no pets" policy. The applicant's disability is readily apparent but the need for an assistance animal is not obvious to the provider. The housing provider may ask the applicant to provide information about the disability-related need for the dog.

> **Example 3:** An applicant with an obvious vision impairment requests that the leasing agent provide assistance to her in filling out the rental application form as a reasonable accommodation because of her disability. The housing provider may not require the applicant to document the existence of her vision impairment.

**18. If a disability is not obvious, what kinds of information may a housing provider request from the person with a disability in support of a requested accommodation?**

A housing provider may not ordinarily inquire as to the nature and severity of an individual's disability (*see* Answer 16, above). However, in response to a request for a reasonable accommodation, a housing provider may request reliable disability-related information that (1) is necessary to verify that the person meets the Act's definition of disability (*i.e.*, has a physical or mental impairment that substantially limits one or more major life activities), (2) describes the needed accommodation, and (3) shows the relationship between the person's disability and the need for the requested accommodation. Depending on the individual's circumstances, information verifying that the person meets the Act's definition of disability can usually be provided by the individual himself or herself (*e.g.*, proof that an individual under 65 years of age receives Supplemental Security Income or Social Security Disability Insurance benefits[10] or a credible statement by the individual). A doctor or other

---

[10]     Persons who meet the definition of disability for purposes of receiving Supplemental Security Income ("SSI") or Social Security Disability Insurance ("SSDI") benefits in most cases meet the definition of disability under the Fair Housing Act, although the converse may not be true. *See e.g.*, <u>Cleveland</u> v. <u>Policy Management Systems Corp.</u>, 526 U.S. 795, 797 (1999)

- 13 -

medical professional, a peer support group, a non-medical service agency, or a reliable third party who is in a position to know about the individual's disability may also provide verification of a disability.  In most cases, an individual's medical records or detailed information about the nature of a person's disability is not necessary for this inquiry.

Once a housing provider has established that a person meets the Act's definition of disability, the provider's request for documentation should seek only the information that is necessary to evaluate if the reasonable accommodation is needed because of a disability.  Such information must be kept confidential and must not be shared with other persons unless they need the information to make or assess a decision to grant or deny a reasonable accommodation request or unless disclosure is required by law (*e.g.*, a court-issued subpoena requiring disclosure).

**19.  If a person believes she has been unlawfully denied a reasonable accommodation, what should that person do if she wishes to challenge that denial under the Act?**

When a person with a disability believes that she has been subjected to a discriminatory housing practice, including a provider's wrongful denial of a request for reasonable accommodation, she may file a complaint with HUD within one year after the alleged denial or may file a lawsuit in federal district court within two years of the alleged denial.  If a complaint is filed with HUD, HUD will investigate the complaint at no cost to the person with a disability.

There are several ways that a person may file a complaint with HUD:

• By placing a toll-free call to 1-800-669-9777 or TTY 1-800-927-9275;

• By completing the "on-line" complaint form available on the HUD internet site: http://www.hud.gov; or

• By mailing a completed complaint form or letter to:

> Office of Fair Housing and Equal Opportunity
> Department of Housing & Urban Development
> 451 Seventh Street, S.W., Room 5204
> Washington, DC  20410-2000

---

(noting that SSDI provides benefits to a person with a disability so severe that she is unable to do her previous work and cannot engage in any other kind of substantial gainful work whereas a person pursuing an action for disability discrimination under the Americans with Disabilities Act may state a claim that "with a reasonable accommodation" she could perform the essential functions of the job).

- 14 -

Upon request, HUD will provide printed materials in alternate formats (large print, audio tapes, or Braille) and provide complainants with assistance in reading and completing forms.

The Civil Rights Division of the Justice Department brings lawsuits in federal courts across the country to end discriminatory practices and to seek monetary and other relief for individuals whose rights under the Fair Housing Act have been violated.  The Civil Rights Division initiates lawsuits when it has reason to believe that a person or entity is involved in a "pattern or practice" of discrimination or when there has been a denial of rights to a group of persons that raises an issue of general public importance.  The Division also participates as *amicus curiae* in federal court cases that raise important legal questions involving the application and/or interpretation of the Act.  To alert the Justice Department to matters involving a pattern or practice of discrimination, matters involving the denial of rights to groups of persons, or lawsuits raising issues that may be appropriate for *amicus* participation, contact:

> U.S. Department of Justice
> Civil Rights Division
> Housing and Civil Enforcement Section – G St.
> 950 Pennsylvania Avenue, N.W.
> Washington, DC  20530

For more information on the types of housing discrimination cases handled by the Civil Rights Division, please refer to the Housing and Civil Enforcement Section's website at http://www.usdoj.gov/crt/housing/hcehome.html.

