**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 16-cv-2304-WJM-GPG

MEGAN MCFADDEN,
LONNIE WHITE, and
ANTONIO "A.J." WHITE,

      Plaintiffs,

v.

MEEKER HOUSING AUTHORITY,

      Defendant.

---

**ORDER DISCHARGING ORDER TO SHOW CAUSE
AGAINST MR. STEPHEN L. BAITY**

---

      Plaintiff Megan McFadden previously resided in the federally subsidized Karen Court apartment complex in Meeker, Colorado.  Plaintiffs Lonnie and A.J. White also previously resided in Karen Court.  All Plaintiffs claim that Defendants discriminated against them in violation of § 504 the Rehabilitation Act of 1973 ("Rehabilitation Act" or "§ 504"), 29 U.S.C. § 794, and the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601 *et seq.*, based on Defendants' policy barring them from keeping therapy pets in their Karen Court apartments absent onerous conditions.  Plaintiffs originally sued Meeker Housing Authority ("MHA") and various individual defendants, but through voluntary dismissals and summary judgment, the only remaining defendant is MHA.  (*See* ECF Nos. 242, 244, 443.)

      After two-and-a-half years of discovery disputes, accusations of wrongdoing, and near-constant motion practice, the parties have reached a settlement that "will finally

and fully resolve all remaining claims in this action." (ECF No. 498.) Independent of that settlement, however, is an outstanding Order to Show Cause why one of Defendants' former attorneys, Mr. Stephen L. Baity, should not be required to pay certain costs and fees Plaintiffs incurred as part of particular discovery efforts that yielded documents MHA should have produced through its own efforts. *See McFadden v. Meeker Hous. Auth.*, 2018 WL 3348882 (D. Colo. July 9, 2018) (ECF No. 376). The Court has reviewed Mr. Baity's response. (ECF Nos. 398–99.) As the Court will explain below, the unique timeline of the relevant discovery dispute demonstrates that Mr. Baity did not act sanctionably. The Order to Show Cause will therefore be discharged.

## I.  LEGAL STANDARD

The Court's order to show cause arose from Mr. Baity's apparent failure to supervise his clients' discovery efforts. (ECF No. 376 at 11, 12.)[1] The basis for sanctions in such a situation is Federal Rule of Civil Procedure 26(g):

> (1) Every disclosure under Rule 26(a)(1) or (a)(3) and every discovery request, response, or objection must be signed by at least one attorney of record in the attorney's own name . . . . By signing, an attorney . . . certifies that to the best of [his or her] knowledge, information, and belief formed after a reasonable inquiry:
>
> > (A) with respect to a disclosure, it is complete and correct as of the time it is made . . . .
>
> * * *
>
> (3) If a certification violates this rule without substantial justification, the court, on motion or on its own, must impose an appropriate sanction on the signer, the party on whose behalf the signer was acting, or both. The sanction may include an order to pay the reasonable expenses, including

---

[1] All ECF page citations are to the page number in the CM/ECF header, which does not always match the document's internal pagination, particularly when citing the parties' exhibits.

attorney's fees, caused by the violation.

Commenting on this rule, the Advisory Committee on Rules of Civil Procedure stated

that

> [t]he duty to make a "reasonable inquiry" is satisfied if the investigation undertaken by the attorney and the conclusions drawn therefrom are reasonable under the circumstances. It is an objective standard similar to the one imposed by Rule 11. In making the inquiry, the attorney may rely on assertions by the client and on communications with other counsel in the case as long as that reliance is appropriate under the circumstances. Ultimately, what is reasonable is a matter for the court to decide on the totality of the circumstances.

> Rule 26(g) does not require the signing attorney to certify the truthfulness of the client's factual responses to a discovery request. Rather, the signature certifies that the lawyer has made a reasonable effort to assure that the client has provided all the information and documents available to him that are responsive to the discovery demand.

Fed. R. Civ. P. 26 advisory committee's note to 1983 Amendments (citations omitted).

The Court need not find bad faith to find a Rule 26(g) violation. *St. Paul Reinsurance Co. v. Commercial Fin. Corp.*, 198 F.R.D. 508, 516 (N.D. Iowa 2000). However, "[a]s with Rule 11 sanctions, the court must avoid hindsight and resolve all doubts in favor of the signer." *Bergeson v. Dilworth*, 749 F. Supp. 1555, 1566 (D. Kan. 1990).

Rule 26(g) disputes may be resolved on a summary record. *See* Fed. R. Civ. P. 26 advisory committee's note to 1983 Amendments ("To prevent the proliferation of the sanction procedure and to avoid multiple hearings, discovery in any sanction proceeding normally should be permitted only when it is clearly required by the interests of justice.").

## II.  FACTUAL FINDINGS

Drawing from the entire record in this case, including Mr. Baity's response, the Court makes the following factual findings.