A HUD or Department of Justice decision not to proceed with a Fair Housing Act matter does not foreclose private plaintiffs from pursuing a private lawsuit.  However, litigation can be an expensive, time-consuming, and uncertain process for all parties.  HUD and the Department of Justice encourage parties to Fair Housing Act disputes to explore all reasonable alternatives to litigation, including alternative dispute resolution procedures, such as mediation.  HUD attempts to conciliate all Fair Housing Act complaints.  In addition, it is the Department of Justice's policy to offer prospective defendants the opportunity to engage in pre-suit settlement negotiations, except in the most unusual circumstances.

- 15 -

1   **1.6   Preliminary Instructions – Direct and Circumstantial Evidence**

2   **Model**

3   *Option 1:*

4       Do not be concerned about whether evidence is "direct evidence" or "circumstantial
5   evidence." You should consider and weigh all of the evidence that is presented to you.  If your
6   experience tells you that certain evidence reasonably leads to a conclusion, you are free to reach
7   that conclusion.

8

9   *Option 2:*

10       There are two types of evidence that you may use in reaching your verdict. One type of
11   evidence is called "direct evidence."  An example of "direct evidence" is when a witness testifies
12   about something that the witness knows through  his own senses — something the witness  has
13   seen, felt, touched or heard or did. If a witness testified that he saw it raining outside, and you
14   believed him, that would be direct evidence that it was raining. Another form of direct evidence is
15   an exhibit where the fact to be proved is its existence or current condition.

16       The other type of evidence is circumstantial evidence.  "Circumstantial evidence" is proof
17   of one or more facts from which you could find another fact. If someone walked into the courtroom
18   wearing a raincoat covered with drops of water and carrying a wet umbrella, that would be
19   circumstantial evidence from which you could conclude that it was raining.

20       You should consider both kinds of evidence that are presented to you. The law makes no
21   distinction in  the weight to be given to either direct or circumstantial evidence. You are to decide
22   how much weight to give any evidence.

23

24   **Comment**

25       Option 1 is derived from Fifth Circuit (Criminal) 1.07 (Alternative A). It can be used by
26   those judges who do not wish to say anything about the distinction between direct and
27   circumstantial evidence, but yet might be concerned that jurors would have preconceived notions
28   about these terms.

29       Option 2 is derived from former Ninth Circuit 3.6.  *Cf.* Ninth Circuit 1.9.  The instruction
30   does not attempt to provide a definition of "direct" evidence. The definitions given in some
31   instructions simply repeat the word "direct". Other instructions on direct evidence are
32   underinclusive, as they refer only to witness testimony, whereas an exhibit can be direct evidence

11

**1.6   Direct and Circumstantial Evidence**

33   of a fact. The example given in the instruction should be sufficient to give jurors a clear idea of
34   "direct" evidence.

12

1    **1.10   Preliminary Instructions — Preponderance of the Evidence**

2    **Model**

3        This is a civil case. [Plaintiff] is the party [who/that] brought this lawsuit. [Defendant]  is
4    the party against [whom/which] the lawsuit was filed. [Plaintiff]  has the burden of proving
5    [his/her/its] case by what is called the preponderance of the evidence.  That means [plaintiff] has to
6    prove to you, in light of all the evidence, that what [he/she/it] claims is more likely so than not so.
7    To say it differently: if you were to put the evidence favorable to [plaintiff] and the evidence
8    favorable to [defendant] on opposite sides of the scales, [plaintiff]  would have to make the scales
9    tip somewhat on [his/her/its] side.  If [plaintiff] fails to meet this burden, the verdict must be for
10   [defendant]. If you find after considering all the evidence that a claim or fact is more likely so than
11   not so, then the claim or fact has been proved by a preponderance of the evidence.

12       In determining whether any fact has been proved by a preponderance of evidence in the
13   case, you may, unless otherwise instructed, consider the testimony of all witnesses, regardless of
14   who may have called them, and all exhibits received in evidence, regardless of who may have
15   produced them.

16       [On certain issues, called affirmative defenses, [defendant] has the burden of proving the
17   elements of the defense by a preponderance of the evidence.  I will instruct you on the facts that
18   will be necessary for you to find on this affirmative defense. An affirmative defense is proven if
19   you find, after considering all evidence in the case, that [defendant] has succeeded in proving that
20   the required facts are more likely so than not so.]