### A.  Early Interactions with MHA

Plaintiffs filed this lawsuit on September 13, 2016.  Mr. Baity, who is based in Denver, made the approximately 4.5-hour drive to Meeker on October 5, 2017, and there met with Stacie Kincher, who was MHA's executive director and property manager at Karen Court—and who was, at the time, also an individual defendant in this lawsuit. (ECF No. 398-1 ¶ 14.)  Mr. Baity explained the litigation process and instructed Kincher to preserve documents and information that might be relevant to the case.  (*Id.* ¶ 15.)  In subsequent phone calls with Kincher (and sometimes other individual defendants) on October 10, 13, and 19, and November 1, 2016, Mr. Baity discussed the defendants' discovery obligations and the importance of searching diligently for responsive documents.  (*Id.* ¶¶ 17–20, 22.)

Through these meetings, Mr. Baity discerned that Kincher "was the person most familiar with MHA's day-to-day operations, and that she conducted all of MHA's business on a single computer located at the MHA offices."  (*Id.* ¶ 25.)  Given Kincher's role as executive director and her familiarity with day-to-day operations, Mr. Baity and his paralegal, Ms. Tia Andrews Beeby, relied on Kincher as the "point person at MHA for searching for and gathering relevant documents responsive to Plaintiffs' discovery requests. . . .  Ms. Kincher was familiar with the computer's contents, and in the best position to conduct searches on that computer for information relevant to the lawsuit." (*Id.* ¶ 26; *see also* ECF No. 398-56 ¶ 14.)

### B.    First Disputes

Plaintiffs and MHA exchanged their Rule 26(a)(1) disclosures and began serving written discovery requests in the normal course.  The first inkling of a discovery dispute in the record is a December 20, 2016 letter from one of Plaintiffs' attorneys, Ms. Laura Wolf, to Mr. Baity, asserting that MHA's initial disclosures were inadequate compared to MHA's affirmative defenses and counterclaims, and demanding that MHA supplement its disclosures with supporting documents.  (ECF No. 301-1.)  Similar letters followed on March 6, 2017 (ECF No. 301-2), and April 14, 2017 (ECF No. 301-3).  The April 14 letter also emphasized Plaintiffs' Rule 34 request for production #14 ("RFP-14"), which Plaintiffs had previously served.  (*Id.* at 2.)  RFP-14 sought communications between MHA and two government agencies, the U.S. Department of Housing & Urban Development ("HUD") and the Colorado Housing & Finance Authority ("CHFA").  MHA had responded that it "has not had communications with HUD or CHFA" responsive to RFP-14, and Ms. Wolf asserted, without elaboration, that "Plaintiffs have every reason to believe that this unverified statement is inaccurate." (*Id.*)

### C.    Allegations of Missing and Altered Documents

By letter to Mr. Baity dated May 18, 2017, Ms. Wolf raised new discovery concerns.  (ECF No. 301-7.)  Ms. Wolf had reviewed documents disclosed by MHA and noted that those documents referenced or implied the existence of other documents not disclosed.  (*Id.* at 1.)  Ms. Wolf therefore requested disclosure of those other documents (*e.g.*, "Ms. Kincher's email to Mr. McKenzie prompting the email found at [the document Bates-labeled] MHA 122"; "Slideshow attachment referenced in MHA 177–178 as well as the undisclosed page 3").  (*Id.*)

In the same letter, Ms. Wolf announced that Plaintiffs had "reason to believe that

a number of documents [produced by MHA] in this case have been altered, back-dated, or are otherwise inauthentic." (*Id.* at 2.)  Ms. Wolf provided the Bates numbers for the documents in question.  (*Id.*)  No party has directly described to the Court what those documents are, but the Court has gleaned from later filings that Plaintiffs were disputing the authenticity at least of violation notices allegedly served on Plaintiffs by MHA, and of photographs allegedly showing the filthy state of Plaintiff McFadden's apartment upon move-out.  (*See* ECF No. 288 at 11–16.)  Ms. Wolf requested "to inspect the devices on which [the disputed] documents were created and produced in order to obtain metadata by which to determine the documents' creation dates and authenticity . . . .  Please provide us with dates in June 2017 on which our forensic team can inspect the devices." (ECF No. 301-7 at 2.)

By letter to Mr. Baity dated May 22, 2017, Ms. Wolf transmitted supplemental disclosures, including

> a lengthy packet of information dated January 23, 2012 that former MHA Board member Robert Barr provided directly to [then-]Defendants Buckler, George, and Parker . . . .  These documents establish that MHA Defendants have been on notice since at least January 2012 of their duties under federal law with respect to the provision of reasonable accommodations relating to assistance animals.

(ECF No. 301-5 at 1.)  Ms. Wolf declared it "incredibly troubling that MHA Defendants never disclosed this document to Plaintiffs," and likened it to the RFP-14 dispute over communications between MHA and HUD/CHFA.  (*Id.*)  Ms. Wolf referenced MHA's "fail[ure] to disclose the e-mails exchanged between Mr. McKenzie [MHA's outside consultant on fair housing requirements] and CHFA [regarding matters pertaining to the events at issue in the lawsuit]."  (*Id.*)  At some point—it is unclear precisely when— Plaintiffs themselves obtained these McKenzie-CHFA e-mails through requests directly

6

to CHFA.  (*See* ECF No. 190 at 1–2.)  Ms. Wolf also re-raised MHA's failure to disclose information supporting its defenses and counterclaims.  (ECF No. 301-5 at 1.)