21       [[Defendant] has also brought claims for relief against [plaintiff], called counterclaims. On
22   these claims, [defendant] has the same burden of proof as has [plaintiff] on [his/her/its] claims.]

23       You may have heard of the term "proof beyond a reasonable doubt." That is a stricter
24   standard of proof and it applies only to criminal cases. It does not apply in civil cases such as this.
25   So you should put it out of your mind.

26

27   **Comment**

28       This instruction is derived from the following sources: pattern instruction used by District
29   Judges in Camden; pattern instruction used by District Judges in Delaware; Fifth Circuit 3.1 (second
30   paragraph); and Eighth Circuit 3.04.

31       It is advisable to give this instruction at both the beginning of the case and at the close of
32   the evidence.

33       It is important that the jury be made aware that the preponderance standard requires an

*Last updated October 2017*

**1.10   Preponderance of the Evidence**

34   analysis and weighing of all of the evidence presented by both sides. *See United States v. Montague,*
35   40 F.3d 1251, 1254-55 (D.C. Cir. 1994):

36          Often, under a preponderance-of-the-evidence standard, it is assumed that the trier of fact
37          piles up the evidence arguably on the defendant's side and determines which pile is greater.
38          . . . In fact, a more accurate notion of the preponderance-of-the-evidence standard is
39          "evidence which as a whole shows that the fact sought to be proved is more probable than
40          not."

20

*Last updated October 2017*

## 9.0     ADA Employment Claims—Introductory Instruction

### Model

In this case the Plaintiff _____ makes a claim based on a federal law known as the Americans with Disabilities Act, which will be referred to in these instructions as the ADA.

Under the ADA, an employer may not deprive a person with a disability of an employment opportunity because of that disability, if that person is able, with reasonable accommodation if necessary, to perform the essential functions of the job. Terms such as "disability", "qualified individual" and "reasonable accommodations" are defined by the ADA and I will instruct you on the meaning of those terms.

[Plaintiff's] claim under the ADA is that [he/she] was [describe the employment action at issue] by the defendant _____ because of [plaintiff's] [describe alleged disability].

[Defendant] denies [plaintiff's] claims. Further, [defendant] asserts that [describe any affirmative defenses].

As you listen to these instructions, please keep in mind that many of the terms I will use, and you will need to apply, have a special meaning under the ADA. So please remember to consider the specific definitions I give you, rather than using your own opinion of what these terms mean.

### Comment

Referring to the parties by their names, rather than solely as "Plaintiff" and "Defendant," can improve jurors' comprehension. In these instructions, bracketed references to "[plaintiff]" or "[defendant]" indicate places where the name of the party should be inserted.

"Congress enacted the ADA in 1990 in an effort to prevent otherwise qualified individuals from being discriminated against in employment based on a disability." *Gaul v. Lucent Technologies Inc.*, 134 F.3d 576, 579 (3d Cir. 1998). The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). A "qualified individual" is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).[1] An entity discriminates against an individual

---

[1] Section 12111(8) continues: "For the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer

3

*Last updated October 2018*

## 9.0   ADA Employment Claims – Introductory Instruction

32   on the basis of disability when, inter alia, it does "not mak[e] reasonable accommodations to the
33   known physical or mental limitations of an otherwise qualified individual with a disability who is
34   an applicant or employee, unless such covered entity can demonstrate that the accommodation
35   would impose an undue hardship on the operation of the business of [the] entity." 42 U.S.C. §
36   12112(b)(5)(A).  Reasonable accommodations may include, inter alia, "job restructuring, part-time
37   or modified work schedules, reassignment to a vacant position, acquisition or modification of
38   equipment or devices, appropriate adjustment or modifications of examinations, training materials
39   or policies, the provision of qualified readers or interpreters, and other similar accommodations
40   for individuals with disabilities." 42 U.S.C. § 12111(9).

41        "In order to make out a prima facie case of disability discrimination under the ADA, [the
42   plaintiff] must establish that she (1) has a 'disability,' (2) is a 'qualified individual,' and (3) has
43   suffered an adverse employment action because of that disability." *Turner v. Hershey Chocolate*
44   *U.S.*, 440 F.3d 604, 611 (3d Cir. 2006).

45        The EEOC's interpretive guidance articulates a two-step test for determining whether a
46   person is a qualified individual.  "The first step is to determine if the individual satisfies the
47   prerequisites for the position, such as possessing the appropriate educational background,
48   employment experience, skills, licenses, etc. ....The second step is to determine whether or not the
49   individual can perform the essential functions of the position held or desired, with or without
50   reasonable accommodation. .... The determination of whether an individual with a disability is
51   qualified is to be made at the time of the employment decision." 29 C.F.R. Pt. 1630, App.