The next day (May 23, 2017), Plaintiffs disclosed more e-mails between McKenzie and CHFA that Plaintiffs had obtained through their own efforts.  (*See* ECF No. 301-6.)  In the cover letter accompanying that disclosure, Ms. Wolf also highlighted a separate document (apparently already disclosed) that references an e-mail between HUD and Kincher.  (*Id.* at 1.)  Ms. Wolf pointed out that such an e-mail would be responsive to Plaintiffs' discovery requests but had never been disclosed.  (*Id.*)

On May 25, 2017, Mr. Baity responded to Ms. Wolf's May 18, 2017 letter.  (*See* ECF No. 399-43.)  As to the various documents that supposedly implied the existence of other documents, Mr. Baity variously responded that no additional documents exist, that MHA was still searching, or that responsive documents had already been disclosed. (*Id.* at 2–3.)  As for Plaintiffs' request to forensically inspect MHA's digital devices, Mr. Baity "object[ed] to this request to the extent that it is overbroad and unduly burdensome.  Plaintiffs' allegation that documents have been 'altered, back-dated, or are otherwise inauthentic' is unfounded."  (*Id.* at 3.)

## D.     First Hearing Before Judge Gallagher and the Forensic Protocol

The parties presented their discovery disputes (including several disputes not mentioned above, which are irrelevant for present purposes) to U.S. Magistrate Judge Gordon P. Gallagher in a hearing held on June 6, 2017.  (*See* ECF No. 167.) Regarding the RFP-14 dispute, Judge Gallagher called for briefing on whether the RFP's demand for communications between MHA and HUD/CHFA imposed an obligation on MHA to look for communications between McKenzie and those entities. (*Id.* at 1.)  As for "looking at meta-data in documents, and only those documents, listed

in a letter from Plaintiffs to Defendants dated May 18, 2017," Judge Gallagher announced that the parties were going to further confer.  (*Id*. at 2.)  Thus, that dispute was "continued to such time as the parties have further need of the court's assistance." (*Id*.)

The next day (June 7, 2017), Ms. Wolf sent an e-mail to Mr. Baity that appears to be part of the ongoing conferral Judge Gallagher noted.  (ECF No. 399-44.)  She re-listed the Bates numbers of the documents in question, and added an additional document to that list.  (*Id*. at 2.)  The additional document was an e-mail that appears to have an attachment, but Mr. Baity had previously represented "that no attachment can be found."  (*Id*.)  In that light, Ms. Wolf "request[ed] to inspect this email [also]."  (*Id*.)

On June 12, 2017, Plaintiffs submitted a brief to Judge Gallagher regarding the RFP-14 question.  (*See* ECF No. 190 at 12.)  Plaintiffs argued that when McKenzie was communicating on MHA's behalf, he was acting as MHA's agent and therefore MHA should be considered in the possession, custody, or control of those e-mails between McKenzie and HUD or CHFA.  (*Id*. at 4–8.)  Plaintiffs also cited the January 2012 packet they had obtained from Barr (the former board member) and the attachment-less e-mail as evidence of MHA's supposed unwillingness to search for responsive documents.  (*Id*. at 8–10.)

That same day, the parties conferred in person over their various disputes.  (ECF No. 398-1 ¶ 42.)  Concerning Plaintiffs' desire to forensically inspect digital files, Mr. Baity apparently withdrew his opposition and agreed to provide "[d]ates in July" for such inspection, while Ms. Wolf agreed to "provide the protocol for [Plaintiffs'] forensic experts' inspection."  (ECF No. 399-45 at 2.)

Another of Plaintiffs' attorneys, Mr. Siddartha Rathod, sent that protocol by e-mail to Mr. Baity on June 21, 2017.  (ECF No. 399-46.)  In the protocol, Forensic Pursuit (Plaintiffs' digital forensics vendor) requested that it be permitted to create a bit-for-bit complete image of the MHA computer's hard drive so Forensic Pursuit could "examine deleted space and system files . . . to compare [each] document's changes over time." (*Id.*)  Mr. Baity agreed to this protocol.  (ECF No. 398-1 ¶ 123.)