52   *The ADA, Public Accommodations and Public Services*

53        Title I of the ADA covers claims made by employees or applicants for disparate treatment,
54   failure to make reasonable accommodations, and retaliation against protected activity.  Titles II
55   and III cover public accommodations and public services for persons with disabilities. These
56   instructions are intended to cover only those cases arising under the employment provisions of the
57   ADA. For a discussion and application of the standards governing actions under Titles II and III
58   of the ADA, *see Bowers v. National Collegiate Athletic Assoc.,* 475 F.3d 524 (3d Cir. 2007).

59   *The Rehabilitation Act*

60        Federal employers, federal contractors, and employers that receive federal funding are
61   subject to the Rehabilitation Act, which is a precursor of the ADA. 29 U.S.C. § 701 et seq. The
62   substantive standards for a claim under the Rehabilitation Act are in many respects identical to
63   those governing a claim under the ADA. *See, e.g., Wishkin v. Potter,* 476 F.3d 180, 184 (3d Cir.
64   2007) ("The Rehabilitation Act expressly makes the standards set forth in the 1990 Americans
65   with Disabilities Act, 42 U.S.C. § 12101 et seq., applicable to federal employers and to employers
66   receiving federal funding."); *Bragdon v. Abbott,* 524 U.S. 624, 632 (1998) (in interpreting the
67   ADA's definition of "disability" by reference to interpretations of the Rehabilitation Act's

---

has prepared a written description before advertising or interviewing applicants for the job, this
description shall be considered evidence of the essential functions of the job."

4

*Last updated October 2018*

## 9.0   ADA Employment Claims – Introductory Instruction

68   definition of "handicapped individual," observing that 42 U.S.C. § 12201(a) directs the courts "to
69   construe the ADA to grant at least as much protection as provided by the regulations implementing
70   the Rehabilitation Act"); *Conneen v. MBNA America Bank, N.A.,* 334 F.3d 318, 330 n.13 (3d Cir.
71   2003) (noting that a precedent concerning the duty under the Rehabilitation Act of the employer
72   and employee to engage in an interactive process "applies with equal force to accommodations
73   under the ADA"); *Deane v. Pocono Medical Center,* 142 F.3d 138, 149 n.13 (3d Cir. 1998) (en
74   banc) (explaining in an ADA employment-discrimination case that "interpretations of the
75   Rehabilitation Act's 'reasonable accommodation' provisions are relevant to our analysis of the
76   ADA and vice versa because in 1992, Congress amended the section of the Rehabilitation Act
77   defining 'reasonable accommodation' to incorporate the standards of the ADA" (citing *Mengine
78   v. Runyon,* 114 F.3d 415, 420 & n.4 (3d Cir. 1997) (in Rehabilitation Act case brought against a
79   federal employer, quoting 29 U.S.C. § 794(d))). These ADA instructions can therefore be adapted
80   for use in a case involving an employment-discrimination claim brought under the Rehabilitation
81   Act.

82   *The ADA's association provision*

83   Chapter 9 does not include an instruction specifically dealing with claims under 42 U.S.C.
84   § 12112(b)(4), which defines "discriminat[ion] against a qualified individual on the basis of
85   disability" to include "excluding or otherwise denying equal jobs or benefits to a qualified
86   individual because of the known disability of an individual with whom the qualified individual is
87   known to have a relationship or association."   For a discussion of such claims, see *Erdman v.
88   Nationwide Ins. Co.*, 582 F.3d 500, 510-11 (3d Cir. 2009).

89   *Religious Entities; Ministerial Exception*

90   Religious entities sued under Subchapter I of the ADA may assert two statutory defenses
91   set out in 42 U.S.C. § 12113(d).   But retaliation claims under 42 U.S.C. § 12203(a) arise under
92   Subchapter IV of the ADA, which does not contain such defenses.

93   Apart from those statutory defenses, the First Amendment's religion clauses give rise to an
94   affirmative defense that "bar[s] the government from interfering with the decision of a religious
95   group to fire one of its ministers." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
96   132 S. Ct. 694, 702, 709 n.4 (2012) (applying this defense to an ADA retaliation claim).   For
97   further discussion of the ministerial exception, see Comment 5.0.