### E.   Allegations of Withheld Documents and Second Hearing Before Judge Gallagher

By this time, Mr. Baity or Ms. Beeby had communicated with Kincher, by phone or e-mail, regarding searching for documents, responding to written discovery, or responding to Plaintiffs' letters at least twenty-five times since January 2017—once in January (ECF No. 398-1 ¶ 52), once in February (*id.* ¶ 56), once in March (*id.* ¶ 63), eleven times in April (*id.* ¶¶ 67, 69, 76–78, 83, 87–88), five times in May (*id.* ¶¶ 90, 92–93, 95, 100), and six times in June (*id.* ¶¶ 101, 104–05, 107–08; *see also* ECF No. 398-56 ¶¶ 14, 16).  Ms. Beeby, in phone calls with Kincher, would emphasize the need to search for and produce all responsive documents.  (*Id.* ¶ 17.)  Mr. Baity and Ms. Beeby relied on Kincher's assurances that she had conducted a thorough search.  (ECF No. 398-1 ¶¶ 28, 49, 50, 126; ECF No. 398-56 ¶¶ 18, 20.)  Mr. Baity, in particular, considered Kincher's representations regarding the limited number of documents discovered to be credible in part because some of the former defendants informed him that MHA business was not conducted by e-mail, which appeared to be a reasonable assertion given that Meeker is a town with less than 2,500 residents.  (ECF No. 398-1 ¶ 29.)  And, in any event, Kincher's efforts had, by June, yielded about 1,900 pages of responsive documents.  (*Id.* ¶¶ 59–60, 75, 79, 84, 91, 106.)

9

Nonetheless, on July 5, 2017, Plaintiffs learned of "hundreds of pages" of additional documents that they believed should have already been disclosed by Defendants.  (ECF No. 301 at 4; ECF No. 301-9 at 1–2.)  These were e-mails Plaintiffs obtained through a subpoena directed to McKenzie, showing that McKenzie had corresponded with "MHA Defendants" about the issues in this lawsuit—as contrasted to a representation from MHA that only one e-mail had been exchanged between itself and McKenzie.  (*Id.*)  The attorneys for both sides discussed this latest development and Mr. Baity either offered or agreed to permit Plaintiffs' forensics vendor to search for responsive documents of any kind on the hard drive image that the vendor was planning to obtain anyway for purposes of investigating the authenticity of particular documents. (*See* ECF No. 301 at 4; ECF No. 398-1 ¶ 125.)

The parties appeared before Judge Gallagher on July 10, 2017, to seek his rulings on their ongoing disputes.  In that hearing, Mr. Rathod accused MHA of intentionally withholding relevant evidence, and he highlighted the recently discovered McKenzie e-mails as a salient example.  (ECF No. 399-8 at 5.)  Mr. Baity responded by characterizing the prior hearing before Judge Gallagher (*i.e.*, the June 6 hearing described above) as already authorizing Plaintiffs to search MHA's computer:

> You've already addressed this issue once, and you've given the plaintiffs the green light to come up and do a search of metadata on the documents that they thought they received. We have not—we initially objected to it, but after the Court's order, we had told them that they can come up and do their inspection whenever they feel like they want to do that.  We have given them dates including any time after July 10 to (unintelligible).  They've done nothing in this regard.
>
> I believe the Court has already addressed this issue once by saying, If you think there are documents missing, you can come up and look at our computers, run your metadata search, and see if you can find any documents.

> With respect to the one email in question, I have asked
> Ms. Kincher, and she said she did not have that document
> when I asked her for the documents.  Why she doesn't have
> that, I don't have a good explanation for.
>
> But certainly to the extent that it may have been eliminated
> by her somehow or—certainly they can go up and do the
> metadata search that they want to do and determine if there
> are documents that have been deleted, changed, discarded,
> whatever they want to do.
>
> And so I think that's the remedy that the Court has already
> given them.  So what they're doing now is not really seeking
> a remedy.  If they believe there are documents missing, they
> have the mechanism available, that the Court's already
> given them, to address the problem.

(*Id.* at 5–6.)  As the argument over this topic continued and Mr. Rathod threatened to

move for spoliation sanctions, Mr. Baity added:

> This is a limited sized computer.  This is not a big system.
> It shouldn't take tens of thousands of dollars to look at this
> system.  Come up, take a look at it, if you think you find
> something, we'll address it.
>
> As far as now seeking a motion for sanctions, I don't know
> what sanctions they could seek.  They've got the documents.
> If they find additional documents, I think we can talk about it.
> But at this point in time, Your Honor, I think you've set out
> mechanism to address the problem they're bringing up, and I
> think they should have exercised the approach that they've
> already outlined for you.

(*Id.* at 6–7.)  Mr. Rathod replied that "we do intend to still go up to Meeker to look at the

documents, to find out what's missing, and to try to figure out from these computers

what dates documents were altered on.  So we intend to do that because we believe

there's more."  (*Id.* at 7.)  Judge Gallagher accordingly described the issues of spoliation

and sanctions as "premature" and made no ruling on the matter: "It sounds like we'll

know more here within the next month or so on that issue" (*i.e.*, after the forensic

examination).  (*Id.*)

11

**F.     Ms. Kincher's Deposition**

On July 18, 2017—before Forensic Pursuit traveled to Meeker to image MHA's

hard drive—Plaintiffs deposed Kincher.  During that deposition, Plaintiffs' counsel and

Kincher had the following exchange:

> Q.     You understand that the discovery obligation is for
> you to produce the documents in your possession, correct?
>
> A.     Yes.
>
> Q.     You understand that some documents I can try to get
> from other sources, correct?
>
> A.     Yes.
>
> Q.     But if you have the document, you still have to
> produce it?
>
> A.     Okay.
>
> Q.     Do you understand that?
>
> A.     Okay.  Okay.  Yes.
>
> Q.     Did you not understand that prior to today?
>
> A.     Probably not.
>
> Q.     So you didn't understand that if you had documents
> related to a document request in this case, that you had to
> produce it?
>
> A.     Yeah.  And—no.  I didn't understand, no.
>
> Q.     Today's the first day that's been explained to you?
>
> A.     Well, yes, in that—in-depth like that, yes.

(ECF No. 288-4 at 15–16.)  Later in that same deposition, Plaintiffs' counsel returned to

a similar topic:

> Q.     Do you know what the duty to preserve is?
>
> A.     I have now learned what that is.

Q.      Have you ever heard that term before today?

A.      Yes, I have.

Q.      Okay.  And you've been notified of your duty to preserve?

A.      Yes.

Q.      And you've been aware since the start of this litigation that you have a duty to preserve documents?

A.      Yes.

Q.      And you have a duty to preserve electronically-stored information?

A.      Yes.

(ECF No. 399-57 at 5.)

## G.    Forensic Findings

Forensic Pursuit conducted its site visit in Meeker on July 25, 2017, and performed additional work to retrieve e-mails (remotely) through August 3, 2017.  (ECF No. 288-27 at 3.)  It issued its report to Plaintiffs' counsel on October 2, 2017.  (*Id.* at 1.) The report announced that Forensic Pursuit had located numerous files responsive to Plaintiffs' discovery requests which had not been previously disclosed.  (*See generally id.*)

On October 5, 2017, Plaintiffs disclosed to MHA the documents gleaned from Forensic Pursuit's efforts.  (ECF No. 303 at 4.)  On October 9, 2017, Mr. Rathod e-mailed Mr. Baity to confer regarding a motion Plaintiffs planned to file "seeking an entry of judgement against the defendants based upon [among other things] the thousands of pages of undisclosed documents [discovered by Forensic Pursuit]."  (ECF No. 399-47 at 3.)  Unsurprisingly, Mr. Baity opposed.  (*Id.* at 2.)

### III.  PROCEDURAL BACKGROUND

Plaintiffs filed their Motion for Entry of Judgment and Dismissal Due to Defendants' Litigation Misconduct ("Sanctions Motion") on October 30, 2017.  (ECF No. 288.)  Plaintiffs accused MHA of "fail[ing] to disclose 258 pertinent documents comprising 2,078 pages of discovery."  (*Id.* at 4.)[2]  Plaintiffs also variously accused MHA, the other defendants (now former defendants), and Mr. Baity of "express refusal to comply with their discovery obligations," improper expert witness coaching, fabricating documents, and testifying falsely in depositions.  (*Id.* at 7–18.)

After briefing on the Sanctions Motion was complete, but before the Court could rule, Mr. Baity withdrew as counsel for MHA.  (ECF Nos. 356–58.)

The Court ruled on the Sanctions Motion in July 2018.  (ECF No. 376.)  The Court found a few of Plaintiffs' accusations substantiated but that most presented factual disputes.  The Court therefore ruled that Plaintiffs' requested sanction—striking MHA's answer, affirmative defenses, and counterclaims, and entering default judgment against it—was unjustified.  The Court *sua sponte* considered alternative sanctions, including, as relevant here, holding Mr. Baity personally liable for some of Plaintiffs' discovery expenses.  Regarding Mr. Baity, the record then before the Court prompted the following conclusions:

> If the instant motions practice demonstrates anything, it is, *at least*, that Mr. Baity approached the discovery process with an inexcusable lack of diligence.  In particular, he made no effort to ensure that his clients took their discovery obligations seriously.  Because Plaintiffs' attorneys ended up doing Mr. Baity's work for him, Plaintiffs suffered prejudice in

---

[2] It is not clear whether Plaintiffs' "258 documents" statistic is inclusive of documents they discovered through their non-forensic efforts (*e.g.*, the subpoena to McKenzie) or if it refers solely to what they found through forensic imaging.

time and expense.

\* \* \*

As for the remainder of the prejudice Plaintiffs suffered [*i.e.*, apart from one instance of false testimony from Kincher], the Court, on this record, can only say that Mr. Baity bears culpability.  Again, he made no effort to ensure that his clients took their discovery obligations seriously, and he himself took a systematic foot-dragging approach to the discovery process.

\* \* \*

[In the alternative to Plaintiffs' requested sanctions], the Court will consider whether Mr. Baity should be held personally responsible for Plaintiffs' attorneys' fees and costs related to the forensic imaging process, and incurred in connection with the Motion.  Because Mr. Baity was not warned ahead of time that this might be a possible outcome, the Court will not decide whether to award those fees and costs without first giving him an opportunity to be heard.  The Court will therefore order him to show cause why fees and costs should not be awarded against him as a sanction for his failure to take his discovery responsibilities seriously.

*McFadden*, 2018 WL 3348882, at \*6 (emphasis in original).  Specifically, the Court ordered Mr. Baity to show cause "why he should not be ordered to pay Plaintiffs' reasonable attorneys' fees and costs related to Plaintiffs' efforts to forensically image the Meeker Housing Authority computer and to search within and produce the documents so obtained, and incurred in connection with the [Sanctions] Motion."  *Id.* at \*7.

In response, Mr. Baity, through counsel of his own, submitted legal argument (ECF No. 398), an affidavit from himself (ECF No. 398-1), an affidavit from Ms. Beeby (ECF No. 398-56), and numerous supporting exhibits.

## IV.  ANALYSIS

This lawsuit has been riddled with problems.  From the Court's perspective, the

basic driver of those problems was a vast mismatch in the intensity with which the opposing lawyers pursued their claims and defenses.  Mr. Baity appears to have viewed the case as a small-town dispute about three plaintiffs, two cats, one dog, and an honest misunderstanding.  Plaintiffs' attorneys, by contrast, litigated with fight-everything, no-motion-left-behind tactics the Court normally only sees from white shoe defense firms representing Fortune 500 companies.  Mr. Baity seems to have never fully reconciled himself to Plaintiffs' counsel's approach and its effect of forcing the lawsuit to a level of granularity not often seen outside of high-dollar disputes.

However, as far as the Court is aware, "intensity mismatch" is not sanctionable. In any event, the Order to Show Cause only contemplates holding Mr. Baity responsible for failing to properly supervise his client's discovery efforts and, by extension, failing to discover and produce the many responsive documents Plaintiffs ultimately discovered through the forensic search.  Having received a much fuller record regarding the relevant events, the Court finds that its inquiry is narrower than it appeared in the Sanctions Motion, and that the resolution turns heavily on a what-happened-when inquiry.

**A.  Did Mr. Baity Reasonably Come to Rely on Kincher in the Early Stages of the Case?**

The Court finds that Mr. Baity acted reasonably at the outset of the lawsuit in concluding that Kincher should be his primary point of contact, and choosing to rely on her to search for discoverable documents.  Of course, Mr. Baity could have brought a paralegal, a scanner, and a forensic vendor to Meeker at the beginning of the case and copied all of MHA's files (paper and electronic), sent those copies to another vendor to create text-searchable images, and then loaded everything onto a sophisticated

e-discovery review platform (likely hosted by yet another vendor) for review and possible production.  But Mr. Baity also could reasonably have concluded that such an expensive approach was not "proportional to the needs of the case."  Fed. R. Civ. P. 26(b)(1).

The Court also accepts at face value Mr. Baity's (and Ms. Beeby's) representations that they adequately instructed Kincher about her preservation and discovery duties.  Although Kincher's deposition testimony on this topic was equivocal (*see* Part II.F, above), the Court also recognizes that deponents regularly forget things under pressure, or get confused.  Kincher's confusion was somewhat understandable considering that Mr. Rathod first began asking her about whether she understood that her duty to disclose specifically included documents that Plaintiffs might also be able to find elsewhere, and then, while seeming to pursue the same topic, he jumped to a broader question about the duty to disclose generally.  When Kincher gave her answers, it is unclear whether she had in mind the general duty to disclose or the more specific duty to disclose documents that might also be discoverable elsewhere.

In this light, the question is whether there came a point where Mr. Baity could no longer have reasonably relied on Kincher's representations that what she found was all she could find.  In other words, at what point does Rule 26(g) obligate a lawyer to question his or her client's representations about the completeness of discovery responses?

Given the Advisory Committee's analogizing of Rule 26(g) to Rule 11, *see* Fed. R. Civ. P. 26 advisory committee's note to 1983 Amendments, courts applying Rule 26(g) have drawn upon Rule 11 jurisprudence for guidance, *see, e.g.*, *Bergeson*, 749

F. Supp. at 1566.  The Third Circuit's reasoning when reviewing a sanction imposed under Federal Rule of Bankruptcy Procedure 9011 (substantially equivalent to Federal Rule of Civil Procedure 11) is persuasive regarding the point at which a lawyer can no longer reasonably rely on a client's representations:

> [A] lawyer need not routinely assume the duplicity or gross incompetence of her client in order to meet the requirements of Rule 9011.  It is therefore usually reasonable for a lawyer to rely on information provided by a client, especially where that information is superficially plausible and the client provides its own records which appear to confirm the information.

*In re Taylor*, 655 F.3d 274, 284 (3d Cir. 2011).  But "ignor[ing] clear warning signs as to the accuracy of the data that [the attorney] receive[s]" may support a sanction.  *Id.* at 285.

### B.   Did Mr. Baity Have "Clear Warning Signs" that Kincher Was Not Fulfilling Her Responsibilities?

Forensic Pursuit ultimately revealed that Kincher had not found everything she should have found—whether through intent or incompetence is still unclear.  The Court must determine when, precisely, Mr. Baity reasonably should have suspected that Kincher could not be relied upon to search thoroughly for responsive information.

Ms. Wolf's discovery dispute letters sent between December 2016 and April 2017 (*see* Part II.B, above) did not reasonably raise any such suspicion, for at least four reasons.  First, discovery was still in its infancy in this case.  Second, Ms. Wolf's primary accusation was a general failure to produce the sorts of documents Ms. Wolf was expecting to see if MHA's affirmative defenses and counterclaims had any evidentiary support, and she was threatening to move to strike the affirmative defenses and counterclaims.  This sort of accusation—what the opposing attorney expects to see

about your own claims and defenses before she moves to strike them—is not the sort of accusation that naturally leads an attorney to suspect that his or her client is not adequately searching for documents.  On its face, it appears to be a question more of litigation tactics than discovery diligence.  Third, the dispute over RFP-14 was, at this stage of the case, *not* a dispute about whether there existed more e-mails between MHA and HUD or CHFA, but whether MHA had a duty to obtain e-mails between its outside consultant, McKenzie, and HUD or CHFA.  In other words, this was a scope-of-agency question, not a potentially-missing-documents question.  Finally, although Kincher had not by then discovered many responsive documents, it was still reasonable for Mr. Baity not to suspect a lack of diligence.  Meeker is a small town and MHA is a small operation.

The first arguable sign that Kincher may have failed to perform an adequate search was Ms. Wolf's May 18, 2017 letter claiming that certain disclosed documents referenced or implied the existence of undisclosed documents.  (*See* Part II.C, above.)  Ms. Beeby contacted Kincher about this letter, and it is not clear whether Kincher re-initiated her search.  (*See* ECF No. 398-1 ¶ 95.)  But, considering the Court's duty to "avoid hindsight and resolve all doubts in favor of the signer," *Bergeson*, 749 F. Supp. at 1566, the Court finds that Ms. Wolf's accusations as of May 18, 2017 did not reasonably rise to a level at which Mr. Baity could no longer rely on Kincher.

The May 18 letter also contains an accusation—without explanation—that certain documents produced by MHA had been fabricated or back-dated.  That mere accusation likewise was not enough for a reasonable lawyer to suspect that his client was engaging in discovery misconduct, and particularly not enough to suspect a lack of

diligence in searching for responsive documents.  But, for purposes of the Court's later

analysis, it is important to note that Ms. Wolf announced an unequivocal intent to have

her vendor forensically inspect MHA's digital devices, and she demanded that Mr. Baity

supply dates on which that could happen.  In other words, Ms. Wolf did not *threaten* to

employ the forensic process *unless* MHA did something more.  From her perspective,

the only solution to the authenticity dispute was a forensic examination by her vendor,

and the only question was when.

Ms. Wolf's May 22, 2017 letter announced that she had obtained a January 2012

packet of relevant information from former MHA board member Robert Barr.  (*See* Part

II.C, above.)  But Ms. Wolf provided no basis for thinking that this five-year-old

document was something that any defendant still possessed or remembered, or that it

could still be found in MHA's files.

Finally, Plaintiffs announced on July 5, 2017, that their subpoena to McKenzie

had yielded numerous e-mails between him and MHA regarding matters relevant to the

lawsuit.  (*See* Part II.E, above.)  At that point, it was no longer an agency question

(which Judge Gallagher had yet to resolve) because these new e-mails were not

between McKenzie and a third party.  These were e-mails between McKenzie and MHA

that should have been in MHA's possession or control, and should have been

previously disclosed.  This was the first "*clear* warning sign[]," *Taylor*, 655 F.3d at 285

(emphasis added), that Kincher could not be relied upon to search for responsive

documents, particularly given her previous representation that she could only find one

e-mail between MHA and McKenzie.

**C.      Did Mr. Baity Fail in His Rule 26(g) Duties After Receiving a Clear Warning Sign of Kincher's Unreliability?**

The final question is what Mr. Baity had a duty to do as of early July 2017, when he received clear warning of Kincher's unreliability.  An attorney in this circumstance would typically have a duty to inquire of his or her client sternly and thoroughly and perhaps to seek the client's permission to have someone skilled in the discovery process (*e.g.*, the attorney him- or herself, a paralegal, or a vendor) perform an independent search in the client's files for responsive information.

However, Mr. Baity did not face a typical situation in early July 2017.  For not quite two months, Plaintiffs had been demanding to have a vendor forensically examine MHA's computer.  This was the method Plaintiffs had chosen to search for evidence of fabricating or back-dating documents, *before* there were clear warning signs of documents that simply had not been produced.  No party has suggested that Mr. Baity should have first hired his own forensic vendor to investigate the accusations of fabricating or back-dating, to save Plaintiffs the expense.  Indeed, given that Plaintiffs demanded at the outset of the authenticity dispute to investigate through their own vendor, it is difficult to imagine that Plaintiffs would have agreed to allow Mr. Baity to investigate on their behalf.

In addition, in late June 2017—also before there were clear warning signs of documents that simply had not been produced—the parties agreed that Forensic Pursuit could obtain a complete image of the MHA computer's hard drive.  (*See* Part II.D, above.)  So, by the time the McKenzie-MHA e-mails came to light, there was already a plan in place for a full forensic examination of MHA's computer. Consequently, Mr. Baity could reasonably propose that Plaintiffs expand the scope of

what they intended to search for within the complete hard drive image that they planned to obtain anyway.

Looked at from a different angle, what was the alternative to Mr. Baity's proposal?  Conceivably, Plaintiffs could have gone forward with their hard drive image solely to search for evidence of inauthentic documents, while Mr. Baity, more or less simultaneously, searched for electronic documents that Kincher had failed to discover. This approach might have been less expensive for Plaintiffs because, although the cost of obtaining a full image likely would have been the same either way, the cost of processing the data (*e.g.*, the vendor's labor costs) probably would have been lower. However, this you-search-for-one-thing-and-I'll-search-for-another approach would have been more complicated, and it is frankly difficult to imagine Plaintiffs' counsel agreeing to it.  In particular, it is difficult to imagine Plaintiffs' counsel agreeing under the circumstances to trust Mr. Baity to carry out the search with the thoroughness they would have required.

In sum, the Court ordered Mr. Baity to show cause "why he should not be ordered to pay Plaintiffs' reasonable attorneys' fees and costs related to Plaintiffs' efforts to forensically image the Meeker Housing Authority computer and to search within and produce the documents so obtained, and incurred in connection with the [Sanctions] Motion." *McFadden*, 2018 WL 3348882, at *7.  The Court has found that by the time Mr. Baity had a Rule 26(g) obligation to act, the forensic imaging process would have happened anyway, and it was within the bounds of reasonableness under Rule 26(g) to allow that process to play out first.  Accordingly, the Court cannot deem Mr. Baity responsible for requiring Plaintiffs' to expend time and resources that they

would not have otherwise expended on the forensic imaging process.  In this light, it follows that the Court also cannot hold Mr. Baity responsible for the costs of the Sanctions Motion.[3]

## D.   Final Remarks

The Court will discharge the Order to Show Cause, but the need for it likely could have been avoided if Mr. Baity had approached his response to the Sanctions Motion differently.  The Sanctions Motion revealed a serious problem—scores of relevant documents that Kincher had either overlooked, or perhaps even intentionally withheld. In the response brief to the Sanctions Motion, Mr. Baity made no attempt to explain how this could have happened.  Indeed, he never acknowledged that *anything* went wrong. The response brief instead displays a pervasive "what's the big deal?" attitude: "Plaintiffs have copied the hard drive and conducted the searches they chose.  They have the documents they contend support their claims and they obtained them using the methodology they wanted."  (ECF No. 294 at 5; *see also id.* at 9, 15, 20.)

The Court recognizes that the Sanctions Motion was a very aggressive tactic for Plaintiffs to have pursued, considering that Plaintiffs went directly for default judgment, entirely bypassing lesser sanctions (*e.g.*, fees and costs, exclusion of evidence, a spoliation instruction, etc.).  And, in places, the Sanctions Motion failed to fairly characterize the nature of the dispute.  *See, e.g.*, *McFadden*, 2018 WL 3348882, at *3 & n.2, *5.  But the Sanctions Motion nonetheless brought to light, at a minimum, Kincher's

---

[3] The Sanctions Motion addressed other topics, such as fabricated documents and false testimony, but no one has suggested that any of this is attributable to Mr. Baity.  To the extent the Sanctions Motion means to say that Mr. Baity did not adequately instruct the individual defendants (apart from Kincher) about their duties to preserve and disclose, the Court finds that Plaintiffs' evidence is equivocal and, in any event, that the claimed prejudice flowing specifically from that was minimal and not remediable through sanctions.

failure to produce numerous relevant documents in MHA's control.  Mr. Baity's choice to ignore the seriousness of this problem created the appearance of taking "no effort to ensure that his clients took their discovery obligations seriously," *id.* at *6, prompting the Order to Show Cause.  It will now be discharged, but the Court is dismayed by the deficiencies in Mr. Baity's cavalier approach to this protracted discovery dispute, prompting the need for its issuance in the first place.  But for the fact that the plan for the forensic imaging process was already in place before Mr. Baity could be charged with failing to heed a clear warning sign of Kincher's malfeasance or incompetence, the result would in all likelihood have been different.

## V.  CONCLUSION

For the reasons set forth above, the Court's Order to Show Cause dated July 9, 2018 (ECF No. 376) is DISCHARGED.

Dated this 21st day of May, 2019.

BY THE COURT:

William J. Martinez
United States District Judge