98   *Scope of Chapter*

99   These model instructions address the elements of ADA employment claims and defenses;
100   pertinent definitions; and questions of damages.   The commentary is designed to explain the
101   drafting of the model instructions and generally does not focus on other procedural matters.[2]

---

[2] Administrative-exhaustion requirements provide one example.   As to employment

*Last updated October 2018*

**9.0   ADA Employment Claims – Introductory Instruction**

claims, the ADA incorporates a number of remedies and procedures from Title VII. *See* 42 U.S.C. § 12117(a) ("The powers, remedies, and procedures set forth in sections 2000e-4, 2000e-5, 2000e-6, 2000e-8, and 2000e-9 of this title shall be the powers, remedies, and procedures this subchapter provides to the Commission, to the Attorney General, or to any person alleging discrimination on the basis of disability in violation of any provision of this chapter, or regulations promulgated under section 12116 of this title, concerning employment."). Among those procedures is a requirement of administrative exhaustion. *See* 42 U.S.C. § 2000e-5; *see also* 1 MERRICK T. ROSSEIN, EMPLOYMENT DISCRIMINATION LAW AND LITIGATION § 11:1.50 (online edition updated June 2018) (discussing the plaintiff's option to await the outcome of the administrative proceeding or to obtain a "right-to-sue" letter prior to that outcome); *Williams v. Pennsylvania Human Relations Comm'n*, 870 F.3d 294, 298 (3d Cir. 2017) (discussing administrative-exhaustion requirement as applied to ADA employment-discrimination and Title VII claims).

"In Title VII actions, failure to exhaust administrative remedies is an affirmative defense in the nature of statute of limitations…. Because failure to exhaust administrative remedies is an affirmative defense, the defendant bears the burden of pleading and proving that the plaintiff has failed to exhaust administrative remedies." *Williams v. Runyon*, 130 F.3d 568, 573 (3d Cir. 1997). In *Williams*, which involved the distinctive exhaustion requirement set by 29 C.F.R. § 1614.105 for suits by federal employees, the Court of Appeals evinced the view that the question of exhaustion could properly be submitted to the jury. *See id.* ("By failing to offer any evidence to the jury on an issue upon which he carried the burden of proof, the Postmaster effectively waived his affirmative defense."). The Court of Appeals has not applied *Williams* to address the judge/jury division of labor in a case involving the more general exhaustion provisions in Section 2000e-5, but at least one other Court of Appeals has held that the questions to which a jury trial right attaches include "the defense in a Title VII case of having failed to file a timely administrative complaint." *Begolli v. Home Depot U.S.A., Inc.*, 701 F.3d 1158, 1160 (7th Cir. 2012). *Compare Small v. Camden Cty.*, 728 F.3d 265, 269, 271 (3d Cir. 2013) (holding that compliance with the exhaustion requirement set by the Prison Litigation Reform Act presents a question that can be resolved by the judge).

In the event that a dispute over exhaustion presents a jury question, the court may wish to submit relevant interrogatories to the jury. As of this time, the Committee has not prepared a model instruction on exhaustion. The Committee welcomes feedback from users of the model instructions concerning the need for, and appropriate nature of, such a model instruction.

6

*Last updated October 2018*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**


Civil Action No. __-cv_____-CMA

_____,

      Plaintiff,

v.

_____,

      Defendant.

_____

**JURY INSTRUCTIONS**
_____

1

**INSTRUCTION NO. 10**
**Corporate Party's Agents and Employees**


A corporation or governmental agency may act only through natural persons who are its agents or employees. Generally, any agents or employees of a corporation or governmental agency may bind the corporation by their acts and declarations made while acting within the scope of their authority delegated to them by the corporation or governmental agency, or within the scope of their duties as employees of the corporation or governmental agency.

## INSTRUCTION NO. 11
## EXPERT WITNESS

The rules of evidence ordinarily do not permit witnesses to testify as to opinions or conclusions. There is an exception to this rule for "expert witnesses." An expert witness is a person who by education and experience has become expert in some art, science, profession, or calling. Expert witnesses give their opinions as to matters in which they profess to be expert, and may also state their reasons for their opinions.

You should consider each expert opinion received in evidence in this case, and give it such weight as you think it deserves. If you should decide the opinion of an expert witness is not based upon sufficient education and experience, or if you should conclude the reasons given in support of the opinion are not sound, or if you feel the expert's opinion is outweighed by other evidence, you may disregard the opinion entirely.

Model Final Jury Instructions (Civil), J. Christine Arguello (D. Colo.), Instruction Nos. 10, 